

**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

**Court of Common Pleas**

**New Case Electronically Filed:**
**May 15, 2018 08:42**

By: F. ALLEN BOSEMAN 0084103

Confirmation Nbr. 1384487

| | |
|---|---|
| IAN COOPERSTEIN, ET AL. | CV 18 897744 |
| vs. | |
| TRAGIC HERO MUSIC GROUP, INC., ET AL. | **Judge:** KATHLEEN ANN SUTULA |

**Pages Filed:** 17

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| | : | |
| IAN COOPERSTEIN | : | |
| 2714 S. McClelland Road | : | CASE NO. |
| Salt Lake City, UT 84106 | : | |
| | : | JUDGE |
| and | : | |
| | : | |
| BRYAN LEE | : | |
| 162 E. 2185 Street | : | **COMPLAINT** |
| Salt Lake City, UT 84115, | : | |
| | : | **(Jury Demand Endorsed)** |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| TRAGIC HERO MUSIC GROUP, INC. | : | |
| 2230 Superior Avenue East, Floor 1 | : | |
| Cleveland, OH 44114 | : | |
| | : | |
| and | : | |
| | : | |
| TOMMY LACOMBE | : | |
| President | : | |
| Tragic Hero Music Group, Inc. | : | |
| 2230 Superior Avenue East, Floor 1 | : | |
| Cleveland, OH 44114, | : | |
| | : | |
| Defendants. | : | |

For their Complaint against Defendants Tragic Hero Music Group, Inc. ("Tragic Hero") and Tommy LaCombe ("LaCombe") (collectively referred to as "Defendants"), Plaintiffs Ian Cooperstein ("Cooperstein") and Bryan Lee ("Lee") (collectively referred to as "Plaintiffs"), by and through undersigned counsel, state and aver as follows:

## PARTIES

1.      Plaintiff Cooperstein is a resident of Salt Lake City, Utah.

2.      Plaintiff Lee is a resident of Salt Lake City, Utah

3.      Upon information and belief, Defendant Tragic Hero is an Ohio corporation with its principal place of business in Cleveland, Ohio, Cuyahoga County.

4.      Upon information and belief, Defendant LaCombe is one of the founders and owners of Tragic Hero and resides in the State of Virginia.

## VENUE

5.      Defendants transact business in Cleveland, Ohio, Cuyahoga County.

6.      Defendants supply services in Cleveland, Ohio, Cuyahoga County.

7.      Defendants conduct sales in Cleveland, Ohio, Cuyahoga County.

8.      Defendants regularly solicit business in Cleveland, Ohio, Cuyahoga County.

9.      Defendants derive substantial revenue from services rendered and sales conducted in Cleveland, Ohio, Cuyahoga County.

10.      Defendants operate and maintain a Tragic Hero office located at 2230 Superior Avenue East, Floor 1, Cleveland, Ohio 44114 in Cuyahoga County.

11.      A substantial portion of the material events alleged in this Complaint occurred in Cuyahoga County, Ohio.

12.      Therefore, personal jurisdiction is proper over Defendants pursuant to Ohio Revised Code §2307.382(A)(1)-(4).

2

13.     This Court has general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## FACTS

14.      Plaintiffs have extensive experience working in the music industry in many different capacities as solo artists, musicians, band members, writers, producers and directors, among other things.   Collectively, they also have valuable experience in management, business development, website design, booking and running tours, releasing albums, creating album art, distributing albums, merchandise design, retail sales, digital media marketing, social media campaigns, outreach and vendor acquisition.

15.     Lee began his career in the music industry in 2006 when he started a band – "Darling You Should Be Ashamed" ("DYSBA") – with his high school classmates.  As a member of DYSBA, Lee wrote music, played the drums, managed the digital marketing campaign (including social media) and outreach for the band.  Lee played in this band for approximately three years and it released albums, performed at local shows and toured.

16.     Over the course of the next decade or so, Lee started and joined several bands that released multiple albums, performed locally and toured the country.  With each of these bands, Lee continued to hone and develop his skills by performing the same duties for his bands that he had performed for DYSBA.

17.     In or around 2011, while Lee was playing with the band "Lionelle," he was introduced to Cooperstein through a mutual friend and they remained in touch as friends and professionals in the music industry.  At or around this same time, Lee began working

3

for the University of Utah as a Marketing Coordinator where his duties included, among other things, digital and social media marketing, graphic design, web development, audio and video production and managing several employees.  Lee continues to work for the University of Utah in this role.

18.     In or around 2012, Lee, along with others, started the band "Visitors."  Like all the other bands, Lee continued performing the same duties for Visitors that he had performed for DYSBA, except now his skills were much more refined and sophisticated because of his critical experience working with the University of Utah.  Soon after the band was started, Lee recruited Cooperstein and he joined the band. Visitors released albums and toured.

19.     To this day, Lee continues to play in and perform marketing and management duties for Visitors and other bands, including "Vadawave," who have national and international acclaim.

20.     Cooperstein began his career in the music industry in 2007 when he joined the band The K.I.N.D. as a guitarist and songwriter.  Like Lee, over the course of the next decade or so, Cooperstein started and joined several bands that released multiple albums, performed locally and toured the country.  In addition to singing and songwriting, Cooperstein was also responsible for releasing music online, compiling albums, conceptualizing and producing music videos, coordinating album artwork, booking and managing tours and marketing for many of these bands.   His work with bands also expanded to handling digital marketing campaigns.

Electronically Filed 05/15/2018 08:42 / / CV 18 897744 / Confirmation Nbr. 1384487 / CLCXH

21.     At or around the time Cooperstein joined Visitors, he also started an online retail business selling vintage guitars, including signed memorabilia, and guitar parts. This online business helped him develop and maintain relationships with musicians and bands all over the world.

22.     In or around 2014, Cooperstein joined the band "Gloe" and continued to perform the same duties for Gloe that he had performed for all the other bands.  He booked and managed a successful tour for Gloe, produced and directed music videos for the band and helped manage the band's media promotion.

23.     Cooperstein also has significant management experience.  He co-managed the personal training department at Bally's for several years and co-created and managed the personal training department at the University of Utah from 2008 to present. Cooperstein's professional management experience has been a very useful asset in the music industry.

24.     In or around December 2016, Cooperstein was directing an engineer who was remixing a record for "Wearing Thin" – a band signed to Tragic Hero – and one of the band members was impressed with Cooperstein's work and passed his contact information on to Tragic Hero's Founder and President, Tommy LaCombe.

25.     Soon after receiving the contact information, LaCombe reached out directly to Cooperstein and requested that he provide him with some information about his current ventures in the music industry.  In response, Cooperstein advised LaCombe about, among other things, two bands he was involved with – Gloe and Visitors – and some of the novel marketing campaigns he was using to promote them.

5

26.     LaCombe was immediately intrigued by Cooperstein's business and music industry knowledge and wanted to sign Gloe to his label because the band had strong industry buzz and Cooperstein was guiding their career.  Cooperstein was reluctant because Tragic Hero's genre of rock – "heavy metal" – was very different from Gloe's more "indie" style.  Despite this reluctance, LaCombe also pushed to sign Cooperstein's other band –Visitors – to Tragic Hero as well.

27.     In or around January 2018, LaCombe began to have regular communications with Cooperstein about how to improve his business and told him directly that he was a valuable asset in the music industry because of his experience and contacts.  After several communications, Cooperstein began to really consider Gloe signing a deal with Tragic Hero, but he did not want Visitors to be on the same heavy metal label.  When Cooperstein advised LaCombe of this dilemma, LaCombe introduced the idea of starting an imprint label focused on signing indie bands that Cooperstein would run on behalf of Tragic.

28.     An imprint is strictly a trademark/brand or, stated differently, a division of an already existing record label.  Therefore, an imprint has no legal business structure and all funding, distributing, marketing, copyrighting and other duties are handled by the record label, not the imprint.  Because of this relationship, employees of an imprint are also employees of the record label.

29.     Over the span of a few weeks, LaCombe and Cooperstein's discussions about creating an imprint heated up and became more serious.  Cooperstein was excited about the opportunity because he did not have the money to start his own record label

6

and an imprint funded by Tragic Hero would allow him to focus on the music while the record label handled all the other issues.  Cooperstein had never been interested in running a record label because of the financial commitment, but LaCombe's promise to fund the imprint and provide staff made the opportunity a realistic possibility.

30.     In or around February 2017, LaCombe, as an agent of Tragic Hero, officially offered Cooperstein a position to run an imprint that would be fully funded by Tragic Hero and Cooperstein accepted.  The imprint was named "Formant" and LaCombe approved the name. Unbeknownst to Cooperstein, however, Defendants had no intention of fulfilling their promises at the time this agreement was made.

31.     Despite LaCombe knowing that Tragic Hero would never fund or support Formant, he instructed Cooperstein to immediately start working on building the imprint by developing the concept, contacting bands to sign and evaluating Tragic Hero bands that should be moved to the imprint.  Cooperstein complied with LaCombe's instruction and began building Formant by engaging in, among other things, the following tasks:  (1) conducting marketing research to properly build the foundation and identity of imprint, (2) constructing marketing campaign for imprint, (3) investigating the contractual obligations of prospective Formant bands, (4) reviewing performance data and qualitative information of prospective bands, (5) reaching out to bands to gauge interest and making monetary offers for contracts, (6) creating customizable media documents/lists for bands based on genre and needs, (7) utilizing industry network to promote formation of imprint, (8) co-branding projects for Formant and Tragic Hero, (9) participating in a weekly conference call (sometimes daily) with LaCombe, (10)

7

contributing to nearly daily email chains about imprint and other Tragic Hero business and (11) creating content for imprint, including, but not limited to, songs, videos and other digital media.

32.     Due to the direct relationship between Tragic Hero and its imprint, Formant, Cooperstein regarded Tragic Hero as his employer and LaCombe as his boss. Therefore, when the duties of building the imprint became overwhelming, Cooperstein requested LaCombe's approval to bring Lee on with Formant and LaCombe consented to Lee joining the Tragic Hero family in March 2017.

33.     Within a week of joining Formant, LaCombe instructed Lee to get on a conference call with most, if not all, of the Tragic Hero stakeholders and key employees to discuss his experience and background and Lee complied.  During this call, they also discussed the imprint and the duties LaCombe wanted Lee to perform for Tragic Hero. Like Cooperstein, Lee believed that Tragic Hero was his employer and LaCombe was his boss.

34.     Over the next few months, Lee performed many of the same duties as Cooperstein and they both performed additional duties to help launch the imprint, including, but not limited to, the following: (1) writing detailed biographies for the Tragic Hero press staff for the launch of Formant, (2) planning and developing press rollout for Formant releases, (3) negotiating studio time for prospective Formant artists, (4) identifying and aggregating vendors to supply services for Formant, (5) calculating and establishing producer points for Formant releases, (6) negotiating with artists to join Formant, (7) developing and deploying creative marketing campaigns for Formant and

8

(8) assisting with tour duties for Tragic Hero bands.  Moreover, Tragic Hero and Formant – the record label and its imprint – released a Visitors' record that was co-branded with the Tragic Hero and Formant logos, even though Visitors did not have a recording contract with Tragic Hero.

35.     In addition to the vast number of duties Plaintiffs performed on behalf of Defendants to launch Formant, they also provided a broad range of services for Tragic Hero itself, including, but not limited to, the following:  (1) acting as a liaison between Tragic Hero and prospective bands, (2) developing marketing proposals, (3) reviewing and modifying social media platforms to analyze user data and improve marketing strategies, (4) gathering and providing intel to Tragic Hero about bands it was targeting to sign, (5) combing through historical analytics of Tragic Hero's "Substream" magazine and advising about how to market the magazine going forward, (6)  improving Tragic Hero's website to capture important analytical information for marketing, (7) drafting tour proposals for Tragic Hero bands, (8) evaluating the content of Tragic Hero bands to help determine development strategy, (9) consulting with Tragic Hero bands, (10) recruiting new bands for Tragic Hero, (11) directing and producing music videos and (12) creating audio and visual content for bands.  Plaintiffs also provided significant and material services to Defendants' merchandising website, Merchbucket.com, as well.

36.     Plaintiffs' services were so valuable to Tragic Hero that, in June 2017, the record label flew them from Utah to Cleveland to formally meet its team, train its staff about digital marketing campaigns, provide additional consultation for Tragic Hero's general business needs and strategize about the imprint.

9

37.     Prior to agreeing to come to Cleveland, Defendants assured Plaintiffs that they would finally reduce their verbal agreement with Tragic Hero to launch Formant into writing.  This promise was critical because Plaintiffs had repeatedly requested payment for their services from the moment they began working for Defendants but exercised tremendous patience because of the long-term nature of the relationship. Defendants, however, failed to keep their promise and the verbal agreement to launch the imprint was not reduced to writing during the Cleveland trip.

38.     When Plaintiffs returned to Utah, they continued to diligently perform their duties for Defendants and LaCombe confirmed and reiterated his promise to compensate them for the services they performed on behalf of Tragic Hero itself and the imprint.

39.     In July 2017, after working for Tragic Hero for approximately six months and being promised compensation for their services on many different occasions, LaCombe – for the first time – informed Plaintiffs that Defendants did not have the funds to pay them for their services but committed to paying them in or around September 2017.

40.     Making matters worse, in August 2017, Defendants finally presented Plaintiffs with a written agreement, but the proposed agreement did not reflect the verbal agreement for Tragic Hero to fully fund the imprint that would be run by Plaintiffs. Instead, the written document contemplated only a distribution agreement that did not fund the imprint, which is not what the parties agreed to when Plaintiffs committed to working for Defendants.

41.     As a result of Defendants' wrongful bait and switch tactic, it became clear that the proposed distribution agreement was designed to force Plaintiffs out of Tragic Hero because LaCombe knew they would never sign an agreement that did not fully fund the imprint.

42.     After rejecting the proposed distribution agreement, Plaintiffs repeatedly demanded payment for the comprehensive services they provided to Defendants.  In November 2017, Plaintiffs sought to resolve the dispute by sending Defendants an itemized invoice for only a fraction of the services they provided over approximately a six-month period.

43.     To date, Defendants have wrongfully failed to remit any payment to Plaintiffs, who were Tragic Hero employees, for the services they provided the record label, despite multiples promises to do so.

44.     In addition, it has become clear that Defendants verbally agreed to fund the imprint and remit payment to Plaintiffs with no intention on fulfilling those promises.

45.     Moreover, Defendants have exerted ownership rights over property that belongs to Plaintiffs without paying for those rights.

46.     Further, Defendants intentionally made false representations to interfere with Plaintiffs' business relationships with artists, bands, studios and third-party vendors.

47.     Accordingly, Defendants fraudulently induced Plaintiffs to enter into a verbal agreement that was breached when Defendants, as their employer, failed to fully fund the imprint and unlawfully withheld payments and/or property from Plaintiffs that

rightfully belonged to them, and this wrongful conduct has tortiously interfered with Plaintiffs' business relationships and/or contract.

## COUNT I:   FRAUDULENT INDUCEMENT/FRAUD

48.     Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

49.     Defendants repeatedly made representations to Plaintiffs to fully fund an imprint company that Plaintiffs would manage and operate as Tragic Hero employees. Defendants also repeatedly made representations to Plaintiffs to compensate them for the services they provided to Defendants.

50.     At the time Defendants made these representations to Plaintiffs, they were fully aware of their falsity or had an utter disregard for their truthfulness.  Defendants never had an intention of honoring the representations and agreements they made with Plaintiffs.

51.     Defendants made these false representations for the express purpose of inducing Plaintiffs to provide valuable and wide-ranging services to Defendants and to enter into an oral agreement under false premises without providing any compensation. Plaintiffs justifiably relied on Defendants' representations and promises and were severely harmed as a result.

52.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

Electronically Filed 05/15/2018 08:42 / / CV 18 897744 / Confirmation Nbr. 1384487 / CLCXH

## COUNT II: BREACH OF CONTRACT

53.     Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

54.     Plaintiffs and Defendants expressly agreed to an oral contract to create an imprint company fully funded by Tragic Hero that Plaintiffs would manage and operate as Tragic Hero employees.

55.     Plaintiffs performed their contractual obligations by providing valuable and wide-ranging services to create, develop and launch the Tragic Hero imprint company Defendants agreed to fully fund.

56.     Despite the parties' agreement, Defendants failed to provide funding for the Tragic Hero imprint company and Defendants also failed to compensate Plaintiffs for the services they performed on behalf of Defendants.

57.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## COUNT III:  FAIR LABOR STANDARDS ACT

58.     Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

59.      Defendants employed Plaintiffs to work for Tragic Hero.  As Tragic Hero employees, Plaintiffs were entitled to be compensated for the services they performed on behalf of Defendants.

13

60. Plaintiffs provided Defendants with valuable and wide-ranging services for the benefit of Tragic Hero and its imprint company, Formant.

61. Defendants, as employers, failed to compensate Plaintiffs, as employees, for the work they performed for Defendants in violation of the Fair Labor Standards Act.

62. As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## COUNT IV: UNJUST ENRICHMENT

63. Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

64. Plaintiffs conferred a significant benefit upon Defendants by providing valuable and wide-ranging services to Tragic Hero and its imprint company, Formant.

65. Defendants are well aware of the benefits Plaintiff conferred upon them and it would be unjust for Defendants to retain these benefits without paying Plaintiffs for their services.

66. As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## COUNT V: CONVERSION

67. Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

14

68.     Plaintiffs are the owners of certain music rights to work created by the band known as the Visitors.  Defendants have wrongfully exerted ownership rights over the work created by the Visitors and dispossessed Plaintiffs of their rights.

69.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

**COUNT VI:  TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONSHIPS AND/OR CONTRACTS**

70.     Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

71.     Plaintiffs had business relationships with artists, bands, studios and third-party vendors.  Defendants were well aware of these business relationships and used Plaintiffs to leverage them for the benefit of Tragic Hero and its imprint company, Formant.

72.     Defendants intentionally made false representations to Plaintiffs to directly and adversely impact their business relationships with artists, bands, studios and third-party vendors.  Defendants' tortious interference caused artists, bands, studios and third-party vendors to end their business relationships Plaintiffs.

73.     Defendants had no justification to interfere with Plaintiffs' business relationships.

Electronically Filed 05/15/2018 08:42 / / CV 18 897744 / Confirmation Nbr. 1384487 / CLCXH

74.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs Ian Cooperstein and Bryan Lee respectfully request that this Honorable Court grant the following relief:

(a)     For an award against Defendants of compensatory and monetary damages to compensate Plaintiffs for financial loss, emotional distress, personal injury, property damage, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(b)     For an award of punitive damages against Defendants in an amount in excess of $25,000;

(c)     For an award of reasonable attorneys' fees and non-taxable costs for Plaintiffs' claims as allowable under law;

(d)     For an award of the taxable costs of this action; and

(e)     For an award of such other relief as this Court may deem necessary and proper.

16

Respectfully submitted,

/s/ F. Allen Boseman
Bradley A. Sherman (0063906)
F. Allen Boseman (0084103)
SHERMAN BOSEMAN LEGAL GROUP, LLC
800 West St. Clair Avenue, 4th Floor
Cleveland, OH 44113
Telephone: 216.239.1414
Facsimile: 216.239.1316
Email: bradley@shermanboseman.com
allen@shermanboseman.com

Attorneys for Plaintiffs,
IAN COOPERSTEIN and BRYAN LEE

## JURY DEMAND

Plaintiffs Ian Cooperstein and Bryan Lee demand a trial by jury by the maximum

number of jurors permitted.

/s/ F. Allen Boseman
F. Allen Boseman

One of the Attorneys for Plaintiffs,
IAN COOPERSTEIN and BRYAN LEE

17

**SUMMONS IN A CIVIL ACTION    COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER**
CLEVELAND, OHIO 44113

| **CASE NO.** | | **SUMMONS NO.** |
|---|---|---|
| CV18897744 | D1 FX | 35364428 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

IAN COOPERSTEIN, ET AL.    **PLAINTIFF**
**VS**
TRAGIC HERO MUSIC GROUP, INC., ET AL.    **DEFENDANT**

# SUMMONS

TRAGIC HERO MUSIC GROUP, INC.
2230 SUPERIOR AVENUE EAST, FLOOR 1
CLEVELAND OH 44114

You have been named defendant in a sums
complaint (copy attached hereto) filed in Cuyahoga
County Court of Common Pleas, Cuyahoga County
Justice Center, Cleveland, Ohio 44113, by the
plaintiff named herein.

You are hereby summoned and required to answer
the complaint within 28 days after service of this
summons upon you, exclusive of the day of service.

**Said answer is required to be served on:**



Said answer is required to be served on Plaintiff's
Attorney (Address denoted by arrow at left.)

**Plantiff's Attorney**

F. ALLEN BOSEMAN JR
1100 SUPERIOR AVENUE, 20TH FL

CLEVELAND, OH 44114-0000

Your answer must also be filed with the court
within 3 days after service of said answer on
plaintiff's attorney.

If you fail to do so, judgment by default will be
rendered against you for the relief demanded in the
complaint.

**Case has been assigned to Judge:**

KATHLEEN ANN SUTULA
**Do not contact judge. Judge's name is given for
attorney's reference only.**

**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| **DATE SENT** |
|---|
| May 15, 2018 |

By _____
Deputy

COMPLAINT FILED    05/15/2018



CMSN130



104786081

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

IAN COOPERSTEIN, ET AL.
    Plaintiff

Case No: CV-18-897744

Judge: KATHLEEN ANN SUTULA

TRAGIC HERO MUSIC GROUP, INC., ET AL.
    Defendant

## JOURNAL ENTRY

PLAINTIFFS' MOTION FOR CONTINUANCE OF CASE MANAGEMENT CONFERENCE, FILED 7/26/2018, IS GRANTED.
THE CASE MANAGEMTNE CONFERENCE SCHEDULED FOR 8/9/2018 IS RESCHEDULED TO 8/30/2018 AT 8:00 A.M.

_____
Judge Signature          07/30/2018

07/27/2018



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**BRIEF IN OPPOSITION**
**September 19, 2018 15:54**

By: JAMES P. SAMMON 0064212

Confirmation Nbr. 1499246

IAN COOPERSTEIN, ET AL.                              CV 18 897744

   vs.

TRAGIC HERO MUSIC GROUP, INC., ET AL.          **Judge:** KATHLEEN ANN SUTULA

**Pages Filed:** 7

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| IAN COOPERSTEIN, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO. CV-18-897744 |
| | ) | |
| -v- | ) | |
| | ) | JUDGE KATHLEEN ANN SUTULA |
| TRAGIC HERO MUSIC GROUP, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

---

## BRIEF IN OPPOSITION TO PLAINTIFFS/COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMS

---

Defendants Tragic Hero Music Group, Inc. ("*Tragic Hero*") and Tommy LaCombe ("*LaCombe*") (together, the "*Defendants/Counterclaim Plaintiffs*"), by and through counsel, file this Brief in Opposition to the Motion to Dismiss Counterclaim (the "*Motion to Dismiss*") filed by Ian Cooperstein ("*Cooperstein*") and Bryan Lee ("*Lee*") (together, the "*Plaintiffs/Counterclaim Defendants*"). For the reasons set forth below, Defendants/Counterclaim Plaintiffs respectfully request that this Court deny the Motion to Dismiss.

## I.    SUMMARY OF THE ARGUMENT

Plaintiffs/Counterclaim Defendants' Motion to Dismiss should be denied for the following reasons:

- A breach of contract claim cannot be dismissed for failure to strictly adhere to a notice and cure provision;

- A breach of contract claim cannot be dismissed for failure to join indispensable parties, but is subject to joinder pursuant to Civ.R. 19(A); and

- The Counterclaim alleges facts with sufficient particularity to survive a motion to dismiss.

## II.  LAW AND ARGUMENT

### A.  Legal Standard.

Under Ohio pleading standards, a complaint generally need only contain "a short and plain statement of the claim showing that the party is entitled to relief." Civ.R. 8. The purpose of a Civ.R. 12(B)(6) motion to dismiss for failure to state a claim upon which relief can be granted "is to test the legal sufficiency of a claim." *Tuleta v. Med. Mut. of Ohio*, 8th Dist. Cuyahoga No. 100050, 2014-Ohio-396, ¶13. A court's review of a motion to dismiss "is limited to the four corners of the complaint along with any documents properly attached to or incorporated within the complaint." *Demeraski v. Bailey*, 8th Dist. Cuyahoga No. 102304, 2015-Ohio-2162, ¶12). "[A]ll factual allegations of the complaint must be taken as true and all reasonable inferences must be drawn in favor of the nonmoving party." *Tuleta*, at ¶13. "[A] dismissal under Civ.R. 12(B)(6) 'is reserved for the rare case that cannot possibly succeed.'" *Demeraski*, at ¶12. Here, taking all the inferences in Defendants/Counterclaim Plaintiffs' favor, there is no doubt that the July 12, 2018 Answer and Counterclaim (the "***Counterclaim***") states proper claims for relief. Those claims are not retaliatory, simply matters of fact.

### B.  The Counterclaim Properly States a Claim for Breach of Contract.

Defendants/Counterclaim Plaintiffs' breach of contract claim cannot be dismissed. Under Ohio law, breach of contract claim must allege that: (i) a binding contract was formed; (ii) the non-breaching party performed its contractual obligations; (iii) the other party failed to fulfill its contractual obligations without legal excuse; and (iv) the non-breaching party suffered damages as a result of the breach." *Prime Props., Ltd. P'ship v. Badah Enters.*, 8th Dist. Cuyahoga No. 99827, 2014-Ohio-206, 13. Here,

the Counterclaim clearly alleges that: (i) Tragic Hero entered into the May 26, 2017 Exclusive Recording Agreement (the "**Contract**") with Cooperstein; (ii) Tragic Hero performed all of its obligations under the Contract; (iii) Cooperstein failed to fulfill his obligations under Paragraph 1(b) and 1(c) the Contract; and (iv) Tragic Hero suffered damages as a result of Cooperstein's breach.

Accordingly, Tragic Hero properly stated a claim for breach of contract that survives the Motion to Dismiss.

### 1. Tragic Hero's Breach of Contract Claim Survives Despite the Notice/Cure Provision.

The Contract's notice/cure provision does not bar the breach of contract claim. Under Ohio law, a technical deviation from a notice provision is not a basis to dismiss a breach of contract claim. *Stonehenge Land Co. v. Beazer Homes Invs., LLC*, 177 Ohio App.3d 7, 2008-Ohio-148, ¶¶ 20-26 (a technical deviation from a contractual notice requirement will not bar the action for breach of contract brought against a party that is aware of its breach); *Roger J. Au & Son, Inc. v. N.E. Ohio Regional Sewer Dist.*, 29 Ohio App. 3d 284, 292 (8th Dist. 1986) (failure to give formal notice of a breach of contract claim does not apply where there is "actual knowledge of the circumstances upon which the claim is based[.]"). Further, the Motion to Dismiss fails to cite a single case where a breach of contract claim was dismissed for failure to strictly adhere to a notice/cure provision.

Here, Cooperstein cannot rely on a technicality within the Contract to dismiss the breach of contract claim. The purpose of the notice/cure provision in paragraph 23 of the Contract is to allow the parties an opportunity to cure any breach *before* commencing litigation. Plaintiffs/Counterclaim Defendants rendered the notice/cure

provision moot when they filed their lawsuit. Additionally, the parties and their counsel engaged in lengthy settlement discussions prior to litigation, and Cooperstein was aware that he failed to fulfill his obligations under the Contract.

Plaintiffs/Counterclaim Defendants would like this Court reach an absurd conclusion — that Cooperstein should be allowed to cure his breach while simultaneously advancing litigation against the non-breaching party. Followed to its logical conclusion, Plaintiffs/Counterclaim Defendants ask this Court to grant them the right to punch and not only tie Defendants/Counterclaim Plaintiffs' hands, but also deny them the right to punch back. Such a conclusion is contrary to Ohio law, and the breach of contract claim cannot be dismissed.

### 2. Tragic Hero's Breach of Contract Claim Survives Without the Remaining Band Members.

The Counterclaim cannot be dismissed for not naming other band members as counterclaim defendants. Ohio law is clear that failure to join all indispensable parties is not grounds for dismissal. *State ex rel. Bush v. Spurlock*, 42 Ohio St.3d 77, 81 (1989). In *Spurlock*, the Ohio Supreme Court held that:

> Ohio Courts have eschewed the harsh result of dismissing an action because an indispensable party was not joined, electing instead to order that the party be joined pursuant to Civ.R. 19(A) (joinder if feasible), or that leave to amend the complaint be granted.

*Spurlock* at 81 (internal citations omitted). The Eighth District similarly holds that a trial court cannot dismiss a case for failure to join an indispensable party, and should instead order joinder pursuant to Civ.R. 19(A). *Park-Ohio Industries, Inc. v. Atwood Resources, Inc.*, 8th Dist. Cuyahoga No. 58142, 1990 Ohio App. LEXIS 562, 11-12 (Feb. 15, 1990) ("[W]e conclude that the trial court could not dismiss the action merely

because the plaintiff might have failed to join an indispensable party. See Civ.R.
12(B)(7). Rather than dismissing a complaint on this basis alone, a trial court should
order joinder pursuant to Civ.R. 19(A).") (emphasis added).

Plaintiffs/Counterclaim Defendants fail to satisfy their burden of demonstrating
that the remaining members of the band Gloe are indispensable parties. Notably,
Plaintiffs/Counterclaim Defendants actually concede that the Contract is silent as to
"whether the contractual duties are joint, several, or joint and several" and that such
silence is subject to interpretation. *See* Motion to Dismiss at 8.

Therefore, whether the remaining members of Gloe are named as defendants has
no bearing on the breach of contract claim, which cannot be dismissed.

### C.     The Counterclaim Properly States a Claim for Fraudulent
###        Misrepresentation.

The fraudulent misrepresentation comports with Ohio's pleading standards and
cannot be dismissed. Under Ohio law, a party alleging fraudulent concealment must
demonstrate: (i) a representation or concealment of fact; (ii) which is material to the
transaction; (iii) made falsely, with knowledge of its falsity, or with such utter disregard
and recklessness as to whether it is true or false that knowledge may be inferred; (iv)
with the intent of misleading another into relying upon it; (v) justifiable reliance upon
the representation or concealment; and (iv) injury proximately caused by the reliance.
*Marquard v. Meadows*, 8th Dist. Cuyahoga No. 75243, 1999 Ohio App. LEXIS 6048, 10
(Dec. 16, 1999). Allegations of fraud must be stated with particularity in accord with
Civ.R. 9(B). *See* Civ.R. 9(B).

Here, the Counterclaim alleges facts with sufficient particularity to survive a
motion to dismiss. The Counterclaim specifically alleged that Plaintiff/Counterclaim

5

Defendants misrepresented their band's fan base, connections in the music industry, and sustainability as an investment for Tragic Hero, and overstated their qualifications in digital marketing. *See* Counterclaim at ¶¶ 20, 21 and 57. Such misrepresentations occurred, *inter alia*, during Plaintiffs/Counterclaim Defendants' exploratory trip to Cleveland in June, 2017. Accordingly, the Counterclaim alleges ample facts, which will only be further clarified throughout the discovery process. Should this Court deem it necessary, Defendants/Counterclaim Plaintiffs can set forth additional facts regarding Plaintiffs/Counterclaim Defendants' fraudulent misrepresentations with additional particularity if this Court grants leave to do so. For all these reasons, the Motion to Dismiss the fraudulent misrepresentation claim must be denied.

## III.    Conclusion.

For the foregoing reasons, Defendants/Counterclaim Plaintiffs respectfully request that this Court deny Plaintiffs/Counterclaim Defendants' Motion to Dismiss.

Respectfully submitted,

**KOHRMAN JACKSON & KRANTZ LLP**

*/s/ James P. Sammon*
JAMES P. SAMMON (0064212)
KYLE A. HUTNICK (0095673)
One Cleveland Center, 29th Floor
1375 East Ninth Street
Cleveland, Ohio 44114
Phone: 216-696-8700
Fax: 216-621-6536
Email: jpsammon@kjk.com; kah@kjk.com

*Counsel for Defendants/Counterclaim
Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing was sent this 19th

day of September, 2018 via the Court's electronic filing system to the following:

Bradley A. Sherman
F. Allen Boseman
Sherman Boseman Legal Group, LLC
800 West St. Clair Avenue
4th Floor
Cleveland, OH  44113
Phone: 216-314-2289
E-mail: Bradley@shermanboseman.com
    Allen@shermanboseman.com


*/s/ James P. Sammon*
James P. Sammon

**SUMMONS IN A CIVIL ACTION     COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER**

CLEVELAND, OHIO 44113

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV18897744 | D2 FX | 35364429 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

IAN COOPERSTEIN, ET AL.  **PLAINTIFF**

**VS**

TRAGIC HERO MUSIC GROUP, INC., ET AL.  **DEFENDANT**

## SUMMONS

TOMMY LACOMBE
PRESIDENT
TRAGIC HERO MUSIC GROUP, INC.
2230 SUPERIOR AVENUE EAST, FLOOR 1

CLEVELAND OH 44114

**You have been named defendant in a sums
complaint** (copy attached hereto) filed in Cuyahoga
County Court of Common Pleas, Cuyahoga County
Justice Center, Cleveland, Ohio 44113, by the
plaintiff named herein.

**You are hereby summoned and required to answer
the complaint within 28 days after service of this
summons upon you, exclusive of the day of service.**

**Said answer is required to be served on Plaintiff's
Attorney** (Address denoted by arrow at left.)

**Your answer must also be filed with the court
within 3 days after service of said answer on
plaintiff's attorney.**

**If you fail to do so, judgment by default will be
rendered against you for the relief demanded in the
complaint.**

**Said answer is required to be served on:**



**Plantiff's Attorney**

F. ALLEN BOSEMAN JR
1100 SUPERIOR AVENUE, 20TH FL

CLEVELAND, OH 44114-0000

**Case has been assigned to Judge:**

KATHLEEN ANN SUTULA
**Do not contact judge. Judge's name is given for
attorney's reference only.**

**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE SENT |
|---|
| May 15, 2018 |

By_____
Deputy

COMPLAINT FILED    05/15/2018



CMSN130

Motion No. 4712777



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**MOTION FOR...**
**August 29, 2018 22:38**

By: F. ALLEN BOSEMAN 0084103

Confirmation Nbr. 1481031

IAN COOPERSTEIN, ET AL.                    CV 18 897744

     vs.

TRAGIC HERO MUSIC GROUP, INC., ET AL.    **Judge:** KATHLEEN ANN SUTULA

**Pages Filed:** 23

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

|  |  |  |
|---|---|---|
| IAN COOPERSTEIN, et al., | : | CASE NO. CV-18-897744 |
|  | : |  |
| Plaintiffs, | : | JUDGE KATHLEEN ANN SUTULA |
|  | : |  |
| v. | : |  |
|  | : |  |
| TRAGIC HERO MUSIC GROUP, INC., et al., | : |  |
|  | : |  |
| Defendants. | : |  |

**MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**

Pursuant to Rule 15(A) of the Ohio Rules of Civil Procedure, Plaintiffs/Counterclaim Defendants Ian Cooperstein ("Cooperstein") and Bryan Lee ("Lee") (collectively referred to as "Plaintiffs/Counterclaim Defendants") respectfully move this Honorable Court for Leave to file an Amended Complaint.  Rule 15 states that leave of Court to amend "shall be freely given when justice so requires" and justice requires this amendment.   Here, the Amended Complaint maintains the counts and allegations of the original Complaint and simply adds new allegations that Defendants/Counterclaim Plaintiffs Tragic Hero Music Group, Inc. ("Tragic Hero") and Tommy LaCombe ("LaCombe") (collectively referred to as "Defendants/Counterclaim Plaintiffs") have abused process by engaging in malicious prosecution and retaliated against Plaintiffs/Counterclaim Defendants for filing Fair Labor Standard Act ("FLSA") claims by asserting baseless counterclaims in response to the Complaint.

The FLSA has a clear antiretaliation provision that prevents employers from retaliating against current or former employees who file a complaint for wage and hour violations. *See, Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 4 (2011); *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 529 (6th Cir. July 7, 2011). Moreover, "'[i]t is certainly true that a lawsuit may be used by an employer as a powerful instrument of coercion or retaliation' and that such suits can create a 'chilling effect'" that discourages others from pursuing an action against the employer. *EEOC v. Outback Steakhouse, Inc.*, 75 F. Supp. 2d 756, 758 (N.D. Ohio Nov. 15, 1999) (internal citations omitted). Indeed, it has been held "that counterclaims that are not brought in good faith but instead are motivated by retaliation, can be a basis for a claim of retaliation." *Nasrallah v. Lakefront Lines, Inc.*, N.D. Ohio No. 1:17-CV-69, 2017 U.S. Dist. LEXIS 80500, at *21-22 (May 25, 2017). Therefore, "the adverse action requirement for a retaliation claim encompasses an allegedly bad faith counterclaim brought by the employer against its former employee." *Gliatta v. Tectum Inc.*, 211 F. Supp. 2d 992, 1009 (S.D. Ohio July 8, 2002).

In the Amended Complaint, Plaintiffs/Counterclaim Defendants allege that Defendants/Counterclaim Plaintiffs filed their Counterclaims in bad faith for the sole purpose of retaliating in violation of the FLSA. If the allegations in the Counterclaims are taken as true, Defendants/Counterclaim Plaintiffs could have asserted their Counterclaims nearly a year ago but, instead, they did not do so until Plaintiffs/Counterclaim Defendants initiated an action for FLSA violations. It is clear that the Counterclaims are designed to intimidate, harass and coerce

2

Plaintiffs/Counterclaim Defendants to dismiss their lawsuit and this perversion of the judicial system is an abuse of process because it is nothing more than malicious prosecution. *See, Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St. 3d 294, 298 (1994) (finding that the same set of facts can prove abuse of process and malicious prosecution).

Accordingly, in the interests of justice, this Court should grant Plaintiffs/Counterclaim Defendants leave to amend the Complaint to assert new claims against Defendants/Counterclaim Plaintiffs that have arisen after the filing of their Counterclaims. The Amended Complaint is attached hereto as Exhibit A.

Respectfully submitted,

*/s/ F. Allen Boseman*
Bradley A. Sherman (0063906)
F. Allen Boseman (0084103)
SHERMAN BOSEMAN LEGAL GROUP, LLC
800 West St. Clair Avenue, 4th Floor
Cleveland, OH 44113
Telephone: 216.239.1414
Facsimile: 216.239.1316
Email: bradley@shermanboseman.com
allen@shermanboseman.com

Attorneys for Plaintiffs,
IAN COOPERSTEIN and BRYAN LEE

## CERTIFICATE OF SERVICE

I hereby certify that, on August 29, 2018, a copy of the foregoing *Motion for Leave to File Amended Complaint* was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ F. Allen Boseman, Jr.*
F. Allen Boseman, Jr.

Attorney for Plaintiffs
IAN COOPERSTEIN and BRYAN LEE

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

|  |  |  |
|---|---|---|
| IAN COOPERSTEIN, et al., | : | CASE NO. CV-18-897744 |
|  | : |  |
| Plaintiffs, | : | JUDGE KATHLEEN ANN SUTULA |
|  | : |  |
| v. | : |  |
|  | : | **FIRST AMENDED COMPLAINT** |
| TRAGIC HERO MUSIC GROUP, INC., et al., | : |  |
|  | : | **(Jury Demand Endorsed)** |
| Defendants. | : |  |

For their Complaint against Defendants Tragic Hero Music Group, Inc. ("Tragic Hero") and Tommy LaCombe ("LaCombe") (collectively referred to as "Defendants"), Plaintiffs Ian Cooperstein ("Cooperstein") and Bryan Lee ("Lee") (collectively referred to as "Plaintiffs"), by and through undersigned counsel, state and aver as follows:

## PARTIES

1.    Plaintiff Cooperstein is a resident of Salt Lake City, Utah.

2.    Plaintiff Lee is a resident of Salt Lake City, Utah

3.    Upon information and belief, Defendant Tragic Hero is an Ohio corporation with its principal place of business in Cleveland, Ohio, Cuyahoga County.

4.    Upon information and belief, Defendant LaCombe is one of the founders and owners of Tragic Hero and resides in the State of Virginia.

## VENUE

5.    Defendants transact business in Cleveland, Ohio, Cuyahoga County.

6.    Defendants supply services in Cleveland, Ohio, Cuyahoga County.

7.    Defendants conduct sales in Cleveland, Ohio, Cuyahoga County.

8.     Defendants regularly solicit business in Cleveland, Ohio, Cuyahoga County.

9.     Defendants derive substantial revenue from services rendered and sales conducted in Cleveland, Ohio, Cuyahoga County.

10.     Defendants operate and maintain a Tragic Hero office located at 2230 Superior Avenue East, Floor 1, Cleveland, Ohio 44114 in Cuyahoga County.

11.     A substantial portion of the material events alleged in this Complaint occurred in Cuyahoga County, Ohio.

12.     Therefore, personal jurisdiction is proper over Defendants pursuant to Ohio Revised Code §2307.382(A)(1)-(4).

13.     This Court has general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## FACTS

14.     Plaintiffs have extensive experience working in the music industry in many different capacities as solo artists, musicians, band members, writers, producers and directors, among other things.  Collectively, they also have valuable experience in management, business development, website design, booking and running tours, releasing albums, creating album art, distributing albums, merchandise design, retail sales, digital media marketing, social media campaigns, outreach and vendor acquisition.

15.     Lee began his career in the music industry in 2006 when he started a band – "Darling You Should Be Ashamed" ("DYSBA") – with his high school classmates.  As a member of DYSBA, Lee wrote music, played the drums, managed the digital marketing campaign (including social media) and outreach for the band.  Lee played in this band for approximately three years and it released albums, performed at local shows and toured.

16.     Over the course of the next decade or so, Lee started and joined several bands that released multiple albums, performed locally and toured the country.  With each of these bands, Lee continued to hone and develop his skills by performing the same duties for his bands that he had performed for DYSBA.

17.     In or around 2011, while Lee was playing with the band "Lionelle," he was introduced to Cooperstein through a mutual friend and they remained in touch as friends and professionals in the music industry.  At or around this same time, Lee began working for the University of Utah as a Marketing Coordinator where his duties included, among other things, digital and social media marketing, graphic design, web development,

audio and video production and managing several employees. Lee continues to work for the University of Utah in this role.

18. In or around 2012, Lee, along with others, started the band "Visitors." Like all the other bands, Lee continued performing the same duties for Visitors that he had performed for DYSBA, except now his skills were much more refined and sophisticated because of his critical experience working with the University of Utah. Soon after the band was started, Lee recruited Cooperstein and he joined the band. Visitors released albums and toured.

19. To this day, Lee continues to play in and perform marketing and management duties for Visitors and other bands, including "Vadawave," who have national and international acclaim.

20. Cooperstein began his career in the music industry in 2007 when he joined the band The K.I.N.D. as a guitarist and songwriter. Like Lee, over the course of the next decade or so, Cooperstein started and joined several bands that released multiple albums, performed locally and toured the country. In addition to singing and songwriting, Cooperstein was also responsible for releasing music online, compiling albums, conceptualizing and producing music videos, coordinating album artwork, booking and managing tours and marketing for many of these bands. His work with bands also expanded to handling digital marketing campaigns.

21. At or around the time Cooperstein joined Visitors, he also started an online retail business selling vintage guitars, including signed memorabilia, and guitar parts.

This online business helped him develop and maintain relationships with musicians and bands all over the world.

22. In or around 2014, Cooperstein joined the band "Gloe" and continued to perform the same duties for Gloe that he had performed for all the other bands. He booked and managed a successful tour for Gloe, produced and directed music videos for the band and helped manage the band's media promotion.

23. Cooperstein also has significant management experience. He co-managed the personal training department at Bally's for several years and co-created and managed the personal training department at the University of Utah from 2008 to present. Cooperstein's professional management experience has been a very useful asset in the music industry.

24. In or around December 2016, Cooperstein was directing an engineer who was remixing a record for "Wearing Thin" – a band signed to Tragic Hero – and one of the band members was impressed with Cooperstein's work and passed his contact information on to Tragic Hero's Founder and President, Tommy LaCombe.

25. Soon after receiving the contact information, LaCombe reached out directly to Cooperstein and requested that he provide him with some information about his current ventures in the music industry. In response, Cooperstein advised LaCombe about, among other things, two bands he was involved with – Gloe and Visitors – and some of the novel marketing campaigns he was using to promote them.

26. LaCombe was immediately intrigued by Cooperstein's business and music industry knowledge and wanted to sign Gloe to his label because the band had strong

industry buzz and Cooperstein was guiding their career.  Cooperstein was reluctant because Tragic Hero's genre of rock – "heavy metal" – was very different from Gloe's more "indie" style.  Despite this reluctance, LaCombe also pushed to sign Cooperstein's other band –Visitors – to Tragic Hero as well.

27.    In or around January 2017, LaCombe began to have regular communications with Cooperstein about how to improve his business and told him directly that he was a valuable asset in the music industry because of his experience and contacts.  After several communications, Cooperstein began to really consider Gloe signing a deal with Tragic Hero, but he did not want Visitors to be on the same heavy metal label.  When Cooperstein advised LaCombe of this dilemma, LaCombe introduced the idea of starting an imprint label focused on signing indie bands that Cooperstein would run on behalf of Tragic.

28.    An imprint is strictly a trademark/brand or, stated differently, a division of an already existing record label.  Therefore, an imprint has no legal business structure and all funding, distributing, marketing, copyrighting and other duties are handled by the record label, not the imprint.  Because of this relationship, employees of an imprint are also employees of the record label.

29.    Over the span of a few weeks, LaCombe and Cooperstein's discussions about creating an imprint heated up and became more serious.  Cooperstein was excited about the opportunity because he did not have the money to start his own record label and an imprint funded by Tragic Hero would allow him to focus on the music while the record label handled all the other issues.  Cooperstein had never been interested in

running a record label because of the financial commitment, but LaCombe's promise to fund the imprint and provide staff made the opportunity a realistic possibility.

30.     In or around February 2017, LaCombe, as an agent of Tragic Hero, officially offered Cooperstein a position to run an imprint that would be fully funded by Tragic Hero and Cooperstein accepted.  The imprint was named "Formant" and LaCombe approved the name. Unbeknownst to Cooperstein, however, Defendants had no intention of fulfilling their promises at the time this agreement was made.

31.     Despite LaCombe knowing that Tragic Hero would never fund or support Formant, he instructed Cooperstein to immediately start working on building the imprint by developing the concept, contacting bands to sign and evaluating Tragic Hero bands that should be moved to the imprint.  Cooperstein complied with LaCombe's instruction and began building Formant by engaging in, among other things, the following tasks:  (1) conducting marketing research to properly build the foundation and identity of imprint, (2) constructing marketing campaign for imprint, (3) investigating the contractual obligations of prospective Formant bands, (4) reviewing performance data and qualitative information of prospective bands, (5) reaching out to bands to gauge interest and making monetary offers for contracts, (6) creating customizable media documents/lists for bands based on genre and needs, (7) utilizing industry network to promote formation of imprint, (8) co-branding projects for Formant and Tragic Hero, (9) participating in a weekly conference call (sometimes daily) with LaCombe, (10) contributing to nearly daily email chains about imprint and other Tragic Hero business

and (11) creating content for imprint, including, but not limited to, songs, videos and other digital media.

32.     Due to the direct relationship between Tragic Hero and its imprint, Formant, Cooperstein regarded Tragic Hero as his employer and LaCombe as his boss. Therefore, when the duties of building the imprint became overwhelming, Cooperstein requested LaCombe's approval to bring Lee on with Formant and LaCombe consented to Lee joining the Tragic Hero family in March 2017.

33.     Within a week of joining Formant, LaCombe instructed Lee to get on a conference call with most, if not all, of the Tragic Hero stakeholders and key employees to discuss his experience and background and Lee complied.  During this call, they also discussed the imprint and the duties LaCombe wanted Lee to perform for Tragic Hero. Like Cooperstein, Lee believed that Tragic Hero was his employer and LaCombe was his boss.

34.     Over the next few months, Lee performed many of the same duties as Cooperstein and they both performed additional duties to help launch the imprint, including, but not limited to, the following: (1) writing detailed biographies for the Tragic Hero press staff for the launch of Formant, (2) planning and developing press rollout for Formant releases, (3) negotiating studio time for prospective Formant artists, (4) identifying and aggregating vendors to supply services for Formant, (5) calculating and establishing producer points for Formant releases, (6) negotiating with artists to join Formant, (7) developing and deploying creative marketing campaigns for Formant and (8) assisting with tour duties for Tragic Hero bands.  Moreover, Tragic Hero and Formant

8

– the record label and its imprint – released a Visitors' record that was co-branded with the Tragic Hero and Formant logos, even though Visitors did not have a recording contract with Tragic Hero.

35.     In addition to the vast number of duties Plaintiffs performed on behalf of Defendants to launch Formant, they also provided a broad range of services for Tragic Hero itself, including, but not limited to, the following:  (1) acting as a liaison between Tragic Hero and prospective bands, (2) developing marketing proposals, (3) reviewing and modifying social media platforms to analyze user data and improve marketing strategies, (4) gathering and providing intel to Tragic Hero about bands it was targeting to sign, (5) combing through historical analytics of Tragic Hero's "Substream" magazine and advising about how to market the magazine going forward, (6)  improving Tragic Hero's website to capture important analytical information for marketing, (7) drafting tour proposals for Tragic Hero bands, (8) evaluating the content of Tragic Hero bands to help determine development strategy, (9) consulting with Tragic Hero bands, (10) recruiting new bands for Tragic Hero, (11) directing and producing music videos and (12) creating audio and visual content for bands.  Plaintiffs also provided significant and material services to Defendants' merchandising website, Merchbucket.com, as well.

36.     Plaintiffs' services were so valuable to Tragic Hero that, in June 2017, the record label flew them from Utah to Cleveland to formally meet its team, train its staff about digital marketing campaigns, provide additional consultation for Tragic Hero's general business needs and strategize about the imprint.

37.     Prior to agreeing to come to Cleveland, Defendants assured Plaintiffs that they would finally reduce their verbal agreement with Tragic Hero to launch Formant into writing.  This promise was critical because Plaintiffs had repeatedly requested payment for their services from the moment they began working for Defendants but exercised tremendous patience because of the long-term nature of the relationship. Defendants, however, failed to keep their promise and the verbal agreement to launch the imprint was not reduced to writing during the Cleveland trip.

38.     When Plaintiffs returned to Utah, they continued to diligently perform their duties for Defendants and LaCombe confirmed and reiterated his promise to compensate them for the services they performed on behalf of Tragic Hero itself and the imprint.

39.     In July 2017, after working for Tragic Hero for approximately six months and being promised compensation for their services on many different occasions, LaCombe – for the first time – informed Plaintiffs that Defendants did not have the funds to pay them for their services but committed to paying them in or around September 2017.

40.     Making matters worse, in August 2017, Defendants finally presented Plaintiffs with a written agreement, but the proposed agreement did not reflect the verbal agreement for Tragic Hero to fully fund the imprint that would be run by Plaintiffs. Instead, the written document contemplated only a distribution agreement that did not fund the imprint, which is not what the parties agreed to when Plaintiffs committed to working for Defendants.

10

41.     As a result of Defendants' wrongful bait and switch tactic, it became clear that the proposed distribution agreement was designed to force Plaintiffs out of Tragic Hero because LaCombe knew they would never sign an agreement that did not fully fund the imprint.

42.     After rejecting the proposed distribution agreement, Plaintiffs repeatedly demanded payment for the comprehensive services they provided to Defendants.  In November 2017, Plaintiffs sought to resolve the dispute by sending Defendants an itemized invoice for only a fraction of the services they provided over approximately a six-month period.

43.     To date, Defendants have wrongfully failed to remit any payment to Plaintiffs, who were Tragic Hero employees, for the services they provided the record label, despite multiples promises to do so.

44.     In addition, it has become clear that Defendants verbally agreed to fund the imprint and remit payment to Plaintiffs with no intention on fulfilling those promises.

45.     Moreover, Defendants have exerted ownership rights over property that belongs to Plaintiffs without paying for those rights.

46.     Further, Defendants intentionally made false representations to interfere with Plaintiffs' business relationships with artists, bands, studios and third-party vendors.

47.     Accordingly, Defendants fraudulently induced Plaintiffs to enter into a verbal agreement that was breached when Defendants, as their employer, failed to fully fund the imprint and unlawfully withheld payments and/or property from Plaintiffs that

rightfully belonged to them, and this wrongful conduct has tortiously interfered with Plaintiffs' business relationships and/or contract.

48.    As a result of this wrongful conduct, Plaintiffs filed a Complaint against Defendants in this Court alleging, among other things, violations of the Fair Labor Standards Act ("FLSA").

49.    In response, Defendants abused the litigation process and maliciously prosecuted baseless and unsupported counterclaims against Plaintiffs for the sole purpose of intimidating and harassing them.

<u>**COUNT I:   FRAUDULENT INDUCEMENT/FRAUD**</u>

50.    Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

51.     Defendants repeatedly made representations to Plaintiffs to fully fund an imprint company that Plaintiffs would manage and operate as Tragic Hero employees. Defendants also repeatedly made representations to Plaintiffs to compensate them for the services they provided to Defendants.

52.    At the time Defendants made these representations to Plaintiffs, they were fully aware of their falsity or had an utter disregard for their truthfulness.  Defendants never had an intention of honoring the representations and agreements they made with Plaintiffs.

53.    Defendants made these false representations for the express purpose of inducing Plaintiffs to provide valuable and wide-ranging services to Defendants and to enter into an oral agreement under false premises without providing any compensation.

Plaintiffs justifiably relied on Defendants' representations and promises and were severely harmed as a result.

54.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

<u>COUNT II: BREACH OF CONTRACT</u>

55.     Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

56.     Plaintiffs and Defendants expressly agreed to an oral contract to create an imprint company fully funded by Tragic Hero that Plaintiffs would manage and operate as Tragic Hero employees.

57.     Plaintiffs performed their contractual obligations by providing valuable and wide-ranging services to create, develop and launch the Tragic Hero imprint company Defendants agreed to fully fund.

58.     Despite the parties' agreement, Defendants failed to provide funding for the Tragic Hero imprint company and Defendants also failed to compensate Plaintiffs for the services they performed on behalf of Defendants.

59.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## COUNT III: FAIR LABOR STANDARDS ACT

60. Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

61. Defendants employed Plaintiffs to work for Tragic Hero. As Tragic Hero employees, Plaintiffs were entitled to be compensated for the services they performed on behalf of Defendants.

62. Plaintiffs provided Defendants with valuable and wide-ranging services for the benefit of Tragic Hero and its imprint company, Formant.

63. Defendants, as employers, failed to compensate Plaintiffs, as employees, for the work they performed for Defendants in violation of the FLSA.

64. As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## COUNT IV: UNJUST ENRICHMENT

65. Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

66. Plaintiffs conferred a significant benefit upon Defendants by providing valuable and wide-ranging services to Tragic Hero and its imprint company, Formant.

67. Defendants are well aware of the benefits Plaintiff conferred upon them and it would be unjust for Defendants to retain these benefits without paying Plaintiffs for their services.

68.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## COUNT V: CONVERSION

69.     Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

70.     Plaintiffs are the owners of certain music rights to work created by the band known as the Visitors.  Defendants have wrongfully exerted ownership rights over the work created by the Visitors and dispossessed Plaintiffs of their rights.

71.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## COUNT VI:  TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND/OR CONTRACTS

72.     Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

73.     Plaintiffs had business relationships with artists, bands, studios and third-party vendors.  Defendants were well aware of these business relationships and used Plaintiffs to leverage them for the benefit of Tragic Hero and its imprint company, Formant.

74.     Defendants intentionally made false representations to Plaintiffs to directly and adversely impact their business relationships with artists, bands, studios and third-

party vendors.  Defendants' tortious interference caused artists, bands, studios and third-party vendors to end their business relationships Plaintiffs.

75.     Defendants had no justification to interfere with Plaintiffs' business relationships.

76.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

<u>COUNT VII:  RETALIATION</u>

77.     Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

78.     The FLSA has a clear antiretaliation provision that prevents employers from retaliating against current or former employees who file complaints for wage and hour violations.

79.     Plaintiffs engaged in conduct protected by the FLSA by filing a Complaint alleging wage and hour violations against Defendants in this Court.

80.     Defendants were put on notice of this protected conduct when they were served with the Complaint.

81.     In response to Plaintiffs' Complaint, Defendants' filed baseless counterclaims against Plaintiffs that were designed to intimidate and retaliate against Plaintiffs for filing, among other things, claims alleging FLSA violations.

82.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## COUNT VIII:  ABUSE OF PROCESS/MALICIOUS PROSECUTION

83.     Plaintiffs incorporate by reference all the allegations contained in the preceding paragraphs of the Complaint.

84.     Plaintiffs properly filed a lawsuit against Defendants for violations of federal and state law.

85.     Defendants have perverted Plaintiffs' lawsuit for the ulterior motive of intimidation and retaliation by asserting baseless counterclaims in response to the Complaint.

86.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer severe economic and non-economic damages, all or a portion of which are likely to continue indefinitely into the future.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs Ian Cooperstein and Bryan Lee respectfully request that this Honorable Court grant the following relief:

(a)     For an award against Defendants of compensatory and monetary damages to compensate Plaintiffs for financial loss, emotional distress, personal injury, property damage, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(b)      For an award of punitive damages against Defendants in an amount in excess of $25,000;

(c)      For an award of reasonable attorneys' fees and non-taxable costs for Plaintiffs' claims as allowable under law;

(d)      For an award of the taxable costs of this action; and

(e)      For an award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,


*/s/ F. Allen Boseman*
Bradley A. Sherman (0063906)
F. Allen Boseman (0084103)
SHERMAN BOSEMAN LEGAL GROUP, LLC
800 West St. Clair Avenue, 4th Floor
Cleveland, OH 44113
Telephone: 216.239.1414
Facsimile: 216.239.1316
Email: bradley@shermanboseman.com
         allen@shermanboseman.com

Attorneys for Plaintiffs,
IAN COOPERSTEIN and BRYAN LEE

## <u>JURY DEMAND</u>

Plaintiffs Ian Cooperstein and Bryan Lee demand a trial by jury by the maximum number of jurors permitted.

*/s/ F. Allen Boseman*
F. Allen Boseman

One of the Attorneys for Plaintiffs,
IAN COOPERSTEIN and BRYAN LEE

Electronically Filed 08/29/2018 22:38 / MOTION / CV 18 897744 / Confirmation Nbr. 1481031 / BATCH

## CERTIFICATE OF SERVICE

I hereby certify that, on August 29, 2018, a copy of the foregoing *Amended Complaint* was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ F. Allen Boseman, Jr.
F. Allen Boseman, Jr.

Attorney for Plaintiffs
IAN COOPERSTEIN and BRYAN LEE

Motion No.  <u>4703849</u>



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**MOTION FOR CONTINUANCE**
**July 26, 2018 12:07**

By: F. ALLEN BOSEMAN 0084103

Confirmation Nbr. 1449711

IAN COOPERSTEIN, ET AL.                                CV 18 897744

      vs.

                                   **Judge:**  KATHLEEN ANN SUTULA

TRAGIC HERO MUSIC GROUP, INC., ET AL.

**Pages Filed:**  2

Electronically Filed 07/26/2018 12:07 / MOTION / CV 18 897744 / Confirmation Nbr. 1449711 / CLJML

IN THE COURT OF COMMON PEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| IAN COOPERSTEIN, et al., | : | |
| | : | |
| Plaintiffs, | : | CASE NO. CV-18-897744 |
| | : | |
| v. | : | JUDGE KATHLEEN ANN SUTULA |
| | : | |
| TRAGIC HERO MUSIC GROUP, INC., et al., | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFFS' UNOPPOSED MOTION FOR CONTINUANCE
## OF CASE MANAGEMENT CONFERENCE

NOW COME Plaintiffs Ian Cooperstein and Bryan Lee ("Plaintiffs"), by and through the undersigned counsel, and hereby request a continuance of the Case Management Conference currently scheduled to occur on Thursday, August 9 at 8:00 a.m. Counsel for Plaintiffs is expecting the birth of his child to occur in the early days of August, but would like to be present at the Case Management Conference as requested by the Court.  Accordingly, Plaintiffs respectfully move this Honorable Court to continue the Case Management Conference for two (2) weeks, until after August 23, 2018.

Counsel for Defendants has represented to the undersigned that they have no objection to this Motion.

Respectfully submitted,

*/s/ F. Allen Boseman, Jr.*
F. Allen Boseman, Jr (0084103)
Bradley A. Sherman (00639060)
SHERMAN BOSEMAN LEGAL GROUP, LLC
800 West St. Clair Avenue, 4th Floor
Cleveland, OH  44113

Telephone:  216.239.1414
Facsimile:    216.239.1316
Email:  allen@shermanboseman.com
          bradley@shermanboseman.com

Attorney for Plaintiffs
IAN COOPERSTEIN and BRYAN LEE

## CERTIFICATE OF SERVICE

I hereby certify that, on July 26, 2018, a copy of the foregoing *Plaintiffs' Unopposed Motion for Continuance of Case Management Conference* was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ F. Allen Boseman, Jr.*
F. Allen Boseman, Jr.

Attorney for Plaintiffs
IAN COOPERSTEIN and BRYAN LEE



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

### NOTICE OF APPEARANCE
June 12, 2018 16:24

By: JAMES P. SAMMON 0064212

Confirmation Nbr. 1410018

IAN COOPERSTEIN, ET AL.                    CV 18 897744

   vs.

**Judge:**  KATHLEEN ANN SUTULA
TRAGIC HERO MUSIC GROUP, INC., ET AL.

**Pages Filed:**  2

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | |
|---|---|
| IAN COOPERSTEIN, ET AL., | ) |
| | ) |
| Plaintiffs, | ) CASE NO. CV-18-897744 |
| | ) |
| -v- | ) |
| | ) JUDGE KATHLEEN ANN SUTULA |
| TRAGIC HERO MUSIC GROUP, ET AL., | ) |
| | ) |
| Defendants. | ) |

---

## NOTICE OF APPEARANCE

---

Now comes James P. Sammon and Kyle A. Hutnick of the law firm of Kohrman

Jackson & Krantz LLP and hereby enter their appearance as counsel of record for

Defendants Tragic Hero Music Group, Inc. and Tommy Lacombe (collectively the

"**Defendants**").  The undersigned requests that all future pleadings, notices,

correspondence, and any and all materials relative to the above-captioned case be sent

to the undersigned at the address set forth below:

James P. Sammon (0064212)
Kyle A. Hutnick (0095673)
Kohrman Jackson & Krantz LLP
One Cleveland Center, 29th Floor
1375 E. 9th Street
Cleveland, Ohio 44114-1793
E-mail:  jpsammon@kjk.com
E-mail:  kah@kjk.com
Phone:  216-696-8700
Fax:  216-621-6536

{K0670657.1}

Respectfully submitted,

**KOHRMAN JACKSON & KRANTZ LLP**

*/s/ James P. Sammon*
JAMES P. SAMMON (0064212)
KYLE A. HUTNICK (0095673)
One Cleveland Center, 29th Floor
1375 East Ninth Street
Cleveland, Ohio 44114
Phone: 216-696-8700/Fax: 216-621-6536
Email: jpsammon@kjk.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was sent this 12th

day of June, 2018 via the Court's electronic filing system to the following:

Bradley A. Sherman
F. Allen Boseman
Sherman Boseman Legal Group, LLC
800 West St. Clair Avenue
4th Floor
Cleveland, OH 44113
Phone: 216-314-2289
E-mail:      Bradley@shermanboseman.com
             Allen@shermanboseman.com

*/s/ James P. Sammon*
James P. Sammon

Motion No.  <u>4712778</u>



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**MOTION TO...**
**August 29, 2018 22:32**

By: F. ALLEN BOSEMAN 0084103

Confirmation Nbr. 1481030

IAN COOPERSTEIN, ET AL.                    CV 18 897744

     vs.

TRAGIC HERO MUSIC GROUP, INC., ET AL.      **Judge:**  KATHLEEN ANN SUTULA

**Pages Filed:**  12

IN THE COURT OF COMMON PEAS
CUYAHOGA COUNTY, OHIO

IAN COOPERSTEIN, et al.,                        :
                                                :
          Plaintiffs,                           :     CASE NO. CV-18-897744
                                                :
v.                                              :     JUDGE KATHLEEN ANN SUTULA
                                                :
TRAGIC HERO MUSIC GROUP, INC., et al.,          :
                                                :
          Defendants.                           :

## PLAINTIFFS' MOTION TO DISMISS DEFENDANTS/COUNTERCLAIM PLAINTIFFS' COUNTERCLAIMS

Pursuant to Rule 12(B)(6) of the Ohio Rules of Civil Procedure, Plaintiffs/Counterclaim Defendants Ian Cooperstein ("Cooperstein") and Bryan Lee ("Lee") (collectively "Plaintiffs"), by and through counsel, hereby move this Honorable Court for an Order dismissing Defendants/Counterclaim Plaintiffs Tragic Hero Music Group, Inc. ("Tragic Hero") and Tommy LaCombe's ("LaCombe") (collectively, the "Defendants/Counterclaim Plaintiffs") breach of contract and fraudulent misrepresentation counterclaims with prejudice.   In asserting these claims, Defendants/Counterclaim Plaintiffs have failed to state claims upon which relief can be granted and the claims must be dismissed.

The reasons for this Motion are more fully stated in the attached Memorandum in Support, which is incorporated herein by reference.

Respectfully submitted,


*/s/ F. Allen Boseman, Jr.*
F. Allen Boseman, Jr (0084103)
Bradley A. Sherman (00639060
SHERMAN BOSEMAN LEGAL GROUP, LLC
800 West St. Clair Avenue, 4th Floor
Cleveland, OH  44113
Telephone:  216.239.1414
Facsimile:   216.239.1316
Email:  allen@shermanboseman.com
        bradley@shermanboseman.com

Attorney for Plaintiffs
IAN COOPERSTEIN and BRYAN LEE


## CERTIFICATE OF SERVICE

I hereby certify that, on August 29, 2018, a copy of the foregoing *Plaintiffs/Counterclaim Defendants' Motion to Dismiss Defendants/Counterclaim Plaintiffs' Counterclaims* with attached *Memorandum in Support* was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


*/s/ F. Allen Boseman, Jr.*
F. Allen Boseman, Jr.

Attorney for Plaintiffs
IAN COOPERSTEIN and BRYAN LEE

IN THE COURT OF COMMON PEAS
CUYAHOGA COUNTY, OHIO

IAN COOPERSTEIN, et al.,                    :
                                             :
        Plaintiffs,                          :      CASE NO. CV-18-897744
                                             :
v.                                           :      JUDGE KATHLEEN ANN SUTULA
                                             :
TRAGIC HERO MUSIC GROUP, INC., et al.,       :
                                             :
        Defendants.                          :

## MEMORANDUM IN SUPPORT OF PLAINTIFFS/COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS DEFENDANTS/COUNTERCLAIM PLAINTIFFS' COUNTERCLAIMS

## I.      INTRODUCTION

"A Civ. R. 12(B)(6) motion to dismiss for failure to state a claim upon which relief can be granted is procedural and tests the sufficiency of the [counterclaims]." *Kleinfeld v. Huntington Natl. Bank*, 8th Dist. Cuyahoga No. 90916, 2008-Ohio-6486, ¶29. "While the factual allegations of the [counterclaims] are taken as true, unsupported conclusions of [counterclaims] are not considered admitted and are not sufficient to withstand a motion to dismiss." *Id*. As a result, the Court must focus on whether the "factual" allegations support the conclusions asserted in the Counterclaims and state a right for relief. Defendants/Counterclaim Plaintiffs cannot meet this minimum standard for their breach of contract and/or fraud claims and they should be dismissed.

Notwithstanding the lack of merit, the breach of contract claim is insufficient on the Counterclaim's face because Tragic Hero has not and cannot allege compliance with the notice and cure provision of the contract, which is a necessary condition precedent to

even claiming breach.  The parties bargained for this very specific contractual language and Tragic Hero tacitly acknowledges its non-compliance with the material term by intentionally omitting any such allegation.  Therefore, on this ground alone, the breach of contract claim should be dismissed.  In addition, the contract was between a record label and a band, yet Tragic Hero's only target for breach is Cooperstein – one of the four band members.   The contract does not contain a term making Cooperstein or any other band member jointly and severally liable for any alleged breach and the obligations of the contract clearly flow between Tragic Hero, as the record label, and the band, as the artist.   The parties' intent is clear – the band's obligations and liabilities are joint and Cooperstein cannot be singled out for a meritless breach of contract claim.  As a result, Tragic Hero has failed to join indispensable parties and its breach of contract claim should be dismissed, on this alternative ground, if Tragic Hero does not join them.

Lastly, Defendants/Counterclaim Plaintiffs' fraud claim is not only insufficient because its "support" is limited to conclusory allegations, but it also falls fatally short of meeting the heightened and well-established standard of particularity.  The 8th District's holding on this issue is clear and long held – at a minimum, a claim must allege "the time, place and contents of the misrepresentation" – and Defendants/Counterclaim Plaintiffs have failed to meet any of these basic requirements in asserting fraud.  *See, Cord v. Victory Solutions, LLC*, 8th Dist. Cuyahoga No. 106006, 2018-Ohio-590, ¶14 (Feb. 15, 2018).  The "particularity" requirement is designed to "protect [parties] from the potential harm to their reputations" based on "general accusations of acts involving" fraud; therefore, the allegations must be "concrete and specific."  *Morgan Stanley Dean Witter*, 8th Dist. No.

86407, 2006-Ohio-1542, ¶20 (Mar. 30, 2016). Defendants/Counterclaim Plaintiffs do not even make a feeble attempt to be "particular" about their allegation of fraud and the claim is nothing more than a thinly-veiled retaliatory action against Plaintiffs/Counterclaim Defendants for seeking relief from Defendants/Counterclaim Plaintiffs for wage and hour violations. The Counterclaims speak for themselves and the lack of particularity plainly support dismissal of the fraud claim.

Based on the foregoing, which is explained in greater detail below, Defendants/Counterclaim Plaintiffs' breach of contract and fraud claims should be dismissed for failing to state a claim upon which relief can be granted.

## II. LAW AND ARGUMENT

### A. Defendants/Counterclaim Plaintiffs Failed to State a Breach of Contract Claim Upon Which Relief Can Be Granted.

#### i. Tragic Hero's Breach of Contract Claim Should Be Dismissed Because It Failed to Perform Its Contractual Obligations.

Tragic Hero cannot state a claim for breach of contract because it has not (and cannot) aver complete performance of its contractual obligations, a necessary element of the claim. Indeed, it is well-established that "[a] party bringing a cause of action for breach of contract must demonstrate the following: (1) the existence of a binding contract or agreement; (2) **that the non-breaching party performed its contractual obligations**; (3) that the other party failed to fulfill its contractual obligations without legal excuse; and (4) that the non-breaching party suffered damages as a result of the breach." *McNulty v. Pls Acquisition Corp.*, 8th Dist. Case Nos. 79025, 79125, 79195, 2002-Ohio-7220, ¶39 (emphasis added). The terms of the contract at issue and Tragic Hero's allegations in the

Counterclaims confirm that Tragic Hero did not perform its contractual obligations before alleging breach.

In a breach of contract action, Civ. R. 10(D) requires that a copy of the contract be attached to the pleading and the attached contract becomes part of the pleading for all purposes. *Krause v. Case W. Res. Univ.*, 8th Dist. Cuyahoga No. 70526, 1996 Ohio App. LEXIS 5771, at *11-12 (Dec. 19, 1996); *Third Fed. S. & L. Assn. v. Haydu*, 9th Dist. Case No. 25985, 2012-Ohio-2887, ¶11 (June 27, 2012) (finding that any contract "attached to a pleading is a part of the pleading for all purposes"); *Oxford Sys. Integration v. Smith-Boughan Mechanical Servs.*, 159 Ohio App.3d 533, 2005-Ohio-210, 824 N.E.2d 586, ¶14 (2d Dist. Jan. 21, 2005) (finding that "because the action is based on the instrument, the instrument itself should be construed as much a part of the pleading as any descriptive paragraph within the pleading"). In the Counterclaims, Tragic Hero has alleged that Cooperstein breached the terms of its Exclusive Recording Contract ("Recording Contract") with the band Gloe. The Recording Contract is attached to the Counterclaims and speaks directly to what is deemed a breach between the parties and it includes notice and the right to cure any alleged breach:

> Neither party to this agreement **shall be deemed to be in breach of any of their respective obligations** hereunder, **unless** and until the party alleging a breach (by the other party) shall have given said party a **written notice** (as outlined in Section 14) describing the breach in detail and the party (alleged to be in "breach") fails to cure the alleged breach or have at least taken **reasonable steps to begin to cure the alleged breach within forty-five (45) days** after receipt of said notice.

(*See*, Recording Contract at ¶23, attached to Counterclaims as Exhibit 1) (Emphasis added.) Therefore, pursuant to the plain and unambiguous language of the Recording

Contract, no party can be in breach of the agreement until (1) the party alleging breach provides detailed written notice of the breach consistent with Section 14; and, (2) the party alleged to be in breach is given 45 days to "take reasonable steps to begin to cure the alleged breach." (*See id.* at ¶¶14 and 23).

In asserting its breach of contract claim, Tragic Hero fails to allege that it complied with the notice and cure provision of the agreement despite making a number of baseless and unsupportable allegations to support its flimsy claim. This failure is not simply a mere oversight but, instead, a tacit admission that Tragic Hero did not comply with the necessary contractual obligations to even allege a breach of contract claim. In the absence of fulfilling these requirements, Cooperstein cannot be in breach of the Recording Contract because the agreement's terms specifically define what "shall be deemed" a breach. (Recording Contract at ¶23). Accordingly, Tragic Hero has failed to state a breach of contract claim and, as a result, the claim should be dismissed on this ground alone.

### ii. Tragic Hero's Breach of Contract Claim Should Be Dismissed Because It Failed to Join Indispensable Parties.

In addition, Tragic Hero cannot state a claim for breach of contract against Cooperstein because it has failed to join indispensable parties. "An 'indispensable party' has been defined as 'one whose absence seriously prejudices any party to the action or prevents the court from rendering an effective judgment between the parties, or is one whose interests would be adversely affected or jeopardized by the judgment between the parties to the action.'" *Malakpa v. Red Cab Co.*, 72 Ohio Misc.2d 27, 30, 655 N.E.2d 458 (C.P.1995); *see also* Civ. R. 19. Here, there can be no real dispute that indispensable parties

7

have not been joined by Tragic Hero and their absence will adversely impact and prejudice the parties.  Therefore, on this alternative ground, this claim should be dismissed if Tragic Hero does not join the indispensable parties.

In this case, Tragic Hero has alleged that Cooperstein, as one of four members of the band Gloe, breached the terms of the Recording Contract.  The Recording Contract, however, is not between Tragic Hero and Cooperstein but, instead, between Tragic Hero, on one hand, and Daniel Actor, Christopher Jensen, Brian Fell and Cooperstein, on the other as members of Gloe.  (*See* Recording Contract at p. 9).   Further, the Recording Contract does not contain a single term imposing joint **and** several liability on any of the band members and the agreement is completely silent about who is liable in general.  In the absence of such terms, "whether the contractual duties are joint, several, or joint and several depends upon the proper interpretation of the contract rendered."  *Royal Appliance Mfg. Co. v. Fernengel*, 8th Dist. No. 51268, 1987 Ohio App. LEXIS 8491 at *17 (Aug. 27, 1987).  "Generally, an obligation entered into by more than one person is **presumed to be joint**, and several responsibilities will not arise except by words of severance."  *Dutro v. Meerdink*, 8th Dist. No. 97725, 2012-Ohio-2316, ¶26 (May 24, 2012) (emphasis added).  Moreover, it is clear that the intent of the contract is for "the band," not any single member of the band, to comply with the contractual obligations if Tragic Hero complied with its corresponding obligations.  Indeed, Tragic Hero's promises in the contract are owed to the band as a whole and not Cooperstein as an individual. Therefore, the terms of the Recording Contract should be interpreted to impose only joint liability among the band members because there was no meeting of the minds about the

individual members being jointly and severally liable. *Altercare of Mayfield Village, Inc. v. Berner*, 2017-Ohio-958, 86 N.E.3d 649, ¶28 (8th Dist.) (finding that there must be a meeting of the minds about "essential terms of the contract" in order for them to be binding and enforceable).

Accordingly, the breach of contract claim should be dismissed, on this alternative ground, if Tragic Hero fails to join the other indispensable parties. Otherwise, Cooperstein will be severely prejudiced by their absence and complete relief will not be granted in the unlikely event that Tragic Hero prevailed on its claim.

    **B.**    **Defendants/Counterclaim Plaintiffs Failed to State a Fraud Claim Upon Which Relief Can Be Granted Because It Does Not Meet the Particularity Requirement.**

Defendants/Counterclaim Plaintiffs cannot state a claim for fraud because they have failed to plead the claim with particularity. "Fraud is a serious matter," and therefore, subject to a heightened pleading standard. *Grayson v. Cadillac Builders*, 8th Dist. No. 68551, 1995 Ohio App. LEXIS 3954, at *12 (Sep. 14, 1995); *Holt Co. v. Ohio Mach. Co.*, 10th Dist. No. 06AP-911, 2007-Ohio-5557, ¶22 (Oct. 8, 2007) (holding that fraud claims place "a higher burden than is normally required upon the person asserting such a claim to support general allegations with specific facts"). Indeed, pursuant to Civ. R. 9(B), all fraud claims "**shall** be stated with particularity" in order to be actionable. *Dolan v. City of Glouster*, 2007-Ohio-6275 at ¶28 (4th Dist. Nov. 15, 2007); *see also, Cord v. Victory Solutions, LLC*, 8th Dist. Cuyahoga No. 106006, 2018-Ohio-590, ¶14 (Feb. 15, 2018). Therefore, "[f]ailure to plead the elements of fraud with particularity results in a defective

claim that cannot withstand a Civ. R. 12(B)(6) motion to dismiss." *Glazer v. Chase Home Fin. L.L.C.*, 2013-Ohio-5589 at ¶83 (8th Dist. Dec. 19, 2013).

"In the context of pleading fraud, the word 'particularity' means that the pleading **must contain allegations of fact** which tend to show each and every element of a cause of action for fraud." *Minaya v. NVR, Inc.*, 8th Dist. Cuyahoga No. 105445, 2017-Ohio-9019, ¶11 (Dec. 14, 2017) (emphasis added). "This means that a plaintiff **must** state the time, place, and content of the false representation, the fact misrepresented, and the nature of what was obtained or given as a consequence of the fraud." *Cord v. Victory Solutions, LLC*, 8th Dist. Cuyahoga No. 106006, 2018-Ohio-590, ¶14 (Feb. 15, 2018) (emphasis added); *see also Fannie Mae v. Brown*, 7th Dist. No. 16 CO 0008, 2017-Ohio-9237, ¶30 (Dec. 22, 2017) ("The plaintiff must allege, at a minimum, the time, place and contents of the misrepresentation on which they relied."); *Pointe at Gateway Condominium Owner's Assn. v. Schmelzer*, 8th Dist. Cuyahoga Nos. 98761, 99130, 2013-Ohio-3615, ¶57 (Aug. 22, 2013); *Reinglass v. Morgan Stanley Dean Witter*, 8th Dist. No. 86407, 2006-Ohio-1542, ¶20 (Mar. 30, 2016). When alleging fraud, "[t]he rules require particularity […] to protect defendants from the potential harm to their reputations which may attend general accusations of acts involving moral turpitude; to ensure that the obligations are concrete and specific so as to provide defendants notice of what conduct is being challenged; and to inhibit the filing of complaints as a pretext for discovery of unknown wrongs." *Dolan*, 173 Ohio App.3d at 629; *see also, Cord v. Victory Solutions, LLC*, 8th Dist. Cuyahoga No. 106006, 2018-Ohio-590, ¶14 (Feb. 15, 2018). As a result, the particularity requirement of

Civ. R. 9(B) cannot be sidestepped because it is designed to protect the integrity of the parties and the litigation process itself.

To support their fraud claim, Defendants/Counterclaim Plaintiffs only allege that "Counterclaim Defendants made **certain representations** about Visitors' fan base, including that Visitors' following would make the band a financially sustainable investment." (*See* Counterclaim at ¶¶21 and 57) (emphasis added). This vague and conclusory allegation, however, is not enough to support a fraud claim in the face of a motion to dismiss. Indeed, the Eighth District Appellate Court has long held that "conclusory statements" are "insufficient to properly plead [a] claim" and this standard is further heightened when a fraud claim is asserted and particularity is required. *Pointe at Gateway Condominium Owner's Assn. v. Schmelzer*, 8th Dist. Cuyahoga Nos. 98761, 99130, 2013-Ohio-3615, ¶58 (Aug. 22, 2013). Contrary to this requirement, Defendants/Counterclaim Plaintiffs have unquestionably failed to state any "facts" to support their allegations, including, but not limited to, when the alleged misrepresentation was made, where the alleged misrepresentation was made, who was the recipient of the alleged misrepresentation and the specific content of the alleged misrepresentation. *See, Glazer v. Chase Home Fin. L.L.C.*, 8th Dist. Cuyahoga Nos. 99875, 99736, 2013-Ohio-5589, ¶93 (finding that Plaintiff's "vague" and "conclusory" allegations were not supported by material facts and warranted dismissal of the claim); *see also, Dolan v. City of Glouster*, 173 Ohio App.3d 617, 630 (Nov. 15, 2007) (dismissing fraud claim for failing to allege particularized facts).

These shortcomings are a death blow to their claim for fraud. Accordingly, in the absence of more particularized facts, Defendants/Counterclaim Plaintiffs' fraud claim is fatally flawed and should be dismissed for failing to state a claim upon which relief can be granted.

## III.  CONCLUSION

For all of the reasons set forth above, Plaintiffs/Counterclaim Defendants request that Defendants/Counterclaim Plaintiffs' fraud and breach of contract claim be dismissed.

Respectfully submitted,

*/s/ F. Allen Boseman, Jr.*
F. Allen Boseman, Jr (0084103)
Bradley A. Sherman (00639060
SHERMAN BOSEMAN LEGAL GROUP, LLC
800 West St. Clair Avenue, 4th Floor
Cleveland, OH  44113
Telephone:  216.239.1414
Facsimile:   216.239.1316
Email:  allen@shermanboseman.com
        bradley@shermanboseman.com

Attorney for Plaintiffs
IAN COOPERSTEIN and BRYAN LEE



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**ANSWER OF...**
**September 10, 2018 20:49**

By: F. ALLEN BOSEMAN 0084103

Confirmation Nbr. 1490326

IAN COOPERSTEIN, ET AL.                          CV 18 897744

       vs.

TRAGIC HERO MUSIC GROUP, INC., ET AL.            **Judge:** KATHLEEN ANN SUTULA

**Pages Filed:** 16

IN THE COURT OF COMMON PEAS
CUYAHOGA COUNTY, OHIO

|  |  |  |
|---|---|---|
| IAN COOPERSTEIN, et al., | : | |
| | : | CASE NO. CV-18-897744 |
| Plaintiffs, | : | |
| | : | JUDGE KATHLEEN ANN SUTULA |
| v. | : | |
| | : | |
| TRAGIC HERO MUSIC GROUP, INC., et al., | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFFS/COUNTERCLAIM DEFENDANTS' ANSWER TO THE COUNTERCLAIMS OF DEFENDANTS/COUNTERCLAIM PLAINTIFFS

Plaintiffs/Counterclaim Defendants Ian Cooperstein ("Cooperstein") and Bryan Lee ("Lee") (collectively, "Plaintiffs/Counterclaim Defendants"), by and through their undersigned counsel, for its Answer to the Counterclaims of Defendants/Counterclaim Plaintiffs, by stating as follows:

1.     The allegations in Paragraph 1 of the Counterclaims are a summary of Defendants/Counterclaim Plaintiffs' claims against Plaintiffs/Counterclaim Defendants and legal conclusions to which no response is required.  To the extent a response is required, Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 1 of the Counterclaims.

## PARTIES

2.     Upon information and belief, Plaintiffs/Counterclaim Defendants admit the allegations in Paragraph 2 of the Counterclaims.

3.     Upon information and belief, Plaintiffs/Counterclaim Defendants admit LaCombe is the Founder and a shareholder of Tragic Hero.  Plaintiffs/Counterclaim Defendants deny the remaining allegations in Paragraph 3 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

4.     Plaintiffs/Counterclaim Defendants admit the allegations in Paragraph 4 of the Counterclaims.

## JURISDICTION AND VENUE

5.     Plaintiffs/Counterclaim Defendants admit the allegations in Paragraph 5 of the Counterclaims.

6.     Plaintiffs/Counterclaim Defendants admit the allegations in Paragraph 6 of the Counterclaims.

## BACKGROUND FACTS

7.     Upon information and belief, Plaintiffs/Counterclaim Defendants admit Tragic Hero is a record label that represents hardcore heavy metal artists and bands. Plaintiffs/Counterclaim Defendants deny the remaining allegations in Paragraph 7 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

8.     Plaintiffs/Counterclaim Defendants admit that Cooperstein works for the University of Utah and is a member of the band Visitors.  Plaintiffs/Counterclaim Defendants also admit that Cooperstein is a member of the band Gloe, who is signed to

an agreement breached by Tragic Hero.  Plaintiffs/Counterclaim Defendants deny any remaining allegations in Paragraph 8 of the Counterclaims.

9.     Plaintiffs/Counterclaim Defendants admit the allegations in Paragraph 9 of the Counterclaims.

10.     Plaintiffs/Counterclaim Defendants admit the allegations in Paragraph 10 of the Counterclaims.

11.     Cooperstein admits that LaCombe expressed interest in his abilities and Gloe because LaCombe believed they could add value to Tragic Hero.  Cooperstein denies any remaining allegations in Paragraph 11 of the Counterclaims.  Further answering, Lee denies the allegations in Paragraph 11 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

12.     In response to Paragraph 12 of the Counterclaims, Cooperstein avers that the Recording Agreement speaks for itself and, therefore, no response is required.  To the extent a response is required, Cooperstein denies the allegations in Paragraph 12 of the Counterclaims.  Further answering, Lee denies the allegations in Paragraph 12 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

13.     In response to Paragraph 13 of the Counterclaims, Cooperstein avers that the Recording Agreement speaks for itself and, therefore, no response is required.  To the extent a response is required, Cooperstein denies the allegations in Paragraph 13 of the Counterclaims.  Further answering, Lee denies the allegations in Paragraph 13 of the

Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

14.     In response to Paragraph 14 of the Counterclaims, Cooperstein avers that the Recording Agreement speaks for itself and, therefore, no response is required.  To the extent a response is required, Cooperstein denies the allegations in Paragraph 14 of the Counterclaims.  Further answering, Lee denies the allegations in Paragraph 14 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

15.     In response to Paragraph 15 of the Counterclaims, Cooperstein avers that the Recording Agreement speaks for itself and, therefore, no response is required.  To the extent a response is required, Cooperstein denies the allegations in Paragraph 15 of the Counterclaims.  Further answering, Lee denies the allegations in Paragraph 15 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

16.     In response to Paragraph 16 of the Counterclaims, Cooperstein avers that the Recording Agreement speaks for itself and, therefore, no response is required.  To the extent a response is required, Cooperstein denies the allegations in Paragraph 16 of the Counterclaims.  Further answering, Lee denies the allegations in Paragraph 16 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

17.     In response to Paragraph 17 of the Counterclaims, Cooperstein avers that the Recording Agreement speaks for itself and, therefore, no response is required.  To the

extent a response is required, Cooperstein denies the allegations in Paragraph 17 of the Counterclaims.  Further answering, Lee denies the allegations in Paragraph 17 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

18.     In response to Paragraph 18 of the Counterclaims, Cooperstein avers that the Recording Agreement speaks for itself and, therefore, no response is required.  To the extent a response is required, Cooperstein denies the allegations in Paragraph 18 of the Counterclaims.  Further answering, Lee denies the allegations in Paragraph 18 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

19.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 19 of the Counterclaims.

20.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 20 of the Counterclaims.

21.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 21 of the Counterclaims.

22.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 22 of the Counterclaims.

23.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 23 of the Counterclaims.

24.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 24 of the Counterclaims.

25.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 25 of the Counterclaims.

26.     Plaintiffs/Counterclaim Defendants admit that Tragic Hero flew them to Cleveland, Ohio to provide valuable services to Defendants/Counterclaim Plaintiffs. Plaintiffs/Counterclaim Defendants deny any remaining allegations in Paragraph 26 of the Counterclaims.

27.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 27 of the Counterclaims.

28.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 28 of the Counterclaims.

29.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 29 of the Counterclaims.

30.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 30 of the Counterclaims.

31.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 31 of the Counterclaims.

32.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 32 of the Counterclaims.

33.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 33 of the Counterclaims.

34.     Plaintiffs/Counterclaim Defendants admit that Tragic Hero presented them with a Proposed Distribution Agreement that was never discussed between the

parties.    Plaintiffs/Counterclaim Defendants deny any remaining allegations in Paragraph 34 of the Counterclaims.

35.    In response to Paragraph 35 of the Counterclaims, Plaintiffs/Counterclaim Defendants aver that the Proposed Distribution Agreement speaks for itself and, therefore, no response is required.    To the extent a response is required, Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 35 of the Counterclaims.

36.    Plaintiffs/Counterclaim Defendants admit that they refused to sign the Proposed Distribution Agreement.    Plaintiffs/Counterclaim Defendants deny any remaining allegations in Paragraph 36 of the Counterclaims.

37.    Plaintiffs/Counterclaim Defendants admit that LaCombe repeatedly made statements confirming that a contract existed between the parties. Plaintiffs/Counterclaim Defendants deny any remaining allegations in Paragraph 37 of the Counterclaims.

38.    Cooperstein denies the allegations in Paragraph 38 of the Counterclaims. Further answering, Lee denies the allegations in Paragraph 38 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

39.    Cooperstein denies the allegations in Paragraph 39 of the Counterclaims. Further answering, Lee denies the allegations in Paragraph 39 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

40.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 40 of the Counterclaims.

## CLAIM ONE: BREACH OF CONTRACT
### (Tragic Hero v. Cooperstein)

41.     In response to Paragraph 41 of the Counterclaims, Plaintiffs/Counterclaim Defendants restate and incorporate by reference their responses to the preceding paragraphs as if fully rewritten herein.

42.     In response to Paragraph 42 of the Counterclaims, Cooperstein avers that Defendants/Counterclaim Plaintiffs' breach of contract claim is the subject of a pending Motion to Dismiss and, therefore, no response is required.  To the extent a response is required, Cooperstein denies the allegations in Paragraph 42 of the Counterclaims. Further answering, Lee denies the allegations in Paragraph 42 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

43.     In response to Paragraph 43 of the Counterclaims, Cooperstein avers that Defendants/Counterclaim Plaintiffs' breach of contract claim is the subject of a pending Motion to Dismiss and, therefore, no response is required.  To the extent a response is required, Cooperstein denies the allegations in Paragraph 43 of the Counterclaims. Further answering, Lee denies the allegations in Paragraph 43 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

Electronically Filed 09/10/2018 20:49 / ANSWERS / CV 18 897844 / Confirmation Nbr. 1490326 / BATCH

44.     In response to Paragraph 44 of the Counterclaims, Cooperstein avers that Defendants/Counterclaim Plaintiffs' breach of contract claim is the subject of a pending Motion to Dismiss and, therefore, no response is required. To the extent a response is required, Cooperstein denies the allegations in Paragraph 44 of the Counterclaims. Further answering, Lee denies the allegations in Paragraph 44 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

45.     In response to Paragraph 45 of the Counterclaims, Cooperstein avers that Defendants/Counterclaim Plaintiffs' breach of contract claim is the subject of a pending Motion to Dismiss and, therefore, no response is required. To the extent a response is required, Cooperstein denies the allegations in Paragraph 45 of the Counterclaims. Further answering, Lee denies the allegations in Paragraph 45 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

## CLAIM TWO: UNJUST ENRICHMENT
### (Tragic Hero v. Cooperstein)

46.     In response to Paragraph 46 of the Counterclaims, Plaintiffs/Counterclaim Defendants restate and incorporate by reference their responses to the preceding paragraphs as if fully rewritten herein.

47.     Cooperstein denies the allegations in Paragraph 47 of the Counterclaims. Further answering, Lee denies the allegations in Paragraph 47 of the Counterclaims for

lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

48.     Cooperstein denies the allegations in Paragraph 48 of the Counterclaims. Further answering, Lee denies the allegations in Paragraph 48 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

49.     Cooperstein denies the allegations in Paragraph 49 of the Counterclaims. Further answering, Lee denies the allegations in Paragraph 49 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

50.     Cooperstein denies the allegations in Paragraph 50 of the Counterclaims. Further answering, Lee denies the allegations in Paragraph 50 of the Counterclaims for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

### CLAIM THREE: TORTIOUS INTERFERENCE WITH CONTRACT
**(All Counterclaim Plaintiffs Against Lee)**

51.     In response to Paragraph 51 of the Counterclaims, Plaintiffs/Counterclaim Defendants restate and incorporate by reference their responses to the preceding paragraphs as if fully rewritten herein.

52.     Cooperstein denies the allegations in Paragraph 52 of the Counterclaims. Further answering, Lee denies the allegations in Paragraph 52 of the Counterclaims for

Electronically Filed 09/10/2018 20:49 / ANSWERS / CV 18 897744 / Confirmation Nbr. 1490326 / BATCH

lack of knowledge or information sufficient to form a belief as to the truth of the allegations.

53.     Plaintiffs/Counterclaim Defendants admit that they knew a Recording Contract existed between Tragic Hero and Gloe.  Plaintiffs/Counterclaim Defendants deny any remaining allegations in Paragraph 53 of the Counterclaims.

54.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 54 of the Counterclaims.

55.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 55 of the Counterclaims.

**CLAIM FOUR: FRAUDULENT MISPREPRESENTATION**
**(All Counterclaim Plaintiffs Against All Counterclaim Defendants)**

56.     In response to Paragraph 56 of the Counterclaims, Plaintiffs/Counterclaim Defendants restate and incorporate by reference their responses to the preceding paragraphs as if fully rewritten herein.

57.     In response to Paragraph 57 of the Counterclaims, Plaintiffs/Counterclaim Defendants aver that Defendants/Counterclaim Plaintiffs' fraudulent misrepresentation claim is the subject of a pending Motion to Dismiss and, therefore, no response is required.  To the extent a response is required, Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 57 of the Counterclaims.

58.     In response to Paragraph 58 of the Counterclaims, Plaintiffs/Counterclaim Defendants aver that Defendants/Counterclaim Plaintiffs' fraudulent misrepresentation claim is the subject of a pending Motion to Dismiss and, therefore, no response is

required.  To the extent a response is required, Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 58 of the Counterclaims.

59.     In response to Paragraph 59 of the Counterclaims, Plaintiffs/Counterclaim Defendants aver that Defendants/Counterclaim Plaintiffs' fraudulent misrepresentation claim is the subject of a pending Motion to Dismiss and, therefore, no response is required.  To the extent a response is required, Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 59 of the Counterclaims.

60.     In response to Paragraph 60 of the Counterclaims, Plaintiffs/Counterclaim Defendants aver that Defendants/Counterclaim Plaintiffs' fraudulent misrepresentation claim is the subject of a pending Motion to Dismiss and, therefore, no response is required.  To the extent a response is required, Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 60 of the Counterclaims.

61.     In response to Paragraph 61 of the Counterclaims, Plaintiffs/Counterclaim Defendants aver that Defendants/Counterclaim Plaintiffs' fraudulent misrepresentation claim is the subject of a pending Motion to Dismiss and, therefore, no response is required.  To the extent a response is required, Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 61 of the Counterclaims.

## CLAIM FIVE: DEFAMATION
### (All Counterclaim Plaintiffs Against All Counterclaim Defendants)

62.     In response to Paragraph 62 of the Counterclaims, Plaintiffs/Counterclaim Defendants restate and incorporate by reference their responses to the preceding paragraphs as if fully rewritten herein.

63.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 63 of the Counterclaims.

64.     Plaintiffs/Counterclaim Defendants deny the allegations in Paragraph 64 of the Counterclaims.

## DEMAND FOR RELIEF

65.     Plaintiffs/Counterclaim Defendants specifically deny any unlawful conduct and further deny that Defendants/Counterclaim Plaintiffs are entitled to any of the relief requested in their "Demand for Judgment" or any other relief.

66.     Plaintiffs specifically deny each and every allegation not specifically admitted herein.

## AFFIRMATIVE DEFENSES

Plaintiffs/Counterclaim Defendants, for their affirmative and additional defenses to the Counterclaims, assert the following relative to Defendants/Counterclaim Plaintiffs' claims (the existence of which is expressly denied):

1.     The Counterclaims fail to state claims upon which relief can be granted.

2.     The Counterclaims fail to state facts sufficient for recovery of attorneys' fees or other litigation expenses.

3.     Plaintiffs/Counterclaim Defendants claim all of the defenses, rights and immunities afforded by Ohio R.C. § 4112.01 et seq.

4.     The Counterclaims are barred, in whole or in part, by the applicable statute of limitations.

5.      The Counterclaims are barred, in whole or in part, by the equitable doctrines of waiver, estoppel, laches, consent, and/or unclean hands.

6.      To the extent Defendants/Counterclaim Plaintiffs failed to mitigate their damages, their claim for monetary relief must be denied.

7.      The Counterclaims are barred, in whole or in part, to the extent Defendants/Counterclaim Plaintiffs failed to exhaust available contractual remedies.

8.      To the extent punitive/liquidated/exemplary damages are even available as a remedy for the Counterclaims (and Plaintiffs/Counterclaim Defendants maintain that punitive damages are not available), any claim for punitive/liquidated/exemplary damages must be denied because Plaintiffs/Counterclaim Defendants did not willfully violate any law with respect to Defendants/Counterclaim Plaintiffs.

9.      Defendants/Counterclaim Plaintiffs' alleged damages are speculative and remote.

10.      Some of the Counterclaims are subject to the provisions of the Ohio Tort Reform Act, O.R.C. § 2315.18, et seq., including, but not limited to the provision regarding bifurcation of this punitive damages claim and evidence regarding alleged punitive damages.

11.      Defendants/Counterclaim Plaintiffs' claims for compensatory damages, to the extent they are even available (and Plaintiffs/Counterclaim Defendants deny that they are), are subject to the limitations of O.R.C. § 2315.18.

12.     Defendants/Counterclaim Plaintiffs' claims for punitive damages, to the extent they are even available (and Plaintiffs/Counterclaim Defendants deny that they are), are subject to the limitations of O.R.C. § 2315.21.

13.     Defendants/Counterclaim Plaintiffs' damages, if any, were solely the result of their own actions or inaction, unaffected by Plaintiffs/Counterclaim Defendants in any way.

14.     Plaintiffs/Counterclaim Defendants assert that if LaCombe alleges to have suffered from emotional distress, it was proximately caused, in whole or in part, by factors other than any action taken by Plaintiffs/Counterclaim Defendants.

15.     Plaintiffs/Counterclaim Defendants at all times acted in good faith and with no willful intent to evade the law.

16.     Plaintiffs/Counterclaim Defendants at all times had reasonable grounds for believing that they were in compliance with the law.

17.     The Counterclaims are barred, in whole or in part, to the extent they seek relief beyond that available under applicable law, including, but not limited to claims for punitive and/or compensatory damages.

18.     The Counterclaims fail because any alleged action or failure to act on the part of Plaintiffs/Counterclaim Defendants was not the proximate cause of any injuries to Defendants/Counterclaim Plaintiffs.

19.     Plaintiffs/Counterclaim Defendants assert all other defenses that potentially may become available as a result of information developed throughout the course of this case, and thus, they reserve the right to assert new or additional defenses.

**WHEREFORE**, having fully answered the Counterclaims, Plaintiffs/Counterclaim Defendants request that the Counterclaims be dismissed in its entirety and that Plaintiffs/Counterclaim Defendants be awarded such other relief as the Court may deem appropriate.

Respectfully submitted,


*/s/ F. Allen Boseman, Jr.*
F. Allen Boseman, Jr. (0084103)
Bradley A. Sherman (0063906)
SHERMAN BOSEMAN LEGAL GROUP, LLC
800 West St. Clair Avenue, 4th Floor
Cleveland, OH  44113
Telephone:  216.239.1414
Facsimile:   216.239.1316
Email:  bradley@shermanboseman.com

Attorneys for Plaintiffs/Counterclaim Defendants
IAN COOPERSTEIN and BRYAN LEE


## CERTIFICATE OF SERVICE

I hereby certify that, on September 10, 2018, a copy of the foregoing *Plaintiffs/Counterclaim Defendants' Answer to the Counterclaims* was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ F. Allen Boseman, Jr.*
F. Allen Boseman, Jr.

Attorney for Plaintiffs/Counterclaim Defendants
IAN COOPERSTEIN and BRYAN LEE

CV18897744                    104586211



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**ANSWER AND COUNTERCLAIM $75**
**July 12, 2018 15:55**

By: JAMES P. SAMMON 0064212

Confirmation Nbr. 1437009

IAN COOPERSTEIN, ET AL,                    CV 18 897744

vs.

TRAGIC HERO MUSIC GROUP, INC., ET AL.      **Judge:** KATHLEEN ANN SUTULA

Pages Filed: 48

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| IAN COOPERSTEIN, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO. CV-18-897744 |
| | ) | |
| -v- | ) | |
| | ) | JUDGE KATHLEEN ANN SUTULA |
| TRAGIC HERO MUSIC GROUP, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

### ANSWER TO COMPLAINT AND COUNTERCLAIM

---

Defendants Tragic Hero Music Group, Inc. (*"**Tragic Hero**"*) and Tommy LaCombe (*"**LaCombe**"*) (collectively, the *"**Defendants**"*), by and through counsel, file this Answer to Plaintiffs Ian Cooperstein (*"**Cooperstein**"*) and Bryan Lee's (*"**Lee**"*) (collectively, the (*"**Plaintiffs**"*) Complaint, and pursuant to Civ.R. 13(A), Counterclaim Plaintiffs Tragic Hero and LaCombe file their Counterclaims against Cooperstein and Lee.

Defendants deny each and every allegation contained in the Complaint that is not specifically admitted in this Answer.

Subject to the foregoing, Defendants answer the Complaint as follows (the paragraphs of Defendants' Answer correspond with the paragraphs of the Complaint):

### PARTIES

1. Defendants admit the allegations contained in this paragraph.

2. Defendants admit the allegations contained in this paragraph.

3. Defendants admit the allegations contained in this paragraph.

4.     Defendants admit that LaCombe founded the Tragic Hero Records label and is a shareholder of Tragic Hero. Defendants specifically deny that LaCombe currently resides or ever resided in the State of Virginia. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

## VENUE

5.     Defendants deny the allegations contained in this paragraph.

6.     Defendants deny the allegations contained in this paragraph.

7.     Defendants deny the allegations contained in this paragraph.

8.     Defendants deny the allegations contained in this paragraph.

9.     Defendants deny the allegations contained in this paragraph.

10.     Defendants admit that Tragic Hero occupies certain office space located at 2230 Superior Avenue East, Floor 1, Cleveland, Ohio 44114 in Cuyahoga County, Ohio. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

11.     Defendants deny the allegations contained in this paragraph.

12.     Defendants deny the allegations contained in this paragraph.

13.     Defendants deny the allegations contained in this paragraph.

## FACTS

14.     Defendants deny the allegations contained in this paragraph for want of knowledge or information sufficient to form a belief as to the truth thereof.

15.     Defendants deny the allegations contained in this paragraph for want of knowledge or information sufficient to form a belief as to the truth thereof.

16.     Defendants deny the allegations contained in this paragraph for want of knowledge or information sufficient to form a belief as to the truth thereof.

17.     Defendants deny the allegations contained in this paragraph for want of knowledge or information sufficient to form a belief as to the truth thereof.

18.     Defendants deny the allegations contained in this paragraph for want of knowledge or information sufficient to form a belief as to the truth thereof.

19.     Defendants deny the allegations contained in this paragraph for want of knowledge or information sufficient to form a belief as to the truth thereof.

20.     Defendants deny the allegations contained in this paragraph for want of knowledge or information sufficient to form a belief as to the truth thereof.

21.     Defendants deny the allegations contained in this paragraph for want of knowledge or information sufficient to form a belief as to the truth thereof.

22.     Defendants deny the allegations contained in this paragraph for want of knowledge or information sufficient to form a belief as to the truth thereof.

23.     Defendants deny the allegations contained in this paragraph for want of knowledge or information sufficient to form a belief as to the truth thereof.

24.     Defendants admit that LaCombe and Cooperstein met in or about December, 2016. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

25.     Defendants deny the allegations contained in this paragraph. Responding further, Defendants specifically deny that Cooperstein "advised" any of the Defendants. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

26.     Defendants deny the allegations contained in this paragraph. Responding further, Defendants admit that shortly after meeting, LaCombe and Cooperstein discussed Cooperstein's business and music background generally. Defendants specifically deny that LaCombe was "immediately intrigued," that Gloe had a "strong industry buzz," or that any Defendant "pushed to sign Cooperstein's other band – Visitors – to Tragic Hero[.]" Defendants deny all allegations contained in this paragraph not specifically addressed herein.

27.     Defendants deny the allegations contained in this paragraph.

28.     Defendants deny the allegations contained in this paragraph. Defendants specifically deny any employment relationship between Plaintiffs and Defendants. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

29.     Defendants deny the allegations contained in this paragraph. Defendants specifically deny any "promise to fund" any "imprint" label. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

30.     Defendants deny the allegations contained in this paragraph. Defendants specifically deny that either "officially offered Cooperstein a position," and specifically deny that an employment relationship existed between any Plaintiff and any Defendant. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

31.     Defendants deny the allegations contained in this paragraph. Defendants specifically deny that an employment relationship existed between any Plaintiff and

any Defendant. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

32.     Defendants deny the allegations contained in this paragraph. Defendants specifically deny that an employment relationship existed between any Plaintiff and any Defendant. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

33.     Defendants deny the allegations contained in this paragraph. Defendants specifically deny that an employment relationship existed between any Plaintiff and any Defendant. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

34.     Defendants deny the allegations contained in this paragraph.

35.     Defendants deny the allegations contained in this paragraph.

36.     Defendants deny the allegations contained in this paragraph.

37.     Defendants deny the allegations contained in this paragraph.

38.     Defendants deny the allegations contained in this paragraph. Defendants specifically deny that any agreed-upon salary or other compensation structure existed between any Plaintiff and any Defendant. Responding further, Defendants specifically deny that an employment relationship existed between any Plaintiff and any Defendant. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

39.     Defendants deny the allegations contained in this paragraph. Defendants specifically deny that any agreed-upon salary or other compensation structure existed between any Plaintiff and any Defendant. Responding further, Defendants specifically

deny that an employment relationship existed between any Plaintiff and any Defendant. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

40.     Defendants deny the allegations contained in this paragraph.

41.     Defendants deny the allegations contained in this paragraph.

42.     Defendants deny the allegations contained in this paragraph.

43.     Defendants deny the allegations contained in this paragraph. Defendants specifically deny that any agreed-upon salary or other compensation structure existed between any Plaintiff and any Defendant. Responding further, Defendants specifically deny that an employment relationship existed between any Plaintiff and any Defendant. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

44.     Defendants deny the allegations contained in this paragraph.

45.     Defendants deny the allegations contained in this paragraph.

46.     Defendants deny the allegations contained in this paragraph.

47.     Defendants deny the allegations contained in this paragraph. Defendants specifically deny that an employment relationship existed between any Plaintiff and any Defendant. Defendants deny all allegations contained in this paragraph not specifically addressed herein.

## COUNT I: FRAUDULENT INDUCEMENT/FRAUD

48.     Defendants incorporate each and every preceding paragraph as if fully restated in this paragraph.

49.     Defendants deny the allegations contained in this paragraph.

50.     Defendants deny the allegations contained in this paragraph.

51.     Defendants deny the allegations contained in this paragraph.

52.     Defendants deny the allegations contained in this paragraph.

## COUNT II: BREACH OF CONTRACT

53.     Defendants incorporate each and every preceding paragraph as if fully restated in this paragraph.

54.     Defendants deny the allegations contained in this paragraph.

55.     Defendants deny the allegations contained in this paragraph.

56.     Defendants deny the allegations contained in this paragraph.

57.     Defendants deny the allegations contained in this paragraph.

## COUNT III: FAIR LABOR STANDARDS ACT

58.     Defendants incorporate each and every preceding paragraph as if fully restated in this paragraph.

59.     Defendants deny the allegations contained in this paragraph.

60.     Defendants deny the allegations contained in this paragraph.

61.     Defendants deny the allegations contained in this paragraph.

62.     Defendants deny the allegations contained in this paragraph.

## COUNT IV: UNJUST ENRICHMENT

63.     Defendants incorporate each and every preceding paragraph as if fully restated in this paragraph.

64.     Defendants deny the allegations contained in this paragraph.

65.     Defendants deny the allegations contained in this paragraph.

66.     Defendants deny the allegations contained in this paragraph.

## COUNT V: CONVERSION

67.     Defendants incorporate each and every preceding paragraph as if fully restated in this paragraph.

68.     Defendants deny the allegations contained in this paragraph.

69.     Defendants deny the allegations contained in this paragraph.

## COUNT VI: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND/OR CONTRACTS

70.     Defendants incorporate each and every preceding paragraph as if fully restated in this paragraph.

71.     Defendants deny the allegations contained in this paragraph.

72.     Defendants deny the allegations contained in this paragraph.

73.     Defendants deny the allegations contained in this paragraph.

74.     Defendants deny the allegations contained in this paragraph.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

1.     The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

2.     Plaintiffs have failed to join all necessary and responsible parties.

### THIRD DEFENSE

3.     Defendants fully complied with their obligations (if any) under the documents attached to the Complaint.

### FOURTH DEFENSE

4.     At all relevant times to the Complaint, Defendants have acted in good faith.

## FIFTH DEFENSE

5.    Plaintiffs' claims are barred by the doctrine of accord and satisfaction.

## SIXTH DEFENSE

6.    Plaintiffs' claims are barred by the doctrines of bad faith and unclean hands.

## SEVENTH DEFENSE

7.    Plaintiffs' claims are barred by the doctrines of release, estoppel, waiver, and laches.

## EIGHTH DEFENSE

8.    Plaintiffs' claims are barred by their own misconduct.

## NINTH DEFENSE

9.    Plaintiffs' claims are barred because any breach of contract was not a material breach.

## TENTH DEFENSE

10.    Plaintiffs have failed to mitigate their alleged damages.

## ELEVENTH DEFENSE

11.    Plaintiffs' claims are barred because no employment relationship existed between any Plaintiff and any Defendant.

## TWELVETH DEFENSE

12.    Plaintiffs' claims are barred because they failed to exhaust all other remedies, administrative or otherwise.

## THIRTEENTH DEFENSE

13.    Plaintiffs' claims are barred for lack of consideration.

## FOURTEENTH DEFENSE

14.     Plaintiffs' claims are barred by the statute of frauds.

## FIFTEENTH DEFENSE

15.     Plaintiffs' claims are barred because there was no meeting of the minds as to the essential terms of any contract between any Plaintiff and any Defendant.

## SIXTEENTH DEFENSE

16.     Any contract or promise from any Defendant to any Plaintiff was made under duress.

## SEVENTEENTH DEFENSE

17.     Plaintiffs' claims are barred because they failed to comply with the 45-day cure period pursuant to Paragraph 23 of the May 26, 2017 Exclusive Recording Agreement.

## EIGHTEENTH DEFENSE

18.     Plaintiffs' claims in Count I are barred because they fail to plead fraud with specificity.

## NINTEENTH DEFENSE

19.     Plaintiffs fail to state a claim for conversion upon which relief can be granted.

## TWENTIETH DEFENSE

20.     Plaintiffs' claims are barred, in whole or in part, by Civ.R. 10(D) for failure to attach any alleged contract or other written instrument to their Complaint.

## TWENTY FIRST DEFENSE

21.     Defendants reserve the right to raise additional affirmative defenses discovered and/or determined as a result of discovery or otherwise in this action.

**WHEREFORE,** Defendants having fully answered the Complaint, pray for judgment as follows:

(a)     Judgment in favor of Defendants on the claims in the Complaint;

(b)     Award Defendants their costs and expenses, including attorney fees incurred as a result of this action; and

(c)     All such other relief as this Court may deem just and proper.

## COUNTERCLAIM

Counterclaim Plaintiffs Tragic Hero Music Group, Inc. (*"Tragic Hero"*) and Tommy LaCombe (*"LaCombe"*) (collectively, the *"Counterclaim Plaintiffs"*) for their Counterclaim against Ian Cooperstein (*"Cooperstein"*) and Bryan Lee (*"Lee"*) (collectively, the (*"Counterclaim Defendants"*) state as follows:

1.     This Counterclaim concerns Cooperstein's breach of an exclusive recording agreement whereby he personally agreed to create certain recordings and fulfill certain recording commitments for Tragic Hero as a member of the band "Gloe." Cooperstein used Gloe's contract with Tragic Hero to deceitfully advance another band "Visitors," of which he and Lee were members. When success eluded Counterclaim Defendants, they began a course of tortious conduct designed to coerce, defame, and

harass the Counterclaim Plaintiffs, all while abandoning Gloe's commitment to its exclusive recording agreement.

## PARTIES

2.    Tragic Hero is an Ohio corporation duly formed and existing under the laws of the state of Ohio, with offices located at 2230 Superior Avenue East, Floor 1, in Cleveland, Cuyahoga County, Ohio.

3.    LaCombe is the Founder of the Tragic Hero Records label and shareholder of Tragic Hero. LaCombe is a resident of the State of North Carolina.

4.    Cooperstein and Lee are citizens of the State of Utah.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction pursuant to R.C. 2305.01 and R.C. 2307.382(A)(1), (2), (3), (4), and (6).

6.    Venue is proper pursuant to Civ.R. 3(C)(3) and (6).

## BACKGROUND FACTS

7.    Tragic Hero is a record label representing a variety of hardcore and heavy metal artists and bands across the United States and around the world.

8.    Cooperstein is a full-time employee at the University of Utah, and a member of the band Gloe, which is signed to the Tragic Hero label. Cooperstein is also a member of the band Visitors.

9.    Lee is a full-time employee at the University of Utah, and along with Cooperstein, is a member of the band Visitors. Upon information and belief, Lee is not and has never been a member of the band Gloe.

10.     In or about January, 2017, LaCombe was introduced to Cooperstein through members of a band signed to Tragic Hero, and the two generally discussed Cooperstein's background and music industry knowledge.

11.     Although Gloe lacked any particular notoriety in the industry, LaCombe took some interest in his conversations with Cooperstein because the band had similar marketability as other artists already signed to Tragic Hero's label.

### Tragic Hero Signs Gloe

12.     On May 26, 2017, Tragic Hero entered into an Exclusive Recording Agreement (the "***Recording Agreement***") with Gloe and each of its band members individually, including Cooperstein. A copy of the Recording Agreement is attached hereto as <u>Exhibit 1</u>.

13.     The Recording Agreement was divided into three parts: an initial period (the "***First Contract Period***") followed by two (2) consecutive Option Periods (each, an "***Option Period***" and collectively, the "***Option Periods***").

14.     During the First Contract Period, the Recording Agreement required Gloe and its members to write and deliver at least ten (10) approved, previously unreleased master recordings (a "***Recording Commitment***"). (See Exh. 1 at ¶ 1(c)).

15.     The First Contract Period extended from the date of signing, May 26, 2017, until twelve (12) months after the initial U.S. release of the first Recording Commitment. (See *Id.* at ¶ 1(a)).

16.     Thereafter, each Option Period, if exercised, required Gloe and its members to write and deliver a new Recording Commitment.

17.     Each Option Period would, if exercised, extend twelve (12) months after the initial U.S. Release of each respective new Recording Commitment. (See *Id.*).

18.     The future option(s) were material to the Recording Agreement because they would allow Tragic Hero to capitalize on its time and efforts invested in Gloe. (See *Id.* at ¶ 1(b)).

### Cooperstein Attempts to Expand His Business Relationship with Tragic Hero

19.     Shortly after Tragic Hero signed Gloe, Cooperstein colluded with Lee to promote their band, Visitors, through Tragic Hero's label.

20.     From the time he was introduced to LaCombe, Cooperstein boasted about his supposed connections in the music industry as part of a veiled strategy to make Visitors part of the Tragic Hero label.

21.     To induce Tragic Hero into working with Visitors, Counterclaim Defendants made certain representations about Visitors' fan base, including that Visitors' following would make the band a financially sustainable investment.

22.     Despite its skepticism, Tragic Hero agreed to advance, as a loan, certain costs associated with Visitors' first album release to explore whether Visitors would be successful.

23.     In total, Tragic Hero advanced $12,305.42 to cover the costs to release Visitors' first album, funds which all parties understood were a loan.

24.     To date, Counterclaim Defendants failed to make any payment on the loan to Visitors.

25.     Shortly thereafter and by their own initiative, Counterclaim Defendants took on certain marketing initiatives that they claimed would be beneficial for Tragic

Hero. Counterclaim Defendants' efforts were designed to demonstrate their value to the Tragic Hero label and advance their strategy to secure a record deal for Visitors, similar to the deal with Gloe.

26.     Counterclaim Defendants eventually planned an exploratory trip, at Counterclaim Plaintiffs' expense, to Tragic Hero's offices in Cleveland to demonstrate their marketing abilities and value to Tragic Hero's representatives.

27.     During that exploratory trip, Counterclaim Plaintiffs questioned Counterclaim Defendants' motives and integrity. Specifically, during his presentation, Cooperstein criticized and disparaged certain well-respected industry professionals with whom Tragic Hero and LaCombe do business daily.

28.     Also during the Cleveland trip, Counterclaim Defendants attempted to demonstrate their marketing expertise, which consisted of only a demonstration on how to create ads on Facebook.

29.     Tragic Hero's representatives were unimpressed with Counterclaim Defendants' skills, given that, by design, any lay person could generate ads on Facebook.

30.     Skeptical of Cooperstein's intentions, Tragic Hero wanted to keep an arms-length relationship between themselves and Counterclaim Defendants.

31.     To further that goal, Tragic Hero suggested that Counterclaim Defendants launch their own record label later referred to as Formant Records (***"Formant"***).

32.     Tragic Hero indicated in its proposal that it was willing to provide distribution services to help launch the label, namely: (i) publicity; (ii) retail distribution; (iii) graphic design; (iv) manufacturing; and (v) marketing.

33.     Tragic Hero also indicated, as is custom in the industry, that it could advance certain costs as a loan in association with the Formant releases.

34.     Tragic Hero's offer was eventually memorialized in a proposed Agreement for Distribution and Administrative Assistance between Tragic Hero and Formant (the "*Proposed Distribution Agreement*"). The Proposed Distribution Agreement is attached hereto as <u>Exhibit 2</u>.

35.     The Proposed Distribution Agreement contained terms standard in the music industry and made clear that: (i) Counterclaim Defendants would operate an independent record label, and; (ii) that no employment relationship would exist between any Counterclaim Defendant and any Counterclaim Plaintiff.

36.     When it became clear that Counterclaim Plaintiffs were catching on to Counterclaim Defendants' scheme to infiltrate the Tragic Hero record label, they refused to sign the Proposed Distribution Agreement and pay back the Visitors loan.

37.     Frustrated that Counterclaim Plaintiffs wanted to avoid a close working relationship with them, Counterclaim Defendants began attempting to elicit self-serving statements from LaCombe — statements which would appear to evidence a contract between the parties which never actually existed.

38.     Specifically, Cooperstein sent text messages and made phone calls to LaCombe at all hours of the day and night during a time when he knew LaCombe was

particularly vulnerable — and after the death of one of their closest business associates and shareholders.

39.    Cooperstein breached his personal obligations under the Exclusive Recording Agreement by: (i) intentionally abandoning his obligation to deliver the Recording Commitment, and; (ii) failing to allow Tragic Hero to capitalize on its time and efforts invested in Gloe and subsequently exercise its future option(s).

40.    Upon information and belief, Cooperstein had no intention of delivering the Gloe record, and along with Lee, schemed to use Visitors to interfere with Gloe's Exclusive Recording Commitment.

## CLAIM ONE: BREACH OF CONTRACT
### (Tragic Hero v. Cooperstein)

41.    Counterclaim Plaintiffs incorporate each and every paragraph as if fully restated herein.

42.    The Recording Agreement is a valid contract between Tragic Hero and Cooperstein individually. (*See*, Exh. 1).

43.    Plaintiffs fully performed all of their obligations under the Recording Agreement.

44.    Cooperstein breached the Recording Agreement by, *inter alia*, (i) failing to deliver the first Recording Commitment pursuant to Paragraph 1(c); and (ii) failing to comply with its obligations to allow Tragic Hero to capitalize on its time and efforts invested in Gloe and subsequently exercise its future option(s) pursuant to Paragraph 1(b).

45. As a direct and proximate cause of Cooperstein's breach of the Recording Agreement, Counterclaim Plaintiffs suffered damages in an amount to be proven at trial.

## CLAIM TWO: UNJUST ENRICHMENT
### (Tragic Hero v. Cooperstein)

46. Counterclaim Plaintiffs incorporate each and every paragraph as if fully restated herein.

47. Tragic Hero conferred a benefit upon Cooperstein, namely its time, advice, and the efforts of various staff invested to deliver the first Recording Commitment.

48. Cooperstein had knowledge of the benefit.

49. Cooperstein retained the benefit Tragic Hero conferred under circumstances where it would be unjust to do so without payment.

50. As a direct and proximate cause of Cooperstein's unjust enrichment, Tragic Hero suffered damages in an amount to be proven at trial.

## CLAIM THREE: TORTIOUS INTERFERENCE WITH CONTRACT
### (All Counterclaim Plaintiffs Against Lee)

51. Counterclaim Plaintiffs incorporate each and every paragraph as if fully restated herein.

52. The Recording Agreement is a valid contract between Tragic Hero, Gloe, and Gloe's individual band members. (*See* Exh. 1).

53. Lee was aware of the Recording Agreement.

54. Lee intentionally and without justification procured Cooperstein to breach the Recording Agreement to promote his and Cooperstein's band, Visitors.

55.     As a direct and proximate cause of Lee's interference, Counterclaim Plaintiffs have been damaged in an amount to be proven at trial.

## CLAIM FOUR: FRAUDULENT MISREPRESENTATION
**(All Counterclaim Plaintiffs Against All Counterclaim Defendants)**

56.     Counterclaim Plaintiffs incorporate each and every paragraph as if fully restated herein.

57.     Counterclaim Defendants falsely represented to Counterclaim Plaintiffs, *inter alia*, the size and commercial significance of the Visitors' fan base.

58.     Counterclaim Defendants knew that their representations were false when they were made.

59.     Counterclaim Defendants intended to mislead Counterclaim Plaintiffs into relying on their false representations in hopes of securing a record deal.

60.     Counterclaim Plaintiffs, with a right to do so, relied on Counterclaim Defendants' false representations.

61.     As a direct and proximate cause of Counterclaim Defendants' false representations, Counterclaim Plaintiffs have been damaged in an amount to be proven at trial.

## CLAIM FIVE: DEFAMATION
**(All Counterclaim Plaintiffs Against All Counterclaim Defendants)**

62.     Counterclaim Plaintiffs incorporate each and every paragraph as if fully restated herein.

63.     Counterclaim Defendants, at least negligently and without privilege, made false and defamatory statements about Counterclaim Plaintiffs, *inter alia*, on

social media and to members or representatives of other bands signed to Tragic Hero's label related to the facts in the Counterclaim.

64.     As a direct and proximate cause of Counterclaim Defendants' defamatory statements, Counterclaim Plaintiffs have been damaged in an amount to be proven at trial.

**WHEREFORE**, Counterclaim Plaintiffs respectfully request that this Court:

A.     As to all Counts in the Complaint, enter judgment in favor of Defendants;

B.     As to Claim One of the Counterclaim, money damages in favor of Counterclaim Plaintiffs, in excess of $25,000.00, plus attorney fees, and costs;

C.     As to Claim Two of the Counterclaim, money damages in favor of Counterclaim Plaintiffs, in excess of $25,000.00, plus attorney fees, and costs;

D.     As to Claim Three of the Counterclaim, money damages in favor of Counterclaim Plaintiffs, in excess of $25,000.00, plus attorney fees, and costs;

E.     As to Claim Four of the Counterclaim, money damages in favor of Counterclaim Plaintiffs, in excess of $25,000.00, plus attorney fees, and costs;

F.     As to Claim Five of the Counterclaim, money damages in favor of Counterclaim Plaintiffs, in excess of $25,000.00, plus attorney fees, and costs;

G.     Pre-judgment and post-judgment interest; and

H.     All such other relief as this Court may deem just and proper.

## JURY DEMAND

Counterclaim Plaintiffs respectfully demand a trial by jury pursuant to Civ.R. 38.

*/s/ James P. Sammon*
JAMES P. SAMMON (0064212)

Respectfully submitted,

**KOHRMAN JACKSON & KRANTZ LLP**

*/s/ James P. Sammon*
JAMES P. SAMMON (0064212)
KYLE A. HUTNICK (0095673)
One Cleveland Center, 29th Floor
1375 East Ninth Street
Cleveland, Ohio 44114
Phone: 216-696-8700
Fax: 216-621-6536
Email: jpsammon@kjk.com; kah@kjk.com

*Counsel for Defendants/Counterclaim*
*Plaintiffs Tragic Hero Music Group, Inc. and*
*Tommy LaCombe*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was sent this 12th

day of July, 2018 via the Court's electronic filing system to the following:

Bradley A. Sherman
F. Allen Boseman
Sherman Boseman Legal Group, LLC
800 West St. Clair Avenue
4th Floor
Cleveland, OH  44113
Phone: 216-314-2289
E-mail:    Bradley@shermanboseman.com
           Allen@shermanboseman.com


*/s/ James P. Sammon*
James P. Sammon



**Tragic Hero Music Group, Inc. / 2230 Superior Avenue, E, FL1 / Cleveland, OH 44114**

May 26, 2017

Daniel lewis Actor, Christopher Norman Jensen, Brian Keith Fell and Ian Joshua Cooperstein
2714 S McClelland / Salt Lake City, UT 84106
Individually Collectively and PKA - "Gloe"


RE:     **Tragic Hero Music Group, Inc. and/or its affiliates, successors and assigns – w –**
         **Gloe / EXCLUSIVE RECORDING AGREEMENT**


DearGentlemen:

The following shall confirm the terms of the agreement (the "Agreement") between Tragic Hero
Music Group, Inc and/or its affiliates, successors and assigns ("Company", "us" or "we") and
Daniel lewis Actor, Christopher Norman Jensen, Brian Keith Fell and Ian Joshua Cooperstein,
individually, collectively and professionally also known as "Gloe" ("you" or "Artist") with regard
to you providing us with exclusive recording services and/or deliveries of finished recordings. All
of the understandings between us have been merged herein. Except as specifically provided
below, all terms of this Agreement shall be subject to standard Company policies, procedures,
exclusive rights, terms and conditions (including, without limitation, policies regarding recording
and delivery procedures, recoupment, royalty reductions and calculations, accounting policies,
warranties, representations, "leaving member" provisions, re-recording restrictions, choice of law,
definitions, indemnifications, etc.) some of which are defined herein or available upon request.
Except as otherwise defined herein, the terms used within this Agreement shall have the same
definitions as ascribed to them by Company Policy or standard industry practices. NO Company
policy or procedure shall be created, exercised or utilized in a way to be unfair to Artist
financially or outside of the standard practices within the recorded music industry.

         The parties hereto may enter into a more formal or comprehensive agreement containing
the terms of this Agreement or one or more of the Company's policies/procedures.  In connection
therewith, Company shall consider in good faith any requests for negotiated changes you may
have to the non-substantive, non-financial, boilerplate terms found within the Company's
policies/procedures, provided that unless and until a said more formal or comprehensive agreement
is fully executed, this Agreement (including all Company Policies) shall be deemed valid and
legally binding.

1

THMG/Gloe
Exclusive Recording Agreement
Execution Version
May 26, 2017

Initials:  DA ___  CJ ___  BF ___  IC ___  THMG ___

*Exhibit 1*

1.  **Term/ Product**:

    (a)    The term of this Agreement (the "Term") shall consist of an initial period (the "First Contract Period") and two (2) consecutive option periods ("Option Period(s)"). The First Contract Period shall begin on the date of execution of this Agreement and shall end on the date twelve (12) months following the initial release in the United States of the recorded composition(s) required to be delivered in complete satisfaction of the Recording Commitment for the First Contract Period.   The consecutive Option Period(s), if exercised by Company, shall begin immediately following the preceding contract period and continue until the date twelve (12) months following each of their respective initial release(s) in the United States of the Committed Album(s) or recorded Composition(s) to be delivered in complete satisfaction of the Recording Commitment(s) for each of the Option Periods.

    (b)    Notwithstanding anything to the contrary contained in this paragraph 1, if Company has not exercised its option to extend the Term for any Option Period as of the date on which the current Contract Period would otherwise expire, the following shall apply:

    > (1)  You shall send Company notice (an "Option Warning") that its option has not yet been exercised.

    > (2)  Company shall have the right to exercise the applicable Contract Period Option by sending a written notice to you not later than the date ten (10) business days after its receipt of the Option Warning (the "Extension Period").

    > (3)  At the time of notice, the current Contract Period shall end on either the last day of the Extension Period or the date of Company's notice (the "Termination Notice") to you that Company does not wish to exercise such option, whichever is sooner.

    > (4)  For the avoidance of doubt, nothing herein shall limit Company's right to send a Termination Notice to you at any time, nor limit Company's right to exercise a Contract Period Option in accordance with paragraph 1, notwithstanding any failure by you to send Company an Option Warning in accordance with this paragraph.

    (c)    The Recording Commitment for the first (1ˢᵗ) Contract Period shall consist of a delivery to Company of not less than Ten (10) previously un-released Master Recordings, written by Artist and approved by Company. The Recording Commitment for any Option Period (if exercised) shall consist of a delivery to Company of not less than Ten (10) previously un-released Master Recordings, written by Artist and approved by Company

    (d)    Each Album required to be Delivered hereunder is sometimes referred to herein as a "Committed Album." In addition, a particular "Committed Album" is sometimes referred to herein as the "First Album", "Second Album", or "Third Album" respectively, in the order in which same is Delivered to Company.

2

(e)     The First Delivery required to be delivered hereunder shall be Delivered to Company within sixty (60) Days following Company's request therefore, which it hereby requests upon execution of this agreement.  Each subsequent Committed Album, if any, shall be Delivered to Company within four (4) months following the commencement of the applicable Option Period.

(f)     Provided you have fulfilled all your material obligations under this agreement, Company will commercially release each Album or Recorded Composition Delivered by you in accordance with this Agreement in the United States not later than One Hundred and Eighty (180) days after you Deliver the Album concerned to us together with all other materials necessary or reasonably desirable to us in connection with such release including, without limitation, all artwork, credits, liner notes, etc. It is understood that Company will fund the costs of artwork, and liner notes.  If (1) Company fails to release the Album concerned as aforesaid; (2) you give Company notice in writing of such failure within sixty (60) days after the end of the above-referenced ninety days (90) day period; and (3) Company fails to release the Album concerned within thirty (30) days after Company's receipt of that notice, then you will have the right to terminate the term of this agreement by written notice to Company within thirty (30) days after the end of that sixty (60) day period.  All rights that extend beyond the end of the term will, however, continue.

2.     **Ownership/Licensing**:

Each of the Master Recording(s) delivered hereunder and all reproductions derived therefrom (other than the underlying musical compositions) shall be Company's property and Company shall be the sole copyright proprietor thereof.  The rights granted to Company for such Master Recordings shall be in perpetuity and shall be for the Territory described below.  Without limiting the generality of the foregoing, during the term(s) herein, Company shall have the exclusive right to exploit all such Master Recordings in any and all forms of media now known or hereafter developed and shall have the further exclusive right to use Artist's name, likeness, and biographical material in connection with any and all promotion, marketing and/or exploitation of such Master Recordings. You shall have the right to approve all photographs, likenesses and biographical material concerning Artist, which approval or disapproval shall not be unreasonably withheld and shall be given to Company by notice in writing within seven (7) days after such photographs, likenesses and biographical material are provided to you.  Your failure to give such notice as aforesaid shall be deemed to be your approval as to the material for which such approval is sought.  All photographs and biographical material concerning Artist that are submitted by you shall be deemed approved by you for the purposes hereof.  This paragraph shall not apply to any photographs, likenesses or biographical material previously approved by you.

3.     **Territory**:  The Universe.

4.     **Recording Budget / All-in Recording Funds**:

(a)     In connection with the First Delivery of recorded Compositions(s) to be delivered herein there shall be a recoupable recording fund and "all-in" costs payable to the Artist or on behalf of

3



Artist to Producer or other third-parties (for any and all costs associated with the production) in an amount NOT to exceed ($4,250.00) which shall be paid as follows: Upon delivery of the finished and approved final mix(es). Any remaining monies from the recording fund following delivery shall be paid directly to Artist.

(b)     With respect to each Committed Album other than the First Delivery, Company shall pay provide you with a recording fund advance in the amount of Ten Percent (10%) of the Gross Revenues received by Company from all sales (including merchandise) during the twelve (12) months following the immediately preceding album released hereunder. This "Recording Fund" shall be subject to the following Minimums and Maximums, set forth as follows:

| Album Recording Fund | Minimum | Maximum |
|---|---|---|
| Second Album | $6,000 | $7,500 |
| Third Album | $7,500 | $10,000 |

The Recording Fund advance for each Committed Album subsequent to the First Album shall be payable as follows: a portion of the Advance equal to 15% (but NOT more than 50%) of the Recording Fund following the commencement of recording or in advance for a deposit to the Producer for the Committed Album concerned; and the balance of the Recording Fund following Delivery of that Committed Album. Company will administer each of the Recording Funds and with all remaining or left over optioned album funds make the remaining amounts payable to you.

(c)     All payments pursuant to this paragraph 4 shall constitute Advances recoupable from royalties (excluding mechanical royalties) payable to you as provided herein.

5.     **Record Royalties:** In connection with each Album released hereunder, the royalty rate for Net Sales of Albums, Singles, and Electronic Transmissions (payable to you) shall be as follows: Thirty Percent (30%) of the net monies (inclusive of Mechanical Royalties) on albums, singles and electronic transmissions sold. All Royalty Rates herein shall be based on the Net Monies actually received by Company, after deducting and/or recouping from the gross revenues actually received by Company, ALL advances, costs and expenses (including but NOT limited to ANY recording funds, cash or merchandise advances, manufacturing, packaging, delivery payments and/or Mechanical Royalty payments made herein). "Net Monies" as used in this paragraph shall mean the gross monies actually received by or credited to Company for sales of units sold herein, less any distribution fees, costs, expenses, recording funds and/or advances and Mechanical Royalties paid by Company, directly related to the Album or Composition Deliveries being contracted for delivery and release herein. All costs, advances and expenses may be cross-collateralized with any Monies at Company's sole election.

6.     **Mechanical Royalties/Controlled Compositions:** You hereby grant Company or its Licensees mechanical licenses for the Territory for all Controlled Compositions embodied in Master Recordings made hereunder, under the terms set forth herein. Company will pay Mechanical Royalties for Controlled Compositions on the basis of one hundred percent (100%) of the minimum compulsory license rate (without regard to playing time) as of the date of actual or scheduled Delivery, whichever is earlier, for full-priced Record royalty-bearing USNRC Net

4

Sales; provided that Company shall not be required to pay more than 10x the applicable rate set forth above for Albums, 5x such rate for EPs, 3x such rate for Maxi-singles and 2x such rate for Singles. No payment on free goods. Mechanical Royalty payments made herein shall be fully deducted from the Gross Monies Company receives from Album unit sales to arrive at the NET (of which your royalty shall be computed).

During the term, Company shall have the option (at its sole discretion) to enter into a fifty-fifty (50/50) co-administrative publishing agreement with you which shall constitute 25% of the entire publishing interest (Publisher AND Songwriter's shares collectively) and artist agrees to negotiate the non-substantive parameters (in good faith) and enter into same, which shall be similar to those made within the "Publishing industry" and concurrent with standard industry practices. Company shall have the right to exercise such option at any time during the term and pay to Artist a recoupable, but non-returnable advance of Five Thousand Dollars ($5,000.00), payable upon exercise of the option; which shall be limited to the compositions released hereunder.

7.  **Marketing/Promotion/Creative Matters**: The Delivery standard will be commercially satisfactory. Company will fund publicity, promotion and marketing for the album or Composition Deliveries and said costs shall be fully recouped from the gross revenues when determining net proceeds and/or royalties owed to you.

8.  **Videos/ Marketing/Promotion**:

     (a)     The budget for Videos, Marketing and Promotions shall be at Company's sole election and negotiated on a case by case basis with you in good faith.

     (b)     One Hundred Percent (100%) of all video production, independent promotion, marketing and/or publicity costs shall be deducted from the gross revenues and recouped by Company when determining net proceeds and/or royalties owed to you.

9.  **Merchandise**: You grant Company the right to use your professional name, approved photographs, approved likeness, logo and other artwork delivered by you and/or created by Company with your approval (not to be unreasonably withheld) solely in connection with the manufacture, advertising, sale and distribution of six (6) exclusive designs in connection with each of the Contract Period(s) hereunder for use on T-Shirts, sweaters, sweatshirts and similar items approved by you (which approval shall not be unreasonably withheld). These rights shall be perpetual and in connection with such sales, Company shall pay you or credit your Royalty account with Fifty (50%) of: (a) all amounts earned and received by Company from the exploitation throughout the world of such products, in perpetuity, either alone or in conjunction with other elements less (b) all costs and third party payments directly related thereto.

With each merchandise design released for sale hereunder, Company shall provide you with the right to purchase units at the then-current wholesale price offered or better. There shall be NO royalty payable to you on free goods or goods sold directly to you.

10.  **Website**: During the Term, you hereby license to Company the right to use Artist's professional name in connection with the establishment and maintenance of Internet website

5

Electronically Filed 07/12/2018 15:58 / ANSWER / CV 18 897244 / Confirmation Nbr. 1437009 / CLHMG

Initials ANBW TH CW BF IC THMG 

pages within Company owned and controlled websites ("Company's Artist Site") (ie- tragic-hero.com/gloe or similar) or third-party retailer websites. You will retain the right to establish and maintain additional web sites relating to Artist, provided that Company will have the right to establish links to and from said sites, including Company's Artist Site, with such other sites. During the term of this agreement, you will make Company and/or at least one of its employees an administrator on your Artist Facebook and any other social networking page(s) for the purpose of marketing, promoting and advertising your releases to your base of fans (fan community).

11.    **Warranties & Representation/Assignment:** Company warrants and represents that Company is free to enter into and to perform the terms of this Agreement. You warrant and represent that you are free to enter into, to make the grants of rights made hereunder and to perform the terms of this Agreement. Company shall have the right to assign this Agreement and Company's rights in whole or in part and any or all of Company's rights hereunder, as more fully provided below. Notwithstanding the foregoing, you shall not have the right to assign any of your rights or obligations hereunder; provided, however, that you will have the right, upon written notice to Company, to assign this Agreement to any corporation or limited liability company that is owned or controlled solely by you, provided that such assignment will not in any manner alter or derogate from Company's rights hereunder and that you will continue to be liable for the complete performance of your obligations hereunder and shall enter into a separate inducement letter with Company therefor. You represent that Company will not have to make any payments with respect to the exploitation of the Masters hereunder, other than as expressly set forth herein.

12.    **Tour Support:** You agree to play not less than One Hundred and Twenty (120) live shows per album cycle. You shall have the right to purchase from Company sales copies of each Album at our standard "artist rate", which rate shall be Five dollars ($5.00) per CD and the then current wholesale price (but NOT less than $9.00) per Vinyl LP unit (more for Double Albums) if manufactured. You shall not have the right to resell such copies through any other outlet other than live shows. No royalties (either record or mechanical) shall be payable to you in connection with such sales to you.

Company will provide you with 120 CDs and 50 Vinyl albums (if and when either is manufactured) free from any charge (other than manufacturing) and sell additional units to you as outlined above. Company will also pay you $800 upon completion of any tour whereby you have performed on a minimum of twenty-five (25) shows in ANY consecutive thirty (30) day period. Any time Company provides you with tour support, in any form (ie-physical music products, merchandise or cash), such tour support amount(s) shall be considered cash advances and be fully recoupable from any monies payable to Artist hereunder (including mechanical royalties).

13.    **Ringtones/Video Ringtones:**   You grant Company the exclusive right to use your professional name, approved photographs, approved likeness in connection with the exploitation, sale and distribution of polyphonic and so-called "MasterTones", "Ringtones", Ringbacks, "Videoringers", "Voicetones", greeting cards, and sound effects as these terms are commonly used in the mobile entertainment industry ("Mobile Uses").   Company may record up to two (2) exclusive Mobile Uses per contract period hereunder, in which the copyright to such Mobile Uses shall be assigned to Company.   You shall cooperate with Company in the recording and/or videotaping of such Mobile Uses, subject to your prior professional commitments and at Company's reasonable, recoupable expense.   Company shall pay you the applicable royalty with

6



respect to each Mobile Use in accordance with the terms of the Exhibit Agreement.

14. **Notices:**  All notices to the parties hereto shall be in writing and may be served upon the applicable party personally, by certified mail, return receipt requested, or by overnight courier for which a signed receipt is obtained, at the address set forth on page 1 above or at such other address as a party hereto may designate in writing from time to time, and for notices to Company with to company's business manager at the following address: Tragic Hero Music Group, Inc., 2230 Superior Avenue E, FL1, Cleveland, OH 44114, attn: Randy Chase.    All notices shall be deemed given when personally delivered or mailed, all charges prepaid, except that notices of a change of address shall be effective only after the actual receipt thereof.

15. **Accounting**:  Company shall account to Artist and pay all royalties due hereunder within ninety (90) days after June 30 and December 31, respectively. You shall have the right at your sole cost and expense to appoint a certified public accountant to examine Books and Records as same pertain to sales of Records subject hereto; provided that, any such examination shall be for a reasonable duration, shall take place at Company's offices during normal business hours on reasonable prior notice and shall not occur more than once in any calendar year. You may examine Books and Records with respect to a particular statement only once.

16. **Grant of Rights:** Company may assign this agreement to: (i) any parent, subsidiary, Sister Corporation, joint venture partner or affiliate thereof, or other affiliate of Company; (ii) a Person acquiring all or substantially all of the Record-related assets of Company; or (iii) an entity merged into or consolidated with Company. The foregoing shall not prohibit or in any way restrict Company from assigning or licensing any of its rights hereunder in the ordinary course of business.  This agreement is personal to you and Artist, and neither you nor Artist shall have the right to assign this agreement or any of your or Artist's rights or obligations hereunder; provided that, you may assign your rights under this agreement to a corporation, all of whose capital stock is owned solely by you or Artist, provided: (A) you have delivered to Company an instrument signed by you and Artist and any other required Person satisfactory to Company in its sole discretion effecting the assignment and the assignee's assumption of your obligations, and Company has executed that instrument to evidence Company's approval of it; (B) no such assignment relieves you or Artist of your or Artist's obligations under this agreement; and (C) such assignee agrees that any further assignment is subject to the same conditions as set forth in this paragraph.

17. **License:** Controlled Compositions shall be and are hereby irrevocably licensed to Company and its licensees throughout the territory.

18. **Injunctive Relief:** You expressly acknowledge that Artist services hereunder are of a special, unique intellectual and extraordinary character which gives them peculiar value, and that in the event of a breach or threatened breach of any term, condition, representation, warranty, agreement or covenant hereof, Company shall be caused immediate irreparable injury, including loss of goodwill and harm to reputation, which cannot be adequately compensated in monetary damages.  Accordingly, in the event of any such breach, actual or threatened, Company shall have, in addition to any other legal remedies, the right to injunctive or other equitable relief.

7

Electronically Filed 07/12/2018 15:58 / ANSWER / CV 18 897044 / Confirmation Nbr 1443709 / CLTMG

19.    **Suspension**: Company reserves the right, at its election and upon notice to you, to suspend the operation of this agreement for the duration of any event, if it is materially hampered in the performance of its obligations under this agreement or unable to capitalize on its investment herein as a result of your actions, or if its normal business operations are delayed or become impossible or commercially impracticable because of any reasonable situation (including any of the following contingencies):  1. A failure by you to perform on and/or deliver recordings, or to play a reasonable number of live shows (at least One Hundred and Twenty [120] shows) during any 12 month album cycle or 2. Any Act of God, fire, catastrophe, labor disagreement, acts of government, its agencies or officers, any order, regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting Company or the industry in which it is engaged, delays in the delivery of materials and supplies or any other cause beyond Company's control.  Any such suspension due to a labor controversy which involves only Company shall be limited to a period of six (6) months.

20.    **Standard Industry Practices**: In all instances, Company may utilize, invoke and enforce "standard industry practices" or parameters within the various agreements or templates of agreements, required to be used or adhered to by Company. Artist may request a list of the various agreements/templates and actual copies for review, provided at Company's discretion (NOT to be unreasonably withheld).

21.    **Re-recording Restriction**: Artist shall not perform for the purpose of recording any Composition, or any adaptation of any Composition, recorded hereunder for any Person other than Company for use in the Territory on Records (including in radio or television commercials or otherwise for synchronization with visual images), before the later of: (A) five (5) years after the date of Delivery of each Recording made and delivered herein; or (B) two (2) years after the expiration or other termination of the Term(s) herein (the "Re-recording Restriction"). The re-recording restrictions herein shall be limited to Compositions recorded and subsequently delivered AND released by Company, NO other Compositions shall be subject to this re-recording restriction.

22.    **Exclusivity**: During the term of this Agreement, your recording services shall be exclusive to Company; however, with Company's permission, approval, and at its sole discretion (NOT to be unreasonably withheld), you may be permitted to record in other projects or situations (as individuals), provided that it does NOT interfere with your ability to properly promote and exploit the recordings delivered herein or disrupt Company's ability to capitalize financially on its involvement herein (and you shall provide Company with a good faith option offered by you to Company to market and distribute such "other" projects as a part of this agreement or in addition to this agreement).

23.    **Breach / Cure**: Neither party to this agreement shall be deemed to be in breach of any of their respective obligations hereunder, unless and until the party alleging a breach (by the other party) shall have given said party a written notice (as outlined in Section 14) describing the breach in detail and the party (alleged to be in "breach") fails to cure the alleged breach or have at least taken reasonable steps to begin to cure the alleged breach within forty-five (45) days after receipt of said notice.

8

Electronically Filed 07/12/2018 16:00 / ANSWER / CV 18 898744 / Confirmation Nbr. 1474009 / CLJMG

24.   **Miscellaneous**: This Agreement (i) sets forth the entire understanding between Company and you and may not be changed orally; and (ii) shall be governed and construed in accordance with the laws of the State of Ohio applicable to contracts entered into and to be performed entirely within the State of Ohio.  Ohio county, federal and state courts only shall have

jurisdiction over any controversies regarding this Agreement; any action or other proceeding that involves such a controversy shall be brought in those courts and not elsewhere.  The parties hereto waive any and all objections to venue in those courts. Each of the parties hereto understand that they should be advised by legal counsel before entering into this agreement. This Agreement shall not become effective until executed by all parties.

If this Agreement reflects your understanding of the agreement between Company and you, please so indicate by signing below.

Very truly yours,

An Authorized Signatory
Tragic Hero Music Group, Inc

**ACCEPTED AND AGREED BY
ARTIST:**

Daniel lewis Actor

Christopher Norman Jensen

Brian Keith Fell

Ian Joshua Cooperstein

9

Electronically Filed 07/12/2018 15:53 / ANSWERS / CV 18 897744 / Confirmation Nb. 1417009 / CLTHMG



AGREEMENT
for Distribution and Administrative Assistance
along with Company requested Ala Carte services
between
TRAGIC HERO MUSIC GROUP, INC ("Tragic")
and
FORMANT RECORDS ("Company')


Dated: August 21, 2017


Capitalized or other terms not defined where they appear in the text are defined in Paragraph 15.

1.     Appointment as Exclusive Distributor.

(a)     Exclusive Rights.

(i)     Company, on behalf of the Company Entities, hereby appoints Tragic as Company's exclusive distributor of Music and (at the sole election of Company) non-exclusive Music Merchandise Products through Normal and Direct to Consumer Distribution Channels during the Term in the Territory in accordance with the terms hereof. Company possesses (and hereby grants Tragic) the right to sell such Products with the name (legal or assumed), photograph, likeness and biographical material, as supplied by Company, of the artists whose performances or Music Company controlled artwork are contained therein or emblazoned thereon. With respect to such names, photographs, likenesses and biographical materials, Tragic shall abide by any contractual requirements or restrictions imposed upon Company of which Tragic is given reasonably sufficient prior written notice.

(ii)     From time to time during the Term, Company shall determine those Products Company wishes to make available for sale via download and via ringtones and the like (collectively, "Digital Services") in the Territory and Company shall provide Tragic with all rights, materials and information necessary for Tragic to copy, store, prepare, deliver and otherwise make such Products available for sale via the Digital Services. For the avoidance of doubt, the distribution of all non-physical Product, is exclusive to Tragic hereof. Company shall cooperate with Tragic to ensure that all such materials and information are provided to Tragic in the form, format{s) and manner Tragic reasonably requires from time to time in order to make Products so available. Company understands that for the purposes of sales of Products via Digital Services, the term "Products" shall be deemed to include units sold as full albums and music "bundles" in addition to units sold as one or more individual recordings otherwise embodied in Product furnished to Tragic hereunder along with all artwork, logos, images, biographical material, graphic designs, other animated Artist images and non-photographic Artist representations, audio alerts, videos and approved names and approved likenesses provided to Tragic by Company or on Company's behalf (either in connection with each recording and/or

**AGREEMENT** Between Tragic Hero Music Group, Inc. and Formant Records

of Distribution and Administrative Assistance / August 21, 2017

*Exhibit 2*

video or portion thereof or sold separately). Solely with respect to units of Products sold by Distributor in the form of Digital Services, "Distributor Net Sales" shall mean (A) the number of units of Products sold via download (or ringtones and the like) multiplied by (B) the price (after all rebates, adjustments, settlements, allowances, credits and discounts [other than cash discounts] approved by Company and actually taken) charged by Distributor to Distributor's customers for all such sales of Products.

(iii)     This agreement is meant to be exclusive with regard to NEW releases by Company; however, whenever it chooses to do so it may use the distribution afforded by this agreement to distribute any/all its products released prior to this agreement and under the same exclusive terms and conditions as found hereunder. Except as otherwise afforded Tragic by the parameters outlined herein, Tragic agrees to distribute such products under the same terms and conditions as outlined herein.

(b)     <u>Tragic's Undertakings</u>.

(i)     Tragic shall render Distribution Services for Company through Distributor(s). Distributor shall distribute and sell Products on Company's behalf through Normal Distribution Channels during the Term in the Territory and shall solicit and fulfill orders for Products in such outlets as shall be selected in good faith by Distributor in Distributor's sole discretion.

(ii)     Tragic shall prepare for Company the same sales, returns, credits and inventory reports as are prepared by Tragic for other Distributed Labels and shall supply Company with such reports with the same frequency as such reports are supplied by Tragic to the other Distributed Labels. Monthly sales and return reports shall include the following information: selection number, artist name, selection title, product configuration, gross units shipped, units actually returned, net units, discounted units, free goods, gross dollars charged, actual gross returned dollar amounts, net dollar amounts, price lines and distribution charges.

(c)     <u>Distribution Fees</u>.

(i)     <u>Product</u>. With respect to sales of Products in physical form initially released during the Term (collectively "Products"), Tragic shall be entitled to retain a distribution fee equal to 7% in addition to Distribution fees charged by its Distributors who will account to Tragic the Net Sales of Company's Products (a "Distribution Fee"). Currently Tragic is charged 18% in the United States of America and 25% Internationally.

(ii)     <u>Non-Physical Product</u>. With respect to sales of Products in non-physical (e.g., downloads, mobile, etc.) form released during the Term, Tragic shall be entitled to retain a distribution equal to 7% in addition to 18% of Distributor Net Sales (a "Distribution Fee").

(iii)     With respect to third party license opportunities that Tragic refers to Company that: (i) Company had not been previously engaged in securing; and (ii) Company enters into an agreement to license a master recording (e.g. film or TV), Company shall pay to Tragic a fee equal to 30% of the gross amount that Company receives for such license (each, an "Tragic Third-Party License"). The paperwork to memorialize all accepted Tragic Third-Party Licenses shall be issued and controlled by Company. If there is a dispute regarding

2|Page

AGREEMENT Between Tragic / Configuration Mbc. 1437009 and Defiant Records for Distribution and Administrative Assistance / August 21, 2017

whether Company was "engaged" with respect to a proposed Tragic Third-Party License, Company must provide written proof or secure written confirmation from the licensee that they had been discussing the opportunity prior to the date that Tragic Approached Company on the third-party opportunity. For the avoidance of doubt, Company's failure to present written confirmation shall be deemed that they were not engaged in the respective proposed opportunity.

(d)    Advances.

(i)    There shall be NO advances to Company by Tragic during the term; however, If Company and Tragic decide to extend the term of this agreement for multiple years beyond the 1st Contract Year Then Tragic and Company can negotiate advances to Company (in good faith) based on the previous year's revenues. Each Advance shall be fully recoupable from all Net Receipts otherwise payable to Company hereunder.

(ii)    Subject to a "Yearly Cap" (below) and after not less than one hundred and twenty (120) days beyond the first accounting period following the initial commercial release of the first Music Album by Company to consumers (released in accordance with the terms herein) in the 2nd year, Tragic will consider (based on reasonable initial revenues and at its sole discretion) providing an advance to Company (upon Company's request and at its sole election whether or not to accept such) up to $2,000 twice yearly, in marketing and promotion or incidentals funds in support of any respective Product (an "Advance"); provided that the aggregate amount of such Advances during any Contract Year shall not exceed a total of $4,000 (the "Yearly Marketing Cap"). Each Advance pursuant to this Section (d) shall be fully recoupable from all Net Receipts otherwise payable to Company hereunder and include a 10% recoupable upcharge.

(iii)    All advances, upcharges, approved Marketing support or any other "out of pocket" expenditures, provided to Company or paid on its behalf pursuant to this Section 1(d) paragraphs (i) through (ii) shall be 100% recoupable from any monies owed to Company by Tragic and the repayment of such shall extend beyond the Term(s) as agreed to herein.

(e)    Notwithstanding anything to the contrary contained herein, in the event Company fails to physically, commercially release an aggregate of four (4) new, previously unreleased, full album length Products during the Contract Year (each a "Release") which must include no less than 1 Release in the 1st calendar quarter, 1 Release in the 2nd calendar quarter, 1 Release in the 3rd calendar quarter and 1 Release in the 4th calendar quarter of the Contract Year, Tragic may (i) suspend payment of any Advances or support as set forth in paragraph l(d)(i), 1(d)(ii) and 1(d)(iii) above or (ii) extend the term of this Agreement until such time as such releases are made.

2.    Title. Title to units of Products manufactured for distribution and sale hereunder shall remain in Company. Units of Products shall be consigned by Company to Tragic, subject to the provisions of this Agreement, Tragic will, in turn, consign units of Products to Distributor(s), Distributor, as consignee, shall be empowered to pass title to units of Products directly to its customers. Distributor shall have the right, as Company's consignee, to accept any and all returns of units of Products from its customers. Upon receipt of units of Products so returned to Distributor from its customers, title therein shall revert from Distributor through Tragic to Company.

3 | P a g e

3.      Manufacturing and Packaging Services.

(a)      Exclusivity.      Company will deliver finished goods to Tragic at its sole expense; however, Company may on a non-exclusive basis (and at its sole election) utilize Manufacturing and Packaging Services provided by Tragic, through Tragic's manufacturing and packaging designees (the "Manufacturing and Packaging Entities"), for the manufacture and packaging of units of Products hereunder, including, without limitation, components therefor and all separations and merchandising materials relating thereto. Manufacturing and Packaging Services shall be furnished on the same terms and at the same prices provided to the Distributed Labels (or to Tragic's own recording Artists) by the Manufacturing and Packaging Entities for the Distributed Labels' and Tragic's own Artists comparable products at similar volumes, along with an upcharge fee of 10% of the costs (or such upcharge as is negotiated at the time of such Manufacturing and Packaging project).

(b)      Delivery of Source Materials. In the event that Tragic's Manufacturing or Packaging services are utilized by Company, Company shall at its sole expense, deliver to Tragic (or to such suppliers as Tragic may designate) all Source Materials. Source Materials shall be of a quality suitable to comply with Tragic's technical standards, Company shall retain title to all Source Materials supplied to Tragic or its designees.

(c)      Trade Advertisements. Tip Sheets and Chart Listings. Company shall be required to cause all trade advertisements, tip sheets and chart listings for any Product to identify ADA (but NOT Tragic) as the distributor of such Product in the Territory. In the event of any failure to accord ADA any such credit, such failure shall not be deemed a breach of this agreement if, following Company's receipt of written notice thereof from Tragic or ADA, Company shall cause such failure to be rectified prospectively.

(d)      Notices on Packaging: Security and Identification Strip. Packaging for Products shall have printed thereon "Distributed by ADA" (or such other identification of manufacturer or distributor as Tragic may reasonably designate from time to time) together with such logo as ADA may reasonably designate. Packaging for Products shall also include, among other things, a security and identification strip (i.e., "title strip" or "dog bone" etc.), as well as internal electronic article surveillance tags, all in a form similar to that affixed to Tragic's own product.

(e)      Parental Advisory Warnings. Upon notice to Company, Tragic shall have the right to affix a parental advisory warning sticker on Products in a format used customarily by Tragic or as may be required by applicable law. If Company does not so designate, but Tragic believes in Tragic's reasonable business judgment that such a warning is appropriate on a particular Product, Tragic may affix such a warning on such Product, Company shall be responsible for and shall pay the costs of applying and affixing the same to or on a Product.

(f)      Ordering.

(i)      The initial orders for finished units of Products shall be mutually determined by Company and Tragic.

4 | P a g e

(ii)     Reorders of finished units of Products shall be determined by Tragic in its good faith discretion (with Company's approval, NOT to be unreasonably withheld) taking into account anticipated demand and sales history for the respective Product.

(iii)    The minimum order quantities for units of Products and for all other items ordered hereunder shall be at Company's discretion with a final approval by Tragic (NOT to be unreasonably withheld). Tragic generally has manufacturing minimums of 1,000 units for CDs or Vinyl Albums and varied minimums for Music Merchandise. Company and Tragic agree to determine quantities based on needs and/or third party distributor requirements and in good faith.

(iv)    Orders hereunder shall be deemed fulfilled by the manufacture of any quantity between 90% and 110% of the quantity ordered.

4.     Release Schedules. Company and Tragic shall mutually establish a release schedule for each specific Product from the release dates offered by Distributor(s). In connection therewith, as and when requested by Company, Tragic shall furnish Company with new release book due dates, merchandise in depots due dates and Distributor's requirements for product release schedules.

5.     Company's Financial Obligations. Company shall be solely responsible for and shall account for and pay: (a) any and all sale and use taxes levied on any of the amounts payable to Company hereunder or on the sale of units of Products or any other taxes relating to units of Products which are in the possession or control of Tragic or its Distributor(s), (b) all costs incurred in the creation of Products, (c) all costs incurred in the manufacturing and packaging of units of Products, and (d) all monies becoming payable to all parties rendering services or otherwise in respect of sales of units of Products (e.g., artist royalties, mechanical royalties, union costs, if any, producer royalties, etc.). In addition, Company shall obtain all consents and permissions required for the release of Products hereunder and Tragic shall have no obligations with regard thereto. For the avoidance of doubt, Company shall not be responsible for payment of: (i) any taxes applicable to the sale of units of Products by Distributor's customers to consumers or (ii) any of Tragic's or Distributor's indirect or general overhead charges or the salaries of Tragic's or Distributor's regular employees. Notwithstanding, Company at its sole discretion and election may use paid services by certain employees of Tragic and/or its Distributors.

6.     Other Company Obligations.

(a)     Advertising, Marketing and Promotion. Except as expressly set forth in paragraph 1(d) above, the advertising, marketing and promotion of Products hereunder shall be Company's sole responsibility.

(b)    Company Reporting. On or before February 1st of each calendar year of the Term, Company will provide Tragic with sales projections for Products for the next calendar year of the Term. Company will provide Tragic with an update for each such sales projection on a quarterly basis.

5 | P a g e

AGREEMENT for Distribution and Administrative Assistance / August 21, 2017

7. <u>Sale and Promotional Use of Products</u>.

(a) <u>Determination of Price Categories</u>. Company shall determine the price category designation (e.g., top-line, mid-line, budget, etc.) of Products and/or, if Company so chooses, the suggested retail list prices for Products, it being understood that Company shall use the same price category designation or list prices which Distributor uses. Company may change such price category designation and/or suggested retail list price of a Product upon 30 days' written notice to Tragic.

(b) <u>Determination of Customer Prices</u>. Tragic and Distributor shall determine the wholesale selling price of Products to customers and the terms of sale for Products, including, without limitation, cash discounts (i.e., discounts for timely or expedited payments from customers) and credit, dating and returns policies; provided. however, that Tragic and Distributor shall obtain Company's consent as to any "special dating" which will result in a delayed payment to Company pursuant to subparagraph 9(a), special program free goods and special sales discounts. If Company should consent to grant a special sales discount on any units of Products for which Company has already received payment, Company shall pay Tragic or Distributor the amount of any such discount within five business days following the granting of such discount. The terms of sale determined by Tragic and Distributor for Products shall otherwise be the same as those utilized by Distributor for Tragic.

(c) <u>Promotional Units and Direct to Consumer Sales</u>. At least once in every consecutive thirty (30) day period, Company shall accurately report to Tragic the number of units it has manufactured of any release. Company shall be entitled to use 15% for promotional purposes without any fees paid to Tragic or its distributors. If Company uses additional units (which it has manufactured) for promotional purposes, then said additional units shall be subject to a 7% charge against Company's account by Tragic to Company (based on the published wholesale price). If Company uses additional units (which it has manufactured) for sale on a direct to consumer basis, then said units shall be subject to a 25% charge against Company's account by Tragic to Company (based on the published wholesale price). If units are manufactured by Tragic's third-party distributors (primarily Warner/ADA) then promotional copies provided to Company shall have their barcode or packaging defaced in the way that is standard within the music industry. If units are manufactured by Tragic's third-party distributors (primarily Warner/ADA) and provided to Company for sale on a direct to consumer basis, then said units shall be subject to a 7% charge against Company's account by Tragic to Company (based on the published wholesale price) and an additional fee as charged by Tragic's third-party distributors (primarily Warner/ADA) of $3.50 per unit.

8. <u>Inventory</u>.

(a) <u>Storage and Shrinkage</u>. Tragic shall accept and store all Products delivered to Distributor hereunder. Neither Tragic nor Distributor shall be responsible for inventory shrinkage of up to 1% of the total volume of all Products in finished good form delivered to Distributor during any calendar year of the Term. With respect to inventory shrinkage in excess of 1%, the sole liability shall be payment to Company of the Replacement Cost therefor. Tragic or Distributor shall, at Tragic's or Distributor's cost and expense, maintain

6 | P a g e

AGREEMENT for Manufacturing, Sales / Configuration, Music, Video and Merchant Records
for Distribution and Administrative Assistance / August 21, 2017

insurance on units of Products in Tragic's or Distributor's possession or under Tragic's or Distributor's custody or control.

(b)     Surplus Units Determination and Removal. Promptly after Tragic's written request, Company shall remove from Distributor's warehouses, or order the destruction of, at Company's sole expense, the stock of any Surplus Units of Products. Company shall be deemed to have ordered the destruction of Surplus Units if, 60 days after the date of the written request from Tragic, Company has not given instructions to Tragic for the immediate delivery of such Surplus Units to a public warehouse or other non-Distributor location at Company's sole expense and for Company's account.

(c)     Marking Inventory. Distributor may deface the bar code on or re-bar Code all units of Products prior to any removal by Company or delivery to Company of such units of Products, and Company shall reimburse Tragic, promptly following Tragic's request therefor, with the amount of any direct, out-of-pocket costs incurred by Tragic or Distributor in connection with such defacing or re-bar-coding.

(d)     Sales of Surplus Units. Company shall have the exclusive right, upon not less than 30 days' notice to Tragic, to sell any Surplus Units of Products, without financial obligation to Tragic or Distributor, except that Company shall reimburse Tragic for any direct, out-of-pocket costs incurred by Tragic or Distributor in connection with such sale.

9.     Statements and Payments.

(a)     Rendition of Statements. Tragic shall account for and pay to Company all Net Receipts derived and received from sales of Products. Tragic shall render a statement for such during each fiscal month of the Term within 30 days following each calendar month in which said funds are received by Tragic. Concurrently with the rendition of each such statement, Tragic shall pay to Company any Net Receipts shown to be due thereby after deduction of any amounts applied in recoupment of the Advances pursuant to paragraphs I(d) or any allowable deducts, recoups or Distribution fees. In each month of the Term a base reserve established by Tragic against returns and credits plus  the amount of any open but not yet credited approved advertising authorizations issued on behalf of Company shall be deducted from any such payments. Such reserve shall not exceed 25% of Distributor Gross Sales for any month of the Term & the amount of any such open but not yet credited approved advertising authorizations; provided, however, that in the last six months of the Term, such reserve shall not exceed the sum of (i) the greater of: (A) 35% of Distributor Gross Sales for any such month or (B) the positive difference, if any, between: (I) the then-current aggregate amount of the open return authorizations issued by Tragic or Distributor and (II) the then-current aggregate amount of the returns reserves being held by Tragic or Distributor; plus (ii) the amount of open but not yet credited approved advertising authorizations issued by Distributor or Tragic on behalf of Company, provided, further, that if at any point during the Term (other than during the three-month period immediately following any Product's initial release hereunder) the total number of units of any particular Product shipped to date as compared to the total number of units of such Product sold to date (as reported by Soundscan) reflects that the potential returns exposure is, in Tragic's sole good faith determination, significantly greater than the amount of the returns reserves then-currently being held by Tragic, then, notwithstanding the foregoing reserve limits, Tragic, upon notice to Company, shall have the right to so increase the amount of the returns reserves then-currently being held by the amount of such shortfall, but in no event shall returns

7 | P a g e

reserves be greater than 40% of Distributor Gross Sales at any time prior to the last six months of the Term. Tragic shall fully liquidate the returns-related portion of each base reserve as initially established, less any credits issued therefrom, within nine (9) months from the date that such base reserve was established. If any statement shall show a balance in Tragic's favor, excluding Advances, (a "Negative Balance") Company shall make payment of such amount to Tragic within ten business days after the date of rendition of the statement but in no event earlier than sixty (60) days from commencement of the Term. Notwithstanding the foregoing, Tragic shall also have the right to deduct the Negative Balance from any monies becoming payable to Company pursuant to this Agreement.

      (b)   <u>Audits</u>. Company shall have the right at Company's sole expense to appoint a certified public accountant who is not then currently engaged in an outstanding audit of Tragic or work within reasonable parameters independently with Tragic's Business Manager to examine Tragic's records as same pertain to sales of Products; provided, however, that any such examination shall be for a reasonable duration and shall take place at Tragic's offices during normal business hours on reasonable prior written notice and shall not occur more than once in any calendar year or more than once for any statement.

      (c)   <u>Objections to Statements</u>. Company shall be deemed to have consented to all accountings rendered by Tragic hereunder and said accountings shall be binding upon Company and shall not be subject to any objection by Company for any reason unless specific objection, in writing, stating the basis thereof, is given to Tragic within two years after the date rendered, and after such written objection, unless suit is instituted within three years after the date rendered.

10.   <u>Post-Term Procedures</u>.

      (a)   <u>Manufacturing and Packaging Services and Distribution Services</u>.

      (i)   Upon the expiration of the Term, Tragic shall cause the cessation of Distribution Services and Manufacturing and Packaging Services and shall have no further rights or obligations with respect to Products except as provided herein and unshipped orders for Products shall be canceled. Within 30 days following the expiration of the Term, Tragic shall provide Company with a list of all units of Products in Tragic's and Distributor's possession on such date and the prices paid by customers during the Term with respect to such Products.

      (ii)   Within 60 days following the expiration of the Term, Company shall remove from Tragic's, Distributor's and the Manufacturing and Packaging Entities' warehouses and other facilities, at Company's sole expense: (A) all units of Products in Distributor's or the Manufacturing and Packaging Entities' possession on the date of expiration, (B) all Source Materials in Tragic's, Distributor's or the Manufacturing and Packaging Entities' possession on the date of expiration, and (C) all manufacturing and packaging materials in Tragic's, Distributor's or the Manufacturing and Packaging Entities' possession on the date of expiration.

      (iii)   Prior to the expiration of the Term, Tragic or Distributor and

8 | P a g e

AGREEMENT between Tragic Distribution, LLC and Merchant Records for Distribution and Administrative Assistance / August 21, 2017

Company shall notify Distributor's customers that following the expiration of the Term, Distributor shall not accept any further returns of units of Products and that Company or Company's new distributor shall accept such returns. Company agrees that all such returns shall be so accepted and credit given or cash paid to Distributor's customers, as appropriate. Company agrees to indemnify Tragic or Distributor from any liability in connection with such returns. Notwithstanding the foregoing, Tragic or Distributor shall honor any open return authorizations. Company shall accept the return from Tragic or Distributor of all units of Products distributed during the Term which are returned by Distributor's customers from time to time thereafter and Company shall re-purchase such units of Products from Distributor for an amount equal to the credit given to Distributor's customers for such return. Units of Products returned to Distributor after the initial removal of Products by Company shall be removed by Company, at Company's sole expense, within 30 days following written request by Tragic or Distributor.

(iv) Any inventory delivered to or removed by Company as aforesaid shall have the bar-coding defaced or shall be re-bar-coded by Tragic at Company's sole expense.

(v) Failure to remove inventory (or to give instructions for its removal within the time periods mentioned in subparagraphs 10(a)(ii) and (iii) shall be deemed to be an authorization to Tragic to destroy such inventory at Company's sole expense.

(b) <u>Continuing Payment Obligations</u>. The expiration of the Term shall not discharge Company or Tragic from their obligations to pay any amounts owing hereunder. As long as any amount so owing to Tragic by Company has not been paid in full, in addition to Tragic's other rights and remedies, Tragic shall have the right to reimburse itself from amounts owed to Company hereunder.

11. Warranties, Representations and Indemnities.

(a) <u>Company's Warranties and Representations</u>. Company warrants and represents: (i) Company is under no disability, restriction or prohibition in respect of: (A) Company's right to execute this Agreement and to fully perform its terms and conditions, and (B) Company's right to grant to Tragic the rights, privileges and licenses herein granted, (ii) no agreement of any kind heretofore entered into by Company shall materially interfere in any manner with the complete performance by Company of this Agreement, (iii) intentionally deleted; (iv) Material embodied in Products and the packaging therefor as supplied by Company and any other items furnished to Tragic or Distributor by Company shall not violate any law or infringe upon the rights of any third party. As used herein, "Material" shall include, without limitation, all musical compositions, names, biographical materials and likenesses, photographic, video or motion picture images, sound recordings, intellectual properties, all packaging and artwork and Company's trademarks, trade names and logos, and (v) Tragic shall not be required to make any payments of any nature for or in connection with Tragic's acquisition, exercise or exploitation of rights pursuant to this Agreement, except as specifically provided herein.

(b) <u>Company's Indemnities</u>. Company agrees to and does hereby indemnify, save and hold Tragic and its affiliates, and each of their respective officers, directors and employees (collectively, for the purposes of this subparagraph 11(b) only, "Tragic") harmless from any and all loss and damage (including, without limitation, court costs and reasonable attorneys' fees **as** and when incurred) arising out of, connected with or as a result of my inaccuracy, inconsistency with, failure of, or breach or threatened breach by Company of any

9 | P a g e

for Distribution and Administrative Assistance / August 21, 2017

warranty, representation, agreement, undertaking or covenant contained in this Agreement. The foregoing indemnity shall be applicable only to such claims as have been reduced to judgment or settled with Company's written approval, which Company shall not unreasonably withhold. Tragic shall give Company prompt notice of any third-party claim to which the foregoing indemnity applies and Company shall assume the defense of any such claim through counsel of Company's choice and at Company's sole expense. Tragic shall have the right to participate in such defense through counsel of Tragic's choice and at Tragic's expense.

        (c)    <u>Tragic's Warranties and Representations</u>. Tragic warrants and represents: (i) Tragic has the right and power to enter into and fully perform this Agreement, (ii) no agreement of any kind heretofore entered into by Tragic shall interfere in any manner with the complete performance by Tragic of this Agreement, and (iii) any items prepared by or otherwise furnished by Tragic or Distributor in connection with Products (e.g., Distributor's logo) and Distributor's performance of Distribution Services hereunder will not violate any law or infringe upon the rights of any third party.

        (d)    <u>Tragic's Indemnities</u>. Tragic agrees to and does hereby indemnify, save and hold Company and its affiliates, and each of their respective officers, directors and employees (collectively, for the purposes of this subparagraph 11(d) only, "Company") harmless from any and all loss and damage (including, without limitation, court costs and reasonable attorneys' fees as and when incurred) arising out of, connected with or as a result of any inaccuracy, inconsistency with, failure of, or breach or threatened breach by Tragic of any warranty, representation, agreement, undertaking or covenant contained in this Agreement. The foregoing indemnity shall be applicable only to such claims as have been reduced to judgment or settled with Tragic's written approval, which Tragic shall not unreasonably withhold. Company shall give Tragic prompt notice of any third party claim to which the foregoing indemnity applies and Tragic shall assume the defense of any such claim through counsel of Tragic's choice and at Tragic's sole expense. Company shall have the right to participate in such defense through counsel of Company's choice and at Company's expense.

    12.    <u>Security Interest</u>. To induce Tragic to enter into this Agreement, Company hereby irrevocably grants to Tragic a first priority security interest in and to all Source Materials, Products, all intellectual property rights in and to Products, all present and after-acquired inventory of Products and any proceeds derived from the sale of such inventory (the "Collateral") to secure the payment of any amounts which Company is required to pay pursuant to this Agreement. Company shall take all action reasonably necessary or as Tragic shall reasonably request to create, confirm or preserve the security interest granted herein, perfect a first priority lien in the Collateral and enable Tragic to exercise and enforce the rights, remedies and powers provided to it hereunder, including, without limitation, the execution and delivery to Tragic of UCC-1 financing statements and agreements and documents evidencing the security interest in Company's intellectual property constituting the Collateral, in each case, in appropriate form for filing in all appropriate filing jurisdictions. Company warrants and represents that Company has not granted and shall not grant or allow to exist any security interest or lien of any  kind in the Collateral other than the security interest granted herein.

    13.    <u>Force Majeure</u>. If because of: an act of God, inevitable accident, fire, lockout, strike or other labor dispute, riot or civil commotion, act of public enemy, enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign), failure of technical facilities, failure or delay of transportation facilities, shortage of raw

10 | P a g e

for Distribution and Administrative Assistance / August 21, 2017

materials, or other cause of a similar or different nature not reasonably within Tragic's, Distributor's or Company's control, as applicable (a "Force Majeure Event"), either party hereto is materially hampered in the performance of its obligations under this Agreement or its normal business operations are delayed or become impossible or commercially impracticable; then, without limiting such party's rights, the party affected by such Force Majeure Event shall have the option, by giving the other party notice, to suspend its obligations hereunder for the duration of any such contingency. Notwithstanding any such suspension, Tragic shall continue to account for Net Receipts to you as and when due, unless the event giving rise to such suspension makes it impracticable to do so. Any such suspension shall be limited to a period of six (6) months, after which, unless such suspension shall be lifted, the party not suspending its obligations hereunder may, during the pendency of such suspension, terminate this Agreement by notice in writing to the other party.

14.    Limitation on Tragic's Obligations.

(a)    Tragic shall have the right, without any liability to Company, to decline to manufacture or distribute and sell (or, as applicable, to cease to manufacture or distribute and sell):

(i)    any Product on the grounds of advocacy of illegal activity, patent offensiveness, invasion of rights of privacy and publicity and/or defamation or other violation of law or infringement of any rights of other persons, including, without limitation, rights of copyright and trademark, and

(ii)    any Product if Tragic reasonably believes that the manufacture or distribution and sale of such Product would constitute a material breach by Company of any of the warranties and representations contained herein.

(b)    Promptly after any new Product becomes available, Company shall send Tragic a copy of such new Product and artwork therefore. If, for any of the reasons set forth in subparagraph 14(a), Tragic elects not to manufacture or distribute and sell (or to cease to manufacture or distribute and sell) any particular Product pursuant to this Agreement, then Tragic shall promptly notify Company of such election, and with respect to such particular Product, Company shall have the right to exploit and/or to cause any third parties to exploit any or all of the rights otherwise herein granted to Tragic in connection therewith without any further obligation to Tragic with respect thereto under this Agreement.

15.    Definitions.

(a)    "ADA" - Alternative Distribution Alliance,

(b)    "Armed Forces Post Exchanges" - US military posts, ships' stores or other US armed forces facilities.

(c)    "Company Entities" - Company and any other entities in the recorded music business (i.e., businesses that acquire rights in recorded music) owned or controlled, directly or indirectly by Company or Chris Mueller or in which Company or Chris Mueller have a direct or indirect income interest (other than publicly traded stock or other securities).

11 | P a g e

AGREEMENT between Tragic Music and Defendant Records
for Distribution and Administrative Assistance / August 21, 2017

      (d)     "Confidential Information" - any information regarding or contained in This Agreement. Confidential Information shall not include information or documents known generally to the public or the recorded music industry other than as a result of an unauthorized disclosure by Tragic or Company.

      (e)     "Contract Year"- each consecutive twelve-month period of the Term (as such period may be suspended or extended as provided herein).

      (f)     "Direct to Consumer" – sales of music and merchandise sold online or otherwise directly to purchasers of such goods (except for sales at venues where the subject or title Artist is performing live for consumers).

      (g)     "Distributed Labels" - the other record labels distributed by Tragic other than those which hold equity in Tragic.

      (h)     "Distribution Services" - the following distribution services provided by Tragic to the Distributed Labels: (i) all field sales/merchandising activities (ii) solicitation, acceptance and processing of orders from customers, (iii) physical distribution, (iv) processing of returns for scrap or return to inventory, (v) inventory control and warehousing, (vi) invoicing and collection of customer accounts, (vii) processing and issuance of credits to customers, (viii) shipping services for promotional units of Products and point-of-purchase materials and (ix) handling, processing, administering and auditing co-operative advertising allowances and issuing credits therefor.

      (i)     "Distributor" - ADA.

      (j)     "Distributor Gross Sales" - (i) the number of units of Products shipped and invoiced for payment multiplied by (ii) the price or box lot price, to the extent that Products are distributed by ADA hereunder (after all rebates, adjustments, settlements, allowances, credits and discounts (other than cash discounts) approved by Company) charged by Distributor to Distributor's customers for all sales of Products.

      (k)     "Distributor Net Sales" – Distributor Gross Sales, net of actual returns.

      (l)     "Manufacturing and Packaging Services" - the following manufacturing and packaging services provided through Distributor to Tragic by the Manufacturing and Packaging Entities: (i) selection of suppliers, (ii) ordering units of Products, components therefor and all separations and merchandising materials relating thereto from various suppliers such as pressing plants, tape duplicators and printers including, without limitation, suppliers affiliated with Distributor, (iii) arranging shipment of components to various points, (iv) arranging shipment of finished units of Products from point of manufacture to Distributor or its customers, as the case may be and (v) inventory control with respect to the foregoing.

      (m)     "Music Merchandise" – Including but not limited to Shirts, Hoodies, Hats, Flags, Dog Tags, Guitar Picks and other durable goods.

      (n)     "Net Receipts" - Distributor Net Sales less:

          (i)     All manufacturing and packaging costs paid or incurred by

12 | P a g e

Distributor or Tragic on Company's behalf as an accommodation to Company,

(ii)      the Distribution Fee to be retained by Distributor and Tragic for their own account,

(iii)      All freight charges incurred by or on behalf of Distributor for shipping of units of Products at Company's written request other than as regular bulk freight,

(iv)      All freight charges incurred by or on behalf of Distributor for shipping of items from various suppliers to Distributor,

(v)      All freight charges incurred by or on behalf of Distributor for the shipping of units of Products referred to in subparagraph l(g)(viii),

(vi)      all content preparation charges and all other out-of-pocket third party amounts actually paid or incurred by Distributor in connection with the preparation or sale of units of Products via download, ringtones and the like, hereunder,

(vii)      all charges set forth to Tragic by ADA or any of its other Distributors, which shall be concurrent and in accordance with the charges applied by said Distributor generally to the Distributed Labels, as such charges may be modified from time to time for all Distributed Labels distributed via Tragic, and

(viii)      all other direct, out-of-pocket third-party expenses paid or incurred by Tragic or Distributor, if any, directly attributable to the manufacture, sale, marketing, advertising, promotion, distribution and exploitation of Products and expressly permitted to be charged to Company pursuant to this Agreement or otherwise.

(o)      "Normal Distribution Channels" - the distribution channels through which Distributor normally distributes audio-only and audio-visual music products, as well as durable goods products including Internet and on-line distribution of products in physical form and products other than in physical form (e.g., "downloads", "Streams" and "ringtones/ringbacks" and the like including via subscription) but specifically excluding record clubs, television sales, "band sales on the road" (i.e., the sale of units of Products at local venues where Company's artists are giving live musical performances), premium sales and licensing of individual master recordings. Notwithstanding the foregoing, with respect to licensing master recordings for third party records (as opposed to synchronization licenses), Company shall not so license more than two master recordings embodied on any individual Product (and may only license such master recordings for use on one record or record set) unless Tragic gives prior written approval to the contrary. All "band sales on the road and sales of Product on Company's website are to be purchased from Tragic at a price of $3.50 per unit (all payments for physical units shall be made to us prior to our shipment of the requested quantities),

(p)      "Products" - all audio-only and audio-visual recordings owned or controlled, directly or indirectly, in the Territory by the Company Entities which the Company Entities wish to release in the Territory.

13 | P a g e

AGREEMENT between Configuration Music / Crashant Records for Distribution and Administrative Assistance / August 21, 2017

(q) "Replacement Cost" − the price paid by or charged to Company for pressing or duplicating units of Products including, without limitation, manufacturing, shrink wrapping, covers, sleeves, labels and similar accessories or inserts and applicable freight costs, without any margin of profit to Company.

(r) "Source Materials" − collectively, the material necessary to manufacture units of Products and all materials necessary to manufacture packaging, inserts and stickers including, without limitation, various components thereof.

(s) "Surplus Units" - more than a six-month supply (as determined in Tragic's good faith business judgment) of units of a particular Product.

(t) "Term" - shall mean the period commencing on January 1, 2017 (the "Effective Date") and continue for a period of One (1) Calendar Contract Year (the "Term"). Notwithstanding the foregoing, if, as of the anniversary (or any subsequent anniversary if extended by mutual agreement) of the Effective Date, the Advances have not been fully recouped by Tragic, then, at Tragic's option exercisable by written notice to Company, the Term shall be extended until 60 days following the sooner of: (i) the end of the month in which Company repays to Tragic the un-recouped amount; or (ii) the end of the month in which the Advances are fully recouped by Tragic. In no event shall the Term expire for any Product delivered during the Term prior to the date 12 months following the initial commercial release of any Product hereunder.

(u) "Territory" – Throughout the world (worldwide)

(t) "Tragic" – The Tragic Hero Music Group, Inc.

16. Confidentiality. Neither Tragic nor Company shall disclose or reveal to any person or entity any Confidential Information, except as required by law or court order. Either party hereto may disclose Confidential Information to its attorneys under privilege, to its accountants and to any other third parties on a "need to know" basis, provided that the recipients of such Confidential Information (other than attorneys or accountants) are bound in writing by a confidentiality agreement in a form acceptable to the other party hereto and to which the other party hereto is a party. No party hereto shall make a press release or public announcement concerning this Agreement without the written consent of the other party hereto.

17. Miscellaneous.

(a) Entire Agreement, Modification, Waiver, This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and supersedes all previous agreements or arrangements between the parties hereto relating to the subject matter hereof. This Agreement cannot be changed or terminated except by an instrument signed by the authorized signatories of the parties. A waiver by either party of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof All remedies, rights, undertakings, obligations,

14 | P a g e

and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party. Should any provision of this Agreement be adjudicated by a court of competent jurisdiction as void, invalid or inoperative, such decision shall not affect any other provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative provision had not been contained herein. This Agreement shall not become effective until executed by all parties hereto. This Agreement may be executed in two or more counterparts each of which shall be deemed to be an original and all of which, when taken together, shall constitute one and the same Agreement.

(b)     Assignment. Either party hereto (the "Assignor") shall have the right without the consent of the other party (the "Other Party") to assign this Agreement in whole or in part, but only if (i) the Other Party's rights and interests under this Agreement are not diminished or otherwise altered as a result of the assignment, (ii) the Assignor, in addition to the assignee, shall in all respects remain liable to the Other Party under this Agreement notwithstanding the assignment and (iii) prior to the assignment and at any times thereafter as the Other Party may reasonably require, the Assignor shall cause the assignee to execute and deliver to the Other Party all documents which the Other Party may reasonably require in connection with the assignment and/or this Agreement.

(c)     Transfers. Sales, Assignment or Encumbrances, Notwithstanding subparagraph 17(b) above, Company represents, warrants and covenants that as an express and written condition to (i) any transfer, sale, assignment, or encumbrance of all or substantially all of Company's assets (including but not limited to the Products), (ii) any transfer, sale, assignment or encumbrance of a majority or controlling interest in Company or its parent corporation, if any, or (iii) any other transaction or arrangement transferring the ownership or the license of any of the Products, this Agreement shall remain in full force and effect, and shall be binding upon all the parties to any such transfer, sale, assignment, encumbrance or transaction including but not limited to Company and any such purchaser, transferee or assignee. Notwithstanding any such sale, assignment, transfer or transaction, Company represents, warrants and covenants that it shall remain fully liable for the obligations of such purchaser, transferee or assignee or any other party to such transaction, unless Tragic shall have previously, in writing, agreed to look only to such purchaser, assignee, transferee or other party to the transaction and has agreed to release Company from its obligations under this Agreement. Company further represents, warrants and covenants that, in the event Tragic is required to commence a lawsuit to enforce the terms of this provision, Tragic will have no adequate remedy at law and will be entitled to injunctive relief as well as the expenses, including reasonable attorneys' fees, incurred by Tragic in enforcing the terms of this provision.

(d)     Breach, Notice and Cure. Other than a breach of the exclusivity provisions hereof, no breach of this Agreement by Company shall be deemed material unless within 60 days after Tragic learns of such breach, Tragic serves written notice on Company specifying the nature thereof and Company fails to cure such breach, if any, within 30 days after receipt of such notice (or 10 days in the case of a failure by Company to pay a sum certain). No breach of this Agreement by Tragic shall be deemed material unless within 60 days after Company learns of such breach, Company serves written notice on Tragic specifying the nature thereof and Tragic fails to cure such breach, if any, within 30 days after receipt of such notice (or 10 days in the case of a failure by Tragic to pay a sum certain).

15 | P a g e

AGREEMENT 84 / Configuration Name: Merchant Records
for Distribution and Administrative Assistance / August 21, 2017

(e)  Further Assurances. Tragic and Company each agree to execute and deliver all such other and additional instruments and documents and to do such other acts and things as may be necessary to more fully effectuate this Agreement.

(f)  Equitable Relief. Each of Tragic and Company recognizes that its rights and obligations hereunder with respect to the performance of non-monetary obligations are unique and that damages at law will be an inadequate remedy for breach or threatened breach of such provisions of this Agreement, and agrees that the parties' respective rights and obligations hereunder with respect to such non-monetary obligations shall be enforceable by specific performance, injunction or other equitable remedy.

(g)  Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of, and shall be enforceable by, each of the parties hereto and their respective successors, heirs, assigns and designees.

(h)  Notices. All notices which any party hereto is required or may wish to give the other shall be given by delivering, mailing or faxing the same to the other at the addresses specified below:

Company:  Formant Records
_____
_____
Attn: _____
Fax: _____

Tragic:  Tragic Hero Music Group, Inc
2230 Superior Avenue, 1st Floor
Cleveland, OH 44114
Attn: Randy Chase
Fax: 480.275.3451

All notices shall be deemed effective upon their receipt.

(i)  No Agency. Company and Tragic each shall have the status of an independent contractor and nothing herein contained shall contemplate or constitute Company as Tragic's agent or employee or Tragic as Company's agent or employee. This Agreement does not constitute or acknowledge any partnership or joint venture between Company and Tragic.

(j)  Construction, Jurisdiction, Venue. This Agreement has been entered into in the State of Ohio, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of Ohio applicable to contracts entered into and performed entirely within the State of Ohio, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance or breach of this Agreement, Company and Tragic each agree to submit to the jurisdiction of the Federal or State courts located in Cleveland, Ohio/Cuyahoga County in any action which may arise out of this Agreement and said courts shall have exclusive jurisdiction over all disputes between Tragic and Company pertaining to this Agreement and all matters related thereto.

(k)  Captions. The captions herein contained are inserted solely for reference

16 | P a g e

and shall not constitute a part of this Agreement nor affect its construction, meaning or effect.

If the foregoing is acceptable, please acknowledge the same by signing in the appropriate places below.

FORMANT RECORDS
A Utah _____ Company

By: _____
_____, PRESIDENT

TRAGIC HERO MUSIC GROUP, INC
An Ohio Corporation

By: _____
An Authorized Signatory

ACCEPTED AND AGREED TO ONLY
INSOFAR AS REFERENCES PERTAIN
TO OR COUPLE ME PERSONALLY
WITH COMPANY:

_____
President, Formant Records

17 | P a g e

**AGREEMENT** 84 / Configuration Music and Formant Records
for Distribution and Administrative Assistance / August 21, 2017

Motion No.  <u>4714113</u>



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**MOTION FOR EXTENSION OF TIME**
September 5, 2018 13:51

By: JAMES P. SAMMON 0064212

Confirmation Nbr. 1485576

IAN COOPERSTEIN, ET AL.                          CV 18 897744

      vs.

TRAGIC HERO MUSIC GROUP, INC., ET AL.            **Judge:**  KATHLEEN ANN SUTULA

**Pages Filed:**  4

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| IAN COOPERSTEIN, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO. CV-18-897744 |
| | ) | |
| -v- | ) | |
| | ) | JUDGE KATHLEEN ANN SUTULA |
| TRAGIC HERO MUSIC GROUP, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

---

**MOTION FOR EXTENSION OF TIME TO RESPOND TO
PLAINTIFF/COUNTERCLAIM DEFENDANTS' MOTION FOR LEAVE TO FILE
AMENDED COMPLAINT AND MOTION TO DISMISS COUNTERCLAIMS**

---

Pursuant to Civ. **R.** 6(B) and Loc. **R.** 8(C) of the Cuyahoga County Court of Common Pleas, General Division, Tragic Hero Music Group, Inc. ("***Tragic Hero***") and Tommy LaCombe ("***LaCombe***") (collectively the "***Defendants/Counterclaim Plaintiffs***"), by and through counsel, file this Motion for Extension of Time to respond to Ian Cooperstein ("***Cooperstein***") and Bryan Lee's ("***Lee***") (collectively, the "***Plaintiffs/Counterclaim Defendants***"): (i) Motion for Leave to File Amended Complaint (the "***Motion for Leave***"); and (ii) Motion to Dismiss Counterclaims (the "***Motion to Dismiss***") (together, the "***Motions***").

Plaintiffs/Counterclaim Defendants filed the Motions via the Court's electronic filing system on August 29, 2018. Pursuant to Loc.R. 11.0(C), Defendants/Counterclaim Plaintiffs' response is currently due on or before September 5, 2018. Defendants/Counterclaim Plaintiffs respectfully request that this Court grant them additional time, up to and including **September 19, 2018**, to respond to the Motions.

Additional time is necessary to allow Defendants/Counterclaim Plaintiffs to properly respond to the Motions, which contain lengthy arguments, *inter alia*, alleging malicious prosecution and retaliation in violation of the Fair Labor Standards Act merely by exercising the right to file a counterclaim. Although these allegations are meritless, additional time is necessary especially in light of the intervening holiday and busy travel schedules. This is Defendants/Counterclaim Plaintiffs' first request for an extension of time to respond to the Motions, and is not being made for the purpose of delay.

Accordingly, Defendants/Counterclaim Plaintiffs respectfully request an additional fourteen (14) days, up through and including **September 19, 2018**, to respond to the Motions. For the Court's convenience, a proposed journal entry is attached as Exhibit A and is being separately uploaded through the Court's electronic docketing system.

Respectfully submitted,

**KOHRMAN JACKSON & KRANTZ LLP**

*/s/ James P. Sammon*
JAMES P. SAMMON (0064212)
KYLE A. HUTNICK (0095673)
One Cleveland Center, 29th Floor
1375 East Ninth Street
Cleveland, Ohio 44114
Phone: 216-696-8700
Fax: 216-621-6536
Email: jpsammon@kjk.com; kah@kjk.com

*Counsel for Defendants/Counterclaim Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing was sent this 5th day of September, 2018 via the Court's electronic filing system to the following:

Bradley A. Sherman
F. Allen Boseman
Sherman Boseman Legal Group, LLC
800 West St. Clair Avenue
4th Floor
Cleveland, OH 44113
Phone: 216-314-2289
E-mail: Bradley@shermanboseman.com
Allen@shermanboseman.com

/s/ James P. Sammon
James P. Sammon

**EXHIBIT A**

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| IAN COOPERSTEIN, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO. CV-18-897744 |
| | ) | |
| -v- | ) | |
| | ) | JUDGE KATHLEEN ANN SUTULA |
| TRAGIC HERO MUSIC GROUP, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

---

## PROPOSED ORDER

---

This matter is before the Court on Defendants/Counterclaim Plaintiffs Tragic Hero Music Group, Inc. and Tommy LaCombe's (collectively the "***Defendants/ Counterclaim Plaintiffs***") Motion for Extension of Time to respond to Ian Cooperstein and Bryan Lee's (collectively, the "***Plaintiffs/Counterclaim Defendants***"): (i) Motion for Leave to File Amended Complaint (the "***Motion for Leave***"); and (ii) Motion to Dismiss Counterclaims (the "***Motion to Dismiss***") (together, the "***Motions***").

After due consideration, and for good cause shown, Defendants/Counterclaim Plaintiffs' Motion for Extension of Time is hereby GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendants/Counterclaim Plaintiffs are granted an additional fourteen (14) days, up to and including **September 19, 2018**, to respond to the Motions.

IT IS SO ORDERED.

_____          _____
DATE                                    JUDGE KATHLEEN ANN SUTULA



105559921

# IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

IAN COOPERSTEIN, ET AL.
    Plaintiff

Case No: CV-18-897744

Judge: KATHLEEN ANN SUTULA

TRAGIC HERO MUSIC GROUP, INC., ET AL.
    Defendant

## __JOURNAL ENTRY__

DEFENDANTS' MOTION FOR EXTENSION OF TIME, FILED 9/5/2018, IS UNOPPOSED AND GRANTED.

_____
Judge Signature          09/20/2018

09/20/2018



105559877

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

IAN COOPERSTEIN, ET AL.
    Plaintiff

TRAGIC HERO MUSIC GROUP, INC., ET AL.
    Defendant

Case No: CV-18-897744

Judge: KATHLEEN ANN SUTULA

## <u>JOURNAL ENTRY</u>

PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT, FILED 8/29/2018, IS UNOPPOSED AND GRANTED.

_____
Judge Signature          09/20/2018

09/20/2018



104687988

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

IAN COOPERSTEIN, ET AL.
    Plaintiff

Case No: CV-18-897744

Judge: KATHLEEN ANN SUTULA

TRAGIC HERO MUSIC GROUP, INC., ET AL.
    Defendant

## **JOURNAL ENTRY**

CASE MANAGEMENT CONFERENCE SET FOR 8/9/2018 AT 8:00 A.M. COUNSEL FOR PLAINTIFF(S) SHALL INFORM ALL OPPOSING COUNSEL AND/OR PRO SE PARTIES, IN WRITING, OF THIS DATE AND TIME. COUNSEL FOR ALL PARTIES ARE REQUIRED TO BE PRESENT IN PERSON AND TO BE FAMILIAR WITH THE UNDERLYING FACTS OF THE CASE.  PARTIES NOT REPRESENTED BY COUNSEL SHALL LIKEWISE BE PRESENT IN PERSON.  FAILURE OF ANY KIND OF THE AFOREMENTIONED PERSONS TO APPEAR AT THIS PROPERLY SCHEDULED CASE MANAGEMENT CONFERENCE MAY RESULT IN SANCTIONS INCLUDING DISMISSAL OF THE CASE AND/OR JUDGMENT BEING RENDERED.

IF A CONTINUANCE IS SOUGHT FOR ANY REASON, PLEASE FILE THE APPROPRIATE MOTION AT LEAST SEVEN DAYS BEFORE THE SCHEDULED EVENT. DO NOT CALL THE COURT. DATES CANNOT BE CONSIDERED FOR CONTINUANCE UNLESS A MOTION HAS BEEN DOCKETED AND HAND-DELIVERED TO THE COURT.

_KA Sutula_

Judge Signature            07/24/2018

07/20/2018

RECEIVED FOR FILING
07/24/2018 15:56:37
NAILAH K. BYRD, CLERK



105301089

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

IAN COOPERSTEIN, ET AL.
    Plaintiff

Case No: CV-18-897744

Judge: KATHLEEN ANN SUTULA

TRAGIC HERO MUSIC GROUP, INC., ET AL.
    Defendant

## <u>JOURNAL ENTRY</u>

CASE MANAGEMENT CONFERENCE CONDUCTED 8/30/2018. THE FOLLOWING DATES, IN ADDITION TO THE DATES
SET FORTH IN THE TRIAL ORDER, APPLY:

1. ALL DISCOVERY TO BE COMPLETED BY 12/21/2018.

2. ALL DISPOSITIVE MOTIONS ARE TO BE FILED BY NOT LATER THAN 1/21/2019. ALL RESPONSES DUE IN
ACCORDANCE WITH LOC.R. 11.

3. TRIAL SCHEDULED FOR 5/6/2019 AT 8:00 A.M.

4. TRIAL ORDER ENTERED. O.S.J.

*O.S.J.*

_____
Judge Signature              Date

FILED
2018 SEP -5 A 9 53
CLERK OF COURTS
CUYAHOGA COUNTY

| STATE OF OHIO | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF CUYAHOGA | ) | CIVIL ACTION NO. _*897744*_ |
| | ) | |
| _Cooperstein, et al_., Plaintiff(s) | ) | JUDGE KATHLEEN ANN SUTULA |
| | ) | |
| vs. | ) | |
| | ) | |
| _Tragic Hero_, Defendant(s) | ) | **TRIAL ORDER** |
| _Music Group, Inc. et al._ | | |

IT IS ORDERED AS FOLLOWS:

1.　　**THIS CASE IS SCHEDULED FOR TRIAL ON** _5/6/19_ **AT 8:00 A.M. ON A STAND-BY BASIS, FOR A PERIOD OF ONE WEEK.** Counsel must report any conflict between this trial date and any pre-planned personal events involving themselves, their client(s), or any material/expert witness to the Court within 30 days of this Order, and said trial date will be moved to accommodate the same. No trial continuances based on such matters will be granted after the expiration of this period. Conflicts with other Court appointments will be handled in accordance with the Supreme Court of Ohio Rules of Superintendence.

2.　　ALL DISCOVERY, including all discovery depositions, to be completed by _12/21/18_

2(a).　　Any discovery disputes must be resolved or brought to the Court's attention in ample time to permit compliance prior to the expiration of the discovery deadline.

3.　　Unless otherwise ordered, motions for summary judgment, if any, may only be filed with leave of Court in accordance with Civ. R. 56(B) and not later than 10 days after the discovery deadline established in (2) above. Said motions are to be filed instanter with a motion for leave. Responses to motions for summary judgment are due within 10 days after the filing of the Motion for Leave and Motion for Summary Judgment whether or not the Court has issued a ruling on the Motion for Leave.

4.　　ALL DEPOSITIONS for **USE AT TRIAL** must be completed 2 weeks prior to the trial date scheduled herein. The Court shall not grant leave to conduct depositions after this deadline for any reason, including continuance of trial, even if said continuance is due to the Court's engagement in another trial. Objections to "unavailability" are not waived by participation in videotaped depositions. All deposition transcripts must be filed with the Clerk by not later than 7 calendar days before trial. Failure to file a transcript will result in the exclusion of said testimony. Deposition transcripts shall be brought to the Court at least 5 calendar days prior to trial.

UNDISPUTED FACT STIPULATIONS

5.　　Counsel for the Plaintiff shall prepare and submit proposed stipulations to opposing counsel and this Court by not later than 7 days after the close of discovery as to undisputed facts for use at trial and submission to the jury in the event of a jury trial. Opposing counsel shall add to and note specific reasons for disagreement, if any, with the proposed stipulation in the same manner as required by Civil Rule 36(A)(2) and so notify counsel for the Plaintiff as to proposed additions, deletions or objections by not later than 14 days after the close of discovery. **-NEXT PAGE-**

Counsel shall then meet and put in final form the stipulation as to undisputed facts, reserving any objections as to relevance, and submit the signed stipulations to the Court by not later than 21 days after the close of discovery.

STIPULATIONS AS TO THE AUTHENTICITY OF ALL DOCUMENTS/EXHIBITS SHALL BE AGREED UPON UNLESS CREDIBLE EVIDENCE TO THE CONTRARY EXISTS.

### SETTLEMENT CONFERENCE

6. Plaintiff shall arrange a settlement conference to be conducted after all discovery has been completed, and not later than 1 week prior to the scheduled trial date. All persons with full settlement authority must attend in person. Said conference shall be at the Plaintiff's firm unless another site is otherwise mutually agreed upon.

All parties must negotiate in good faith.

### TRIAL BRIEFS

7. Complete trial briefs **shall** be filed and delivered to the Court's chambers by not later than 7 calendar days prior to trial. A complete trial brief includes: (a) a statement of the facts; (b) a discussion of the controlling law; (c) a list of proposed witnesses along with a brief description of the subject matter of the testimony of each witness; (d) an index of all proposed exhibits containing a brief description of each exhibit; and (e) a discussion of any evidentiary issues likely to arise at trial. Trial briefs also shall include any unique or sensitive proposed *voir dire* questions. (Traditional or boilerplate *voir dire* questions need not be provided.)

8. Motions in Limine **shall** be filed at any time between the close of discovery and by not later than 7 days prior to trial. Responses are due 3 days prior to trial.

9. **Counsel must file a list of all filed deposition transcripts that are to be utilized at trial by not later than 10 calendar days prior to trial. Counsel must confer and present a list of all objections for which a ruling is desired as well as a list of withdrawn objections on said date. Failure to submit said list shall result in waiver of all objections.**

10. *Witnesses or exhibits not listed in the trial brief shall not testify or be introduced at trial absent a showing of good cause.*

11. In a **jury** case, counsel shall submit proposed jury instructions with applicable O.J.I. or case citations, as well as verdict forms and any interrogatories by not later than 14 calendar days prior to trial. Any objections to the submitted proposed jury instructions, verdict forms and any interrogatories shall be submitted by not later than 7 calendar days prior to trial.

12. All proposed jury instructions, verdict forms, and interrogatories shall be provided to the Court on disc as well as hard copy. All proposed jury instructions, verdict forms, and interrogatories shall be properly formatted in Microsoft Word.

13. In a **bench** trial, counsel shall submit Proposed Findings of Fact and Conclusions of Law in addition to the trial brief.

**-OVER-**

<u>EXHIBITS</u>

14.     Two (2) copies of all exhibits shall be hand delivered to the Court 2 business days prior to the scheduled trial date.  These two (2) copies are for the Court's use.  The original exhibits are to be introduced by counsel the day of the trial.  Counsel shall also exchange copies of all exhibits and exhibit indexes on this date.  Any exhibit containing more than 20 pages must be Bates stamped in numerical order. If the total pages of exhibits exceeds 100 pages, these exhibits are to be provided in a three ring binder. This exchange of exhibits does not take the place of discovery.

15.     Exhibits shall be marked before trial with exhibit stickers. The plaintiff shall mark exhibits with numbers and the defendant shall mark exhibits with letters.  If there are multiple parties, numbers or letters shall be used, followed by the party's last name (*i.e.,* "1 – Miller" or "A – Jones"). If the defendant has more than twenty-six (26) exhibits, double letters shall be used (*i.e.,* "AA", "BB", etc.)

16.     An exhibit index shall be provided listing all exhibits as well as the rule or witness authenticating the exhibit.

<u>**NOTICE TO COUNSEL**</u>

**COUNSEL ARE ADVISED THAT PENDING MOTIONS, INCLUDING PENDING DISPOSITIVE MOTIONS, DO NOT TOLL ANY OF THE REQUIREMENTS HEREIN.**

**COUNSEL ARE FURTHER ADVISED THAT FAILURE TO COMPLY WITH ANY PORTION OF THIS TRIAL ORDER MAY RESULT IN THE IMPOSITION OF MONETARY SANCTIONS AS WELL AS DISMISSAL OF THE ACTION WITH PREJUDICE OR JUDGMENT BEING RENDERED.**

*If the case is settled or dismissed, counsel must notify this Court via telephone before the scheduled trial date or fines will be imposed.  Notification must be to a member of the Court's staff. The duty to inform the Court of settlement shall be borne equally by all counsel on the case, and all counsel will be fined if the Court is not properly advised of settlement. Furthermore, if the Court is not advised of the matter's disposition prior to trial date, and the parties do not appear for trial, the case shall be dismissed, with prejudice, for want of prosecution.*

DATE: ___9-4-18___     _____
                                KATHLEEN ANN SUTULA, JUDGE

**I acknowledge that I have read and understand all of the requirements contained in the Court's Trial Order, and I further acknowledge that I have received a copy of the Court's Trial Order.**

_____          _____
(Counsel for Plaintiff)                                  (Counsel for Defendant)


_____          _____
(Counsel for Plaintiff)                                  (Counsel for Defendant)


_____          _____
(Counsel for Plaintiff)                                  (Counsel for Defendant)

DATE: 8/30/18

Rev. 3/30/2018



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

**Court of Common Pleas**

**NOTICE OF**
**August 15, 2018 13:09**

By: F. ALLEN BOSEMAN 0084103

Confirmation Nbr. 1467653

IAN COOPERSTEIN, ET AL.                                    CV 18 897744

vs.

TRAGIC HERO MUSIC GROUP, INC., ET AL.        **Judge:**  KATHLEEN ANN SUTULA

**Pages Filed:**  2

IN THE COURT OF COMMON PEAS
CUYAHOGA COUNTY, OHIO

IAN COOPERSTEIN, et al.,                    :
                                            :
        Plaintiffs,                         :     CASE NO. CV-18-897744
                                            :
v.                                          :     JUDGE KATHLEEN ANN SUTULA
                                            :
TRAGIC HERO MUSIC GROUP, INC., et al.,      :
                                            :
        Defendants.                         :

**PLAINTIFFS' NOTICE OF EXTENSION OF TIME
TO RESPOND TO DEFENDANTS' COUNTERCLAIMS**

Plaintiffs Ian Cooperstein and Bryan Lee ("Plaintiffs"), by and through their undersigned counsel, hereby give notice that Plaintiffs and Defendants Tragic Hero Music Group, Inc. and Tommy LaCombe ("Defendants") have agreed to a thirty (30) day extension of time, up to and including September 12, 2018, for Plaintiffs to move, answer, or otherwise plead in response to Defendants' Counterclaims filed on July 12, 2018.

Counsel for Plaintiffs' daughter was born on July 31, 2018 and, on that same day, the 30-day extension was requested and Defendants' counsel agreed to grant Plaintiffs until September 12, 2018 to move, answer or otherwise plead in response to Defendants' Counterclaims. Therefore, the extension was not requested for the purpose of delay, but out of necessity to properly respond to the Counterclaims.

Respectfully submitted,


*/s/ F. Allen Boseman, Jr.*
F. Allen Boseman, Jr (0084103)
Bradley A. Sherman (00639060)
SHERMAN BOSEMAN LEGAL GROUP, LLC
800 West St. Clair Avenue, 4th Floor
Cleveland, OH  44113
Telephone:  216.239.1414
Facsimile:   216.239.1316
Email:  allen@shermanboseman.com
          bradley@shermanboseman.com

Attorney for Plaintiffs
IAN COOPERSTEIN and BRYAN LEE


## CERTIFICATE OF SERVICE

I hereby certify that, on August 15, 2018, a copy of the foregoing *Plaintiffs' Notice of Extension of Time to Respond to Defendants' Counterclaims* was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


*/s/ F. Allen Boseman, Jr.*
F. Allen Boseman, Jr.

Attorney for Plaintiffs
IAN COOPERSTEIN and BRYAN LEE



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

**Court of Common Pleas**

**NOTICE OF**
**September 19, 2018 15:59**

By: JAMES P. SAMMON 0064212

Confirmation Nbr. 1499261

IAN COOPERSTEIN, ET AL.                               CV 18 897744

      vs.

                                   **Judge:**  KATHLEEN ANN SUTULA

TRAGIC HERO MUSIC GROUP, INC., ET AL.

**Pages Filed:**  2

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **IAN COOPERSTEIN, ET AL.,** | ) |
| | ) |
| Plaintiffs, | ) CASE NO. CV-18-897744 |
| | ) |
| **-v-** | ) |
| | ) JUDGE KATHLEEN ANN SUTULA |
| **TRAGIC HERO MUSIC GROUP, ET AL.,** | ) |
| | ) |
| Defendants. | ) |
| | ) |

---

### NOTICE OF NON-OPPOSITION TO PLAINTIFFS/COUNTERCLAIM DEFENDANTS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

---

Defendants Tragic Hero Music Group, Inc. ("***Tragic Hero***") and Tommy LaCombe ("***LaCombe***") (together, the "***Defendants/Counterclaim Plaintiffs***"), by and through counsel, hereby give notice that they do not oppose the Motion for Leave to File Amended Complaint (the "***Motion for Leave***") filed by Ian Cooperstein ("***Cooperstein***") and Bryan Lee ("***Lee***") (together, the "***Plaintiffs/Counterclaim Defendants***").

Although the allegations in the Amended Complaint are substantively meritless, this Court should grant the Motion for Leave and deem the Amended Complaint filed on the date that leave is granted.

Respectfully submitted,

**KOHRMAN JACKSON & KRANTZ LLP**

*/s/ James P. Sammon*
JAMES P. SAMMON (0064212)
KYLE A. HUTNICK (0095673)
One Cleveland Center, 29th Floor
1375 East Ninth Street
Cleveland, Ohio 44114
Phone: 216-696-8700
Fax: 216-621-6536
Email: jpsammon@kjk.com; kah@kjk.com
*Counsel for Defendants/Counterclaim Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was sent this 19th

day of September, 2018 via the Court's electronic filing system to the following:

Bradley A. Sherman
F. Allen Boseman
Sherman Boseman Legal Group, LLC
800 West St. Clair Avenue
4th Floor
Cleveland, OH  44113
Phone: 216-314-2289
E-mail:       Bradley@shermanboseman.com
              Allen@shermanboseman.com


*/s/ James P. Sammon*
James P. Sammon



104687982

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

IAN COOPERSTEIN, ET AL.
    Plaintiff

Case No: CV-18-897744

Judge: KATHLEEN ANN SUTULA

TRAGIC HERO MUSIC GROUP, INC., ET AL.
    Defendant

## <u>JOURNAL ENTRY</u>

ALL WRITTEN DISCOVERY IS TO BE SERVED BY NOT LATER THAN 8/7/2018.

_____

Judge Signature          07/24/2018

07/20/2018